IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| OHIO VALLEY ENVIRONMENTAL COALITION, et al., <br>　　　　Plaintiffs, <br><br>v. <br><br>UNITED STATES ARMY CORPS OF ENGINEERS, <br>　　　　Defendants. | ) <br> ) <br> ) <br> ) Civil Action No. 3:05-0784 <br> ) Civil Action No. 3:06-0438 <br> ) <br> ) <br> ) <br> ) |

**FOURTH SUPPLEMENTAL COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

**Introduction**

1. Plaintiffs incorporate by reference the allegations in their prior initial, amended and supplemental complaints in this action.

2. This Fourth Supplemental Complaint adds a challenge to the recently-issued mine permit for Spruce No. 1 Mine to the challenges already brought against several other mines in Plaintiffs' prior initial and supplemental Complaints. In particular, this supplemental complaint challenges the U.S. Army Corps of Engineers' January 22, 2007 decision to issue individual permit No. 199800436-3 under Section 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344, to Mingo Logan Coal Company, allowing it to disturb 2,278 acres of forest land and permanently bury over seven miles of West Virginia streams with mining waste rock and dirt generated by its Spruce No. 1 Mine near Blair, West Virginia. The Corps' issuance of this permit violates the CWA and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 706(2)(A).

3. Plaintiffs ask the Court to (1) declare that the Corps violated its statutory and regulatory duties under the CWA and NEPA, (2) issue an injunction requiring the Corps to rescind the Spruce No. 1 Mine permit, (3) enjoin the Corps from authorizing any further mining, valley fills or sedimentation ponds in connection with this mine mines until it complies with the CWA and NEPA, and (4) award to the Plaintiffs their costs and expenses, including reasonable attorneys' and expert witness fees.

4. Plaintiffs' members will suffer injury to their aesthetic, recreational, environmental and/or economic interests as a result of the Corps' issuance of the permit for the Spruce No. 1 Mine. Plaintiffs have members and staff that live in and frequently travel throughout southern West Virginia in order to enjoy the natural beauty of the area, including mountains, forests, rivers and streams, and the extraordinary array of wildlife living in the area. These members observe and experience the adverse impacts of mountain top removal mining and other surface mining activities, including changes to the landscape, deforestation, impaired or destroyed streams, and discharges of air and water pollutants in or near areas where the Plaintiffs' members live, travel and recreate. Plaintiffs' members and staff will suffer harm to their aesthetic, recreational, environmental and/or economic interests if the Spruce No. 1 Mine is allowed to conduct destructive valley fill activities and associated mining activities that do not comply with the law.

**Statutory and Regulatory Background**

5. Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal, the CWA prohibits the discharge of any pollutant, including dredged spoil or other fill material, into navigable waters unless authorized by a permit. Id., § 1344.

2

6. The CWA authorizes the Secretary of the Army to issue permits, under certain circumstances, "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." Id., § 1344(a). The Secretary of the Army acts through the Chief of Engineers of the U.S. Army Corps of Engineers. Id., § 1344(d); 33 C.F.R. § 323.6(a).

7. The U.S. Environmental Protection Agency, in conjunction with the Corps, has developed Guidelines for discharging fill material under § 404 of the CWA. 40 C.F.R. § 230.2(a). Under Corps policies, a § 404 permit "will be denied if the discharge that would be authorized by such permit would not comply with" the Guidelines. 33 C.F.R. § 320.4(a).

8. Pursuant to the Guidelines, no permits shall be issued that "will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c).

9. Findings of significant degradation must be based on several factual determinations, including a determination about "the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem and organisms." Id., § 230.11(e).

10. Under the Guidelines, the Corps must adopt practicable alternatives that avoid environmental impacts of the discharge. 40 C.F.R. § 230.10(a). It must also take "appropriate and practicable steps" to "minimize potential adverse impacts of the discharge on the aquatic ecosystem." Id., § 230.10(d). A 1990 Memorandum of Agreement between the Corps and EPA interprets the Guidelines to mean that "[a]ppropriate and practicable compensatory mitigation is required for unavoidable adverse impacts which remain after all appropriate and practicable minimization has been required." EPA/Corps Memorandum of Agreement (Feb. 6, 1990), Section II (1990 MOA).

3

11.  It is Corps policy that "[i]n determining compensatory mitigation, the functional

values lost by the resource to be impacted must be considered."  1990 MOA, Section II.  On May

7, 2004, the Corps issued a guidance document in which it stated that:

> The Clean Water Act, and the Corps implementing regulations and policies, requires that
> compensatory mitigation projects <u>replace aquatic functions</u> lost as a result of authorized
> activities.  Ideally, stream functions lost as a result of permanent fills are replaced by
> compensatory mitigation projects that provide equivalent or similar stream functions
> within the same watershed.

"Mitigation for Impacts to Aquatic Resources from Surface Coal Mining," p. 3 (emphasis

added).  This guidance also states that "[t]he amount of mitigation credit should be based on an

assessment procedure that identifies the amount of 'ecological lift' provided by compensatory

mitigation plans. 'Ecological lift' means an <u>increase in aquatic functions</u>." <u>Id</u>. at 4 (emphasis

added).

12.  The Corps' significant degradation determination must be based on the "effects

contributing to significant degradation considered individually or collectively."  40 C.F.R. §

230.10(c). The determinations of effects of each proposed discharge "shall include" a

"determination of the cumulative effects on the aquatic ecosystem." <u>Id</u>., § 230.11 and (g).

"Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the

collective effect of a number of individual discharges of dredged or fill material." <u>Id</u>., §

230.11(g)(1). The Guidelines warn that the cumulative effect of piecemeal changes can result in

major impairment of water resources and interfere with existing aquatic ecosystems. <u>Id</u>., §

230.11(g)(2). Cumulative effects "should be predicted to the extent reasonable and practical." <u>Id</u>.

13.  NEPA requires federal agencies to prepare a detailed environmental impact statement

(EIS) for every major Federal action significantly affecting the quality of the human

4

environment. 42 U.S.C. § 4332(2)(C).

14.  If an EIS is prepared, it must include an analysis of direct and indirect environmental "effects" of the proposed action, including "cumulative" impacts and "cumulative actions." 40 C.F.R. §§ 1502.16, 1508.8, 1508.25(a)(2).

15.  A "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." Id. Cumulative actions are actions "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." Id. § 1508.25(a)(2). "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." Id.

16.  NEPA requires that the Corps "insure the . . . scientific integrity of the discussions and analyses" in an EIS and "make explicit reference . . . to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24.

**Facts**

17.  In 1998, the West Virginia Department of Environmental Protection (WVDEP) granted a surface coal mining permit to Hobet Mining, Inc. (a subsidiary of Arch Coal, Inc.) for its Spruce No. 1 Mine near Blair, West Virginia.  At that time, this mine was the largest mountaintop-removal mine ever proposed in West Virginia, covering 3,113 acres (over five

square miles) of land and creating valley fills and sediment control ponds that would destroy or disturb 57,775 linear feet (over ten miles) of streams.  Spruce Record of Decision (ROD), pp. 2, 11.

18.   In January 1999, without first preparing an EIS, the Corps granted a Nationwide Permit 21 permit (instead of an individual permit) to Hobet under § 404 to construct valley fills in waters of the U.S. as part of this project.  In March 1999, Judge Haden found that the Corps' permitting decision violated NEPA and enjoined the mining operations.  Bragg v. Robertson, 54 F. Supp.2d 635 (S.D. W.Va. 1999); Spruce ROD, p. 11.  In June 1999, the Corps withdrew the 404 permit and agreed to prepare an EIS on this mining project.

19.   Between 1999 and 2005, Arch modified its mining project and obtained a new mining permit from WVDEP.  In December 2005, Arch Coal transferred the Spruce No. 1 mine to its Mingo Logan Coal Company subsidiary.  FEIS, Abstract, p. 2.  Under Mingo Logan's modified plan, the mine would cover 2,278 acres and create six valley fills that would permanently bury 36,814 linear feet (over seven miles) of streams.  Id., and p. iv.

20.   To attempt to mitigate this stream loss, Mingo Logan proposed a mitigation plan to create 43,565 feet on-site drainage ditches, restore 7,132 feet of on-site streams, enhance 11,272 feet of off-site streams, and develop more defined channels in 26,625 feet of existing non-jurisdictional drainage ways.  FEIS, p. vii; Revised Compensatory Mitigation Plan, pp. 18, 21.  Based on this plan, the Corps calculated that the mining project would result in a "net gain" of waters of the U.S.  FEIS, p. vii; Plan, p. 26.

21.   Mingo Logan applied to the Corps for an individual § 404 permit.  The Corps issued a Draft EIS (DEIS) on this project March 31, 2006 and a Final EIS (FEIS) on September 22,

2006. 71 Fed. Reg. 16293, 55441.  The Corps issued a Record of Decision and an individual §

404 permit to Mingo Logan on January 22, 2007.

22.  The Corps has never assessed, and has no guidelines or approved method for

assessing, the functional values of the streams that will be destroyed by the Spruce No. 1 Mine.

23.  The Corps used a Stream Habitat Unit (SHU) assessment method in the EIS to

assess how much mitigation was needed to compensate for the streams buried by valley fills for

the Spruce No. 1 Mine.  The Corps has admitted that SHUs are not a scientifically defensible

method for assessing stream functions.  The Corps abandoned the SHU method in its Record of

Decision.

24.  The Corps also assumed that the Spruce No. 1 Mine would have no adverse

environmental effects because it was requiring Mingo Logan to create on-site drainage ditches

that would offset the natural streams which will be buried and lost.  The Corps rated the

likelihood of successful stream creation as "high."  FEIS, p. 2-16. The Corps has no scientific

evidence to support this rating, or to show that either the structures or the functions of

permanently destroyed streams can be re-created or replaced in other locations.

25.  On a cumulative basis, existing surface mine permits and valley fills, when

combined with the Spruce No. 1 permit and valley fills, will cover 21.1% of total stream length

and 35.5% of headwater stream length in the Spruce Fork watershed.  FEIS, p. 2-189.  The

Spruce Fork watershed is part of the larger Coal River watershed.  On a cumulative basis,

existing surface mine permits and valley fills, when combined with the Spruce No. 1 permit and

valley fills, will cover 11.5% of total stream length and 14.9% of headwater stream length in the

Coal River Watershed. FEIS, p. 2-188.

7

26.   The Corps concluded that: "Overall, it would be anticipated that the Spruce No. 1 Mine would only contribute minimally to cumulative impacts on surface water quality." FEIS, p. vi.  This conclusion has no scientific basis.  On the contrary, scientific studies demonstrate that valley fills significantly degrade downstream water quality, such as by increasing conductivity, and significantly alter the biological diversity of downstream aquatic life, such as by replacing pollution-intolerant macroinvertebrates with pollution-tolerant macroinvertebrates.

27.   The Corps made no assessment or determination of whether the cumulative impacts of all surface coal mining projects on water quality were significant.  It did not analyze impacts outside the Spruce Fork watershed.  In addition, the Corps only considered the <u>incremental</u> impacts on water quality <u>contributed by</u> the Spruce No. 1 Mine, rather than the cumulative impacts on water quality of all existing surface coal mines <u>in addition to</u> those from the Spruce No. 1 Mine.  FEIS, pp. vi (Spruce mine would "only contribute minimally"), 3-197 to 3-198 (the "incremental effects" are "relatively minor" and "would not be ecologically significant").

28.   The Corps ignored studies in its own October 2005 Mountaintop Mining/Valley Fills in Appalachia Final Programmatic EIS showing that the cumulative impacts of past, present, and future surface coal mining activities are significant.

29.   Mingo Logan has obtained an NPDES permit under § 402 of the CWA, 33 U.S.C. § 1342, for discharges from the outlets of the sediment control ponds that are downstream from the valley fills at the Spruce No. 1 Mine.  FEIS, pp. i, 2-41.  However, Mingo Logan has no NPDES permit for discharges of pollution-laden water from the toes of the valley fills into waters of the U.S. upstream from the sediment control ponds.

30.   The valley fills for the Spruce No. 1 mine will discharge water from the toes of those fills.  That water will contain total suspended solids, settleable solids and other pollutants and will add significant amounts of those pollutants to the stream segment between those toes and the downstream sediment control ponds.  FEIS, p. 2-42.

31.   Mingo Logan has already begun timbering, clearing, and grubbing activities in the permit area and will, unless enjoined by this Court, continue to disturb and adversely affect land and surface water in the permit area.  Because of the absence of any scientifically valid method of mitigating this harm, these actions will cause permanent and irreparable damage to the environment and to Plaintiffs' environmental, recreational, and aesthetic interests.

## Claims

## Count One

32.   Plaintiffs allege and incorporate by reference paragraphs 1-31 above.

33.   The Corps' determination that the Spruce No. 1 Mine will not cause significant degradation of waters of the U.S. and will not violate 40 C.F.R. § 230.10(c) is arbitrary and capricious, because:

a.  the Corps has no scientific basis or substantial evidence to assess the functions of streams that are buried by valley fills;

b.  the Corps has no scientific basis or substantial evidence to conclude that the structures or functions of buried streams will be offset by attempted stream re-recreation, restoration or enhancement pursuant to Mingo-Logan's compensatory mitigation plan;

c.  the Corps has no scientific basis or substantial evidence to conclude that the cumulative environmental effects of the Spruce No. 1 mine will be insignificant either

9

individually or collectively with other mining projects; and

       d. the Corps failed to make a required factual determination concerning the cumulative environmental effects of all existing surface coal mines in addition to those from the Spruce No. 1 Mine.

    34. These violations of the Clean Water Act and the APA by the Corps threaten the Plaintiffs with irreparable injury for which they have no adequate remedy at law.

**Count Two**

    35. Plaintiffs allege and incorporate by reference paragraphs 1-31 above.

    36. The Corps' FEIS on the Spruce No. 1 Mine violates NEPA standards for scientific integrity, reasoned analysis, and supporting evidence because:

       a. the Corps has no scientific basis or substantial evidence to assess the functions of streams that are buried by valley fills;

       b. the Corps has no scientific basis or substantial evidence to conclude that the structures or functions of buried streams will be offset by attempted stream re-recreation, restoration or enhancement pursuant to Mingo-Logan's compensatory mitigation plan;

       c. the Corps has no scientific basis or substantial evidence to conclude that the cumulative environmental effects of the Spruce No. 1 mine will be insignificant either individually or collectively with other mining projects; and

       d. the Corps' analysis of potential selenium contamination, stormwater runoff, flooding, forest loss, and social and land use impacts is seriously inadequate.

    37. These violations of NEPA and the APA by the Corps threaten the Plaintiffs with irreparable injury for which they have no adequate remedy at law

10

## Count Three

38.  Plaintiffs allege and incorporate by reference paragraphs 1-31 above.

39.  The Guidelines provide that no discharge of fill material shall be permitted if it would cause a violation of state water quality standards.  40 C.F.R. § 230.10(b)(1).

40.  The water discharged from the toes of the valley fills at the Spruce No. 1 Mine will contain pollutants that will cause violations of West Virginia water quality standards for those pollutants in the stream segments between the toes of the valley fills and the downstream sediment control ponds.

41.  The Corps contends that these discharges flow into a waste treatment system that is not part of waters of the U.S. and therefore are within the scope of a § 404 permit and do not require an NPDES permit under § 402.

42.  The stream segments between the toes of the valley fills and the sediment control ponds are waters of the U.S., because the Corps has no authority to designate waters of the U.S. to be used for waste assimilation or as a waste treatment system.

43.  The Corps does not have jurisdiction to issue a § 404 permit for the discharges from the toes of the fills because the pollutants discharged do not qualify as "fill material."

44.  Accordingly, the Corps' attempt to permit these discharges exceeds the scope of its jurisdiction and violates the CWA.

45.  These violations of the Clean Water Act and the APA by the Corps threaten the Plaintiffs with irreparable injury for which they have no adequate remedy at law.

## Requests for Relief

Plaintiffs respectfully request this Court to grant the following relief:

11

1. Declare that the Corps' issuance of a § 404 permit to Mingo Logan for the Spruce No. 1 Mine violates the CWA and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law in violation of the APA.

2. Declare that the Corps' FEIS on the Spruce No. 1 Mine violates NEPA and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law in violation of the APA.

3. Declare that the Corps has no jurisdiction under § 404 of the CWA to permit Mingo Logan to discharge pollutants into the stream segments between the toes of the valley fills and the downstream sediment control ponds because those segments are waters of the U.S. and cannot be used for waste assimilation, and because those discharges require a permit under § 402 of the CWA.

4. Order the Corps to rescind immediately the § 404 permit for the Spruce No. 1 Mine.

5. Enjoin the Corps from authorizing further discharges of mining rock, dirt, or other fill materials into valley fills or surface impoundments at the Spruce No. 1 Mine site or at off-site locations in connection with the mining operations or reclamation activities there unless and until the Corps complies with its duties under the CWA and NEPA.

6. Grant Plaintiffs their costs and expenses, including reasonable attorneys' and expert witness' fees, pursuant to 28 U.S.C. § 2412(d)(1)(A).

7. Grant such other relief as may be just and proper.

Respectfully submitted,

_/s/ Joseph M. Lovett_
JOSEPH M. LOVETT
Appalachian Center for the
Economy and the Environment

12

P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006
jlovett@appalachian-center.org

*/s/ Jennifer C. Chavez*
STEPHEN E. ROADY
JENNIFER C. CHAVEZ
Earthjustice
1625 Massachusetts Av. NW, Suite 702
Washington, DC 20036
Phone: (202) 667-4500
Fax: (202) 667-2356
sroady@earthjustice.org
jchavez@earthjustice.org

*Counsel for the Plaintiffs*

Of Counsel:   James M. Hecker
Public Justice
1825 K Street, N.W. Suite 200
Washington, D.C. 20006
(202) 797-8600
jhecker@publicjustice.net

## CERTIFICATE OF SERVICE

I, Joseph M. Lovett, hereby certify that on January 30, 2007, I electronically filed the

foregoing Plaintiffs' Fourth Supplemental Complaint for Declaratory and Injunctive Relief with

the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

the following CM/ECF participants:

13

James S. Crockett, Jr.
Kelly B. Griffith
Spilman Thomas & Battle, PLLC
Spilman Center
300 Kanawha Boulevard East
P.O. Box 273
Charleston, West Virginia 25321-0273
*jcrockett@spilmanlaw.com*
*kgriffith@spilmanlaw.com*

Ruth Ann Storey
U.S. Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, DC 20044-0663
*ruth.ann.storey@usdoj.gov*

Cynthia J. Morris
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986
*c.j.morris@usdoj.gov*

Stephen M. Horn
U.S. Attorney's Office
P.O. Box 1713
Charleston, WV 25326-1713
*Steve.Horn@usdoj.gov*
*usawvs.ecfcivil@usdoj.gov*

Robert G. McLusky
Blair M. Gardner
Jeffrey R. Vining
Jackson Kelly, PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
*rmclusky@jacksonkelly.com*
*bgardner@jacksonkelly.com*
*jrvining@jacksonkelly.com*
*aroehl@jacksonkelly.com*
*rjeffries@jacksonkelly.com*
*sbo@jacksonkelly.com*

I hereby certify that I have mailed the document by United States Postal Service to the

following non-CM/ECF participants:

Allyn G. Turner
Spilman Thomas & Battle
P. O. Box 273
Charleston, WV 25321-0273

Ann D. Navaro
U. S. Army Corps Of Engineers
Great Lakes and Ohio River Division
P. O. Box 1159
Cincinnati, OH 45201

14

Steven E. Rusak
U.S. Department Of Justice
Environment & Natural Resources Division
Environmental Defense Section
Byron Rogers Federal Building
1961 Stout Street - 8th Floor
Denver, CO 80294

     I hereby certify that, pursuant to US District for the Southern District of West Virginia,

Administrative Procedures for Electronic Case Filing, Rule 13.9, I have mailed a courtesy copy

by United States Postal Service to:

Honorable Robert C. Chambers
United States District Judge
Post Office Box 1570
Huntington, WV 25716

     */s/ Joseph M. Lovett*
JOSEPH M. LOVETT
Appalachian Center for the
     Economy and the Environment
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006
jlovett@appalachian-center.org

15