IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

OHIO VALLEY ENVIRONMENTAL
COALITION, et al.,

                Plaintiffs,

v.                                     CIVIL  ACTION  NO.  3:05-0784

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Plaintiffs brought this action seeking declaratory relief that the U.S. Army Corps of Engineers violated the Clean Water Act and the National Environmental Policy Act in issuing four permits to fill headwater streams in conjunction with mountaintop removal coal mining.  Plaintiffs request injunctive relief to prevent the conduct authorized under these permits and seek judicial review of the agency's decisions under the Administrative Procedure Act.  For the reasons stated below, the Court **GRANTS** judgment in favor of Plaintiffs, **RESCINDS** the permits and decisions, **ENJOINS** Defendants and Intervenors from all activities authorized under those permits, and **REMANDS** the permits to the Corps for further proceedings consistent with this Memorandum Opinion and Order.

**I.
INTRODUCTION**

Coal mining has long been part of the fabric of Appalachian life, providing jobs to support workers and their families and energy to fuel the nation.  Unfortunately, coal mining also exacts a toll on the natural environment.  In particular, the mining technique at issue in these permits

potentially results in dramatic environmental consequences.  The Honorable Charles H. Haden II, after a firsthand examination of mountaintop removal mining sites in southern West Virginia, offered the following description:

> [M]ined sites were visible from miles away.  The sites stood out among the natural wooded ridges as huge white plateaus, and the valley fills appeared as massive, artificially landscaped stair steps. Compared to the thick hardwoods of surrounding undisturbed hills, the mine sites appeared stark and barren and enormously different from the original topography.

*Bragg v. Robertson*, 54 F. Supp.2d. 635, 646 (S.D. W. Va. 1999) (issuing preliminary injunction upon finding irreparable harm).

This lawsuit represents another challenge against the coal industry and governmental regulators over mountaintop removal coal mining.  The controversy surrounding this method of coal mining has spawned numerous lawsuits by environmentalists against state and federal regulators involved in the approval and use of mountaintop removal mining in West Virginia and neighboring Appalachian states.[1]  The Honorable Paul V. Niemeyer, speaking for a panel of the Fourth Circuit, aptly described the backdrop for this controversy six years ago:

> Mountaintop-removal coal mining, while not new, only became widespread in West Virginia in the 1990s.  Under this method, to reach horizontal seams of coal layered in mountains, the mountaintop rock above the seam is removed and placed in adjacent valleys; the coal is extracted; and the removed rock is then replaced in an effort to achieve the original contour of the mountain.  But because rock

---

[1]Cases filed within this district include *Bragg v. Robertson*, 72 F. Supp.2d 642 (S.D. W. Va. 1999), decided by the late Chief Judge Haden and subsequently reversed in *Bragg v. West Virginia Coal Association*, 248 F.3d 275 (4th Cir. 2001); *Ohio Valley Environmental Coalition v. Bulen*, 410 F. Supp.2d 450 (S.D. W. Va. 2004) (Goodwin, J.), *aff'd in part, vacated in part* 429 F.3d 493 (4th Cir. 2005); and *Ohio River Valley Environmental Coalition v. Norton*, No. 3:04-0084, 2005 WL 2428159 (S.D. W. Va. 2005), *aff'd sub nom. Ohio River Valley Environmental Coalition v. Kempthorne*, 473 F.3d 94 (4th Cir. 2006).

taken from its natural state and broken up naturally "swells," perhaps by as much as 15 to 25%, the excess rock not returned to the mountain—the "overburden"—remains in the valleys, creating "valley fills."  Many valley fills bury intermittent and perennial streams and drainage areas that are near the mountaintop.  Over the years, the West Virginia Director of Environmental Protection (the "Director" or "State Director"), as well as the U.S. Army Corps of Engineers, has approved this method of coal mining in West Virginia.

The disruption to the immediate environment created by mountain-top mining is considerable and has provoked sharp differences of opinion between environmentalists and industry players.

*Bragg v. West Virginia Coal Assoc.*, 248 F.3d 275, 286 (4th Cir. 2001).

In this matter, environmentalists have targeted the U.S. Army Corps of Engineers ("Corps"). Although the Corps has no direct regulatory authority with respect to mountaintop removal coal mining, it plays an indirect role through its control over a critical byproduct of mountaintop removal mining: valley fills, which entail burying streams when valleys are filled with overburden.  Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq.*, vests authority in the Corps to issue permits for the disposal of fill material into the waters of the United States.  Without such a permit, the discharge is prohibited, thus precluding the construction of valley fills necessary for mountaintop removal coal mining.

## II.
## PROCEDURAL BACKGROUND

In this case, the Corps issued permits to five coal companies between July 2005 and August 2006 after reviewing the permit applications pursuant to Section 404 and the simultaneous analysis required under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321, *et seq.* As to each permit, the applicants provided a voluminous amount of material to the Corps to consider, much of which also was submitted to other regulatory authorities for their review under

-3-

state and federal surface mining regulations and other environmental statutes.  Though thousands of pages of consultants' reports, application plan documents, correspondence, and comments by other agencies and interested persons have been compiled in the administrative records, the critical documents for each decision are remarkably similar, and often identical in key findings.

These proceedings began shortly after the Corps issued the July 17, 2005 permit for the Camp Branch Surface Mine ("Camp Branch").  Ohio Valley Environmental Coalition ("OVEC"), Coal River Mountain Watch, and West Virginia Highlands Conservancy ("Plaintiffs"), grassroots organizations dedicated to the improvement and preservation of the environment, filed suit alleging the Corps, Lieutenant General Carl A. Strock, Commander and Chief of Engineers, and Colonel William E. Bulen, Commander, Huntington District ("Defendants") acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, in issuing the permit contrary to the substantive and procedural provisions of both the CWA and NEPA.  In November 2005, Plaintiffs amended their Complaint to challenge the August 23, 2005 permit issued for the Black Castle Contour Surface Mine ("Black Castle").

In January 2006, Aracoma Coal Company and Elk Run Coal Company, holders of the Camp Branch and Black Castle permits, respectively, intervened as defendants in this matter.  Shortly thereafter, Plaintiffs again amended their Complaint to include the December 22, 2005 permit issued to Alex Energy, Inc. for the Republic No. 2 Surface Mine ("Republic No. 2").  Alex Energy, Inc. subsequently intervened.  In addition, the West Virginia Coal Association, a trade association representing the vast majority of West Virginia's underground and surface coal mine production companies, intervened in March 2006.

The Corps issued a fourth permit on April 28, 2006, to Independence Coal Company for the Laxare East Surface Mine ("Laxare East").  Plaintiffs again contested the issued permit, which the Court consolidated with this proceeding.  Independence Coal Company similarly intervened.  In August 2006, Plaintiffs amended their Complaint for the third time to challenge a permit issued to Alex Energy, Inc. for the Republic No. 1 Surface Mine.  The Republic No. 1 permit is not part of this trial, however, because it was not yet ripe having been issued on the eve of trial.[2]

In sum, Plaintiffs allege in their Third Supplemental Complaint that the Corps acted arbitrarily and capriciously in violation of the APA in issuing the permits for the Camp Branch, Black Castle, Republic No. 2, and Laxare East mine sites.[3]  Specifically, Plaintiffs claim the Corps violated NEPA by issuing the permits without first preparing an Environmental Impact Statement ("EIS"), failing to adequately assess the effects of Intervenors' conduct, improperly limiting the scope of analysis, and ignoring relevant evidence regarding the cumulative effects of the permits on the environment.  In addition, Plaintiffs argue Defendants failed to comply with the CWA and its governing regulations by improperly evaluating the structure and function of the streams impacted, failing to characterize the affected streams as riffle and pool complexes,[4] ignoring relevant evidence

---

[2]Although the Republic No. 1 permit is not at issue in this proceeding, the findings and conclusion of the Corps appear to be consistent with the Combined Decision Documents discussed herein and thus subject to the same flaws.  The Court, however, will reserve decision on this permit until the parties have been heard.

[3]In addition, Plaintiffs have requested leave from the Court after the close of trial to contest two additional permits.  Those permits include the January 22, 2007 permit issued to Mingo Logan Coal Company for the Spruce No. 1 Mine and the February 12, 2007 permit issued to Coal-Mac, Inc. for the Phoenix No. 5 Mine.  The Court has yet to rule on these requests.

[4]Portions of streams are sometimes characterized as riffle and pool complexes by their hydraulic characteristics, with the rapid movement of water in riffles and deep associated pools.  40 C.F.R. § 230.45(a).

relating to storm runoff and flooding, and relying on untested and questionable mitigation measures to offset the destroyed streams.

In response, Defendants and Intervenors[5] counter that the Corps adhered to the required process for issuing the permits under the CWA and NEPA and did not act arbitrarily and capriciously in doing so.  The Corps asserts that it adequately considered all relevant factors, including stream functions, the effects on the aquatic ecosystem, the existence of riffle and pool complexes, and the cumulative impacts of the permitted activities to the watersheds.[6]  Further, the Corps argues that it imposed appropriate compensatory mitigation conditions on the CWA permits of at least a 1:1 linear foot basis based upon its best professional judgment.

This case originally was scheduled for trial in June 2006 as to the first four permits. However, on the eve of trial the Corps moved to stay the proceedings and sought voluntary remand of the permits to allow it to reconsider them.[7]  The Court granted the motion, but the stay was short-lived.  The Corps reissued the permits a month later with a supplemented administrative record.  Its decisions were altered, but the controversy with Plaintiffs was not resolved.  The litigation resumed, and a six day bench trial was conducted as to the first four permits in October 2006.  The parties were given leave to file post-hearing briefs, following which the Court heard oral argument.  The matter is ripe for decision.

_____

[5]At the time of trial, Intervenors included: Alex Energy, Inc., Aracoma Coal Company, Elk Run Coal Company, Independence Coal Company, and the West Virginia Coal Association.

[6]A watershed is a land area that drains into a body of water, such as a river or stream. *Random House Webster's College Dictionary* 1477 (2000).

[7]The Corps' motion explained that it sought voluntary remand as to the four permits "in order that it may conduct further review" to allow for "reconsideration or revision" of its decisions. (Defs.' Mot. for Voluntary Remand and Stay of Further Proceedings 1, 3).  The Corps subsequently revised and reissued each permit and Combined Decision Document with revisions.

## III.
## STANDING

Before considering the merits of Plaintiffs' allegations, the Court must first address whether they have standing to bring their claims. Intervenors have challenged Plaintiffs' standing to contest the Republic No. 2 permit, asserting that Plaintiffs have "manufactured" their injury solely for the purpose of establishing standing.[8] If true, Plaintiffs' claims are nonjusticiable and any judgment issued by the Court with respect to this permit would be tantamount to a constitutionally prohibited advisory opinion. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 100–02 (1998).

Standing has both constitutional and prudential components. Plaintiffs first must satisfy the constitutional standing requirements set forth by Article III of the United States Constitution, namely that Plaintiffs (1) "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc., v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). In addition, Plaintiffs must satisfy the prudential standing principles set forth by the Supreme Court that (1) their interests fall within the zone of interests protected by NEPA and the CWA and that (2) Plaintiffs meet the organizational standing exception to the rule against third party standing. Further, in seeking review of an agency decision under the APA, Plaintiffs also must satisfy its statutory requirements for standing. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990).

---

[8]Defendants and Intervenors have stipulated that Plaintiffs have standing to challenge the Black Castle, Camp Branch, and Laxare East permits.

### A. Injury in Fact

In an environmental action such as this, the most significant obstacle for a plaintiff is establishing an injury in fact. *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006) ("In environmental suits, the injury-in-fact inquiry tends to be more searching than the causation or redressability considerations."). Injury to the environment is insufficient to satisfy Article III standing requirements; rather, the injury must be to the plaintiffs themselves. *Friends of the Earth, Inc.*, 528 U.S. at 181. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003). However, mere general averments and conclusory allegations are inadequate; Plaintiffs must show the challenged activity directly affects their recreational, aesthetic, and economic interests. *Friends of the Earth, Inc.*, 528 U.S. 183–84 (citing *Nat'l Wildlife Fed'n*, 497 U.S. at 888).

Plaintiffs have plainly demonstrated injury in fact through the testimony of one of its members, Vivian Stockman. Ms. Stockman testified that she frequently travels to southern West Virginia, including the location of the Republic No. 2 mine on the border of Kanawha and Fayette Counties, and intends to do so regularly in the future. She does so in order to take photographs and to observe aquatic wildlife within the streams. She further testified that she will not wade in streams located in areas impacted by mountaintop removal coal mining because of the presence of selenium and other chemicals used in the mining process. Based on this testimony, it is clear that Plaintiffs have alleged a direct aesthetic injury and not merely an abstract interest in ensuring the law is

properly enforced.  An injury to an aesthetic interest in observing wildlife is sufficient to satisfy the requirements of Article III standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992) ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859–60 (9th Cir. 2005) (finding standing based on risk of harm to environment that would impact plaintiffs' ability to "study the ecological area, observe wildlife, and use [the area] for recreation").

Intervenors argue that Plaintiffs "manufactured" their purported injury for the sole purpose of establishing standing, relying on *Mancuso v. Consol. Edison Co. of N.Y., Inc.*, 324 F. Supp.2d 469 (S.D.N.Y. 2004), in support of this assertion.  Their argument is unpersuasive as *Mancuso* is distinguishable from the matter at hand.  In *Mancuso*, the plaintiff did not reside, own property, or recreate in, on, or near the affected area.  *Id.* at 471.  Instead, the plaintiff had visited the area in question solely to prepare for litigation by obtaining evidence and, as such, any aesthetic injury suffered by the plaintiff was nothing more than a byproduct of the lawsuit.  *Id.*  Conversely, in this case Ms. Stockman testified that she frequently visits southern West Virginia in pursuit of her interest in photography and to observe aquatic wildlife, thereby demonstrating her recreational use of the affected areas.  Moreover, *Mancuso* involved environmental damage resulting from polychlorinated biphenyls ("PCBs"), which are colorless, odorless carcinogens that were virtually undetectable by the plaintiff.  342 F. Supp.2d at 471.  The effects of mountaintop removal coal mining, on the other hand, are plainly evident to the casual observer and constitute a cognizable aesthetic injury to a recreational user of the area such as Ms. Stockman.

*B. Causation*

Plaintiffs also satisfy the second prong of the standing inquiry, that the injury in fact is "fairly traceable" to Defendants' alleged illegal conduct. *Friends of the Earth, Inc.*, 528 U.S. at 180. The causation prong does not require Plaintiffs to "show to a scientific certainty that defendant[] . . . caused the precise harm suffered by the plaintiffs." *Nat'l Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 n.7 (4th Cir. 1992) (quoting *Pub. Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 72 (3d Cir. 1990)). Rather, the causation requirement ensures a nexus between the injury and the defendant that is not based upon speculation or conjecture. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000).

Plaintiffs' aesthetic injury directly results from Intervenors' permitted conduct, which in turn results from the permits issued by Defendants. Without the Section 404 permits, Intervenors would be unable to bury streams with the overburden created through mountaintop removal coal mining, thus creating the required nexus between Defendants' conduct and Plaintiffs' alleged injury.

*C. Redressability*

Plaintiffs meet the final requirement for Article III standing as the relief sought will remedy Plaintiffs' injury. A plaintiff satisfies the redressability test if it is likely "that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.*, 528 U.S. at 181. Here, Plaintiffs request declaratory and injunctive relief requiring the Corps to rescind the issued permits and prepare an EIS analyzing alternatives to the proposed activity and the cumulative impacts of those activities. Clearly, rescinding the permits and enjoining further mining would alleviate Plaintiffs' concerns. In addition, a plaintiff "assert[ing] inadequacy of a government agency's environmental studies under NEPA need not show that further analysis by the government would result in a

different conclusion," only that the "decision could be influenced by the environmental considerations that NEPA requires an agency to study." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001). If the Corps had conducted an EIS and considered the cumulative impact of burying streams throughout the watershed of southern West Virginia as Plaintiffs requested, the decision to issue a Section 404 permit could have been influenced by these environmental considerations, thus satisfying this undemanding test.

### D. Organizational Standing

A plaintiff ordinarily cannot assert the legal rights and interests of third parties. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The doctrine of organizational standing, however, is an exception to this prudential rule against third party standing. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342 (1977). In order to assert a claim of one of its members, an organization must establish that (1) at least one of its members would have standing to sue in his own right; (2) the interests at issue are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual member of the organization. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000).

Plaintiffs have satisfied this organizational standing requirement as well. At least one of OVEC's members, Ms. Stockman, has standing to sue in her own right. The interest at issue, namely the burying of streams with the overburden from mountaintop removal coal mining, is certainly germane to OVEC's purpose of improving and preserving the environment. Further, the participation of individual members of OVEC would be unnecessary and unhelpful in a determination of the issues and, if warranted, any appropriate relief.

*E. Zone of Interests*

Plaintiffs also meet the requirements for prudential standing because their injury is within the zone of interests protected by NEPA and the CWA.  The zone of interest test is "not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  However, where the plaintiff itself is not the subject of the contested regulatory action, the zone of interest test "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*  In applying the test, the Court first determines the interests protected by the statutory provision at issue and then ascertains whether the plaintiff's interests are among them. *TAP Pharm. v. U.S. Dept. of Health & Human Servs.*, 163 F.3d 199, 202–03 (4th Cir. 1998) (citing *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 494 n.7 (1998)).

In this matter, Plaintiffs' interests clearly satisfy the zone of interests test.  Congress enacted NEPA in order to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable unintended consequences."  42 U.S.C. § 4331(b).  Similarly, the CWA aims to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  Plaintiffs claim aesthetic injuries from the effects of mountaintop removal coal mining and request an injunction to prevent burying more streams within the affected watersheds.  Plaintiffs' objectives unquestionably mirror Congress' intent in enacting the CWA and NEPA.

*F. Statutory Standing*

Finally, Plaintiffs, in seeking judicial review of an agency action under the APA, also must satisfy the APA statutory requirements for standing.  *Nat'l Wildlife Fed'n*, 497 U.S. at 882–83.

Plaintiffs' request for review under the APA "must establish (1) that there has been final agency action adversely affecting the plaintiff, and (2) that, as a result, it suffers legal wrong or that its injury falls within the 'zone of interests' of the statutory provision the plaintiff claims was violated." *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 976 (9th Cir. 2003). Having already established that Plaintiffs assert claims within the zone of interests of the APA, the only question is whether a final agency action adversely affected Plaintiffs. Issuance of a permit to discharge fill material into waters of the United States constitutes a final agency action, which in turn adversely affected Plaintiffs by causing the injury in fact, thus providing Plaintiffs statutory standing.

## IV.
## STANDARD OF REVIEW

A federal agency's compliance with the CWA and NEPA is subject to review under the APA. 5 U.S.C. § 702. The APA requires a court to set aside an agency action, findings or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of such review is narrow; the reviewing court looks only to see if there has been a "clear error of judgment." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 287 (4th Cir. 1999) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)). An agency action will be set aside as arbitrary or capricious

> if the agency relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 287–88 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Insur.*, 463 U.S. 29, 43 (1983)).

Review of agency action under the arbitrary or capricious standard is highly deferential and presumes the validity of such action. *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993). Although the Court's review must be "searching and careful," it must not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). The APA extends such deference in order to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004).

This deferential standard of review in no way requires the Court to "rubber stamp" an agency action, however. On the contrary, the Court must "immerse" itself in the evidence in order to "determine whether the agency decision was rational and based on consideration of the relevant factors." *Etyhl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976).

> The close scrutiny of the evidence is intended to educate the court. It must understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made. The more technical the case, the more intensive must be the court's effort to understand the evidence . . . . But that function must be performed with conscientious awareness of its limited nature. The enforced education into the intricacies of the problem before the agency is not designed to enable the court to become a superagency that can supplant the agency's expert decision-maker. To the contrary, the court must give due deference to the agency's ability to rely on its own developed expertise.

*Id.* This inquiry requires the Court to consider not only the final documents prepared by the agency, but also the entire administrative record. 5 U.S.C. § 706; *Sierra Club v. U.S. Army Corps of Eng'rs*,

-14-

295 F.3d 1209, 1216 (11th Cir. 2002). Further, though the Court ordinarily is restricted to the confines of the administrative record, it may, when necessary, consider evidence outside the record to determine whether the agency has considered all relevant factors or to explain technical terms or complex subject matter.[9]

In sum, the role of the Court is not to make the ultimate decision, but only to determine whether the agency took a "'hard look' at all relevant factors." *Coal. for Responsible Reg'l Dev. v. Coleman*, 555 F.2d 398, 400 (4th Cir. 1977) (citation omitted). "What constitutes a 'hard look' cannot be outlined with rule-like precision. At the least, however, it encompasses a thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail." *Nat'l Audubon Soc. v. Dept. of the Navy*, 422 F.3d 174, 185 (4th Cir. 2005). That inquiry is necessarily case-specific, and the Court must examine all of the components of an agency's analysis to determine, on the whole, whether the agency has conducted the required "hard look." *Id.* at 186. In reviewing an agency action under NEPA, the Court must

_____

[9]*See Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004); *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246–47 & n.1 (11th Cir. 1996); *USA Group Loan Servs., Inc v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996); *Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1138 (10th Cir. 1991); *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988). Here, the Court permitted the parties in its Memorandum Opinion and Order entered March 31, 2006, to submit extra-record evidence to explain scientific and technical terms and to address whether the Corps ignored or inadequately addressed relevant factors. Having reviewed the thousands of pages of the administrative record and extra-record evidence, the Court confirms this extra-record evidence was essential to the Court's understanding of the parties' arguments and to the Court's findings in this Memorandum Opinion and Order. This Court could not have met its obligation to conduct a "searching and careful" review without this additional information. Given Plaintiffs' complaint that relevant factors were ignored or discounted, if the extra-record evidence had not been adduced, the Court would serve as little more than a rubber-stamp for the agency's decisions. Furthermore, the thrust of Plaintiffs' objections to the Corps' decisions may be found in their extensive comments on each proposed permit within the administrative record. The testimony of experts assisted the parties and, ultimately, the Court, by focusing and explicating their positions.

make a "searching and careful" inquiry into the record to determine whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *City of Alexandria v. Fed. Highway Admin.*, 756 F.2d 1014, 1017 (4th Cir. 1985) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 416).

The Court is limited in performing its inquiry to only those grounds upon which the agency based its decision and cannot affirm the decision by applying different reasons or legal standards that the agency did not adopt. *SEC v. Chenery*, 318 U.S. 80, 94–95 (1943) ("[A]n administrative [action] cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."). Further, no deference to an agency's action is required if the agency failed to follow its own promulgated regulations. "The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct." *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986). If an agency fails to scrupulously observe the rules, regulations, or procedures which it has established, the Court is required to overturn its actions.[10]

---

[10]The Court's review of an agency's application of a statute or regulation differs from its review of an agency's interpretation of a statute or regulation. Judicial review of an agency's interpretation of a statute is conducted under the familiar two-step framework of *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Under *Chevron*, the Court first determines "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If Congress's intent is clear, then both the Court and the agency must abide by it. *Id.* at 842–43. Where the statute is silent or ambiguous, however, the Court must defer to an agency's interpretation if it is "based on a permissible construction of the statute." *Id.* at 843.

In contrast, the agency is not entitled to such deference in the interpretation of its own regulations unless "it appears that Congress delegated authority generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Gonzalez v. Oregon*, 546 U.S. 243, __ , 126 S. Ct. 904, 915 (2006) (citing *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). If an agency interpretation or policy does not carry the force of law, it is "'entitled to respect'" only to the extent that it has the "power to persuade.'" *Gonzalez*, 546 U.S. at __, 126 S. Ct. at 915 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

(continued...)

*Id.*; *U.S. v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969).

In contrast, the CWA provides for a "more intrusive power of review" to prohibit agency action whenever a project will have a significant adverse impact on the environment. *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1051 (2d Cir. 1985). Therefore, when the Corps approves a project that the reviewing court finds will have a significant adverse impact, that approval violates the CWA and cannot stand. *Id.*

Two federal acts control the Corps' responsibilities in this matter: the Clean Water Act and the National Environmental Policy Act. Plaintiffs raise claims under each. Therefore, the provisions of each Act are the beginning point for the Court's analysis of Plaintiffs' claims.

*A. Clean Water Act*

Congress enacted the Federal Water Pollution Control Amendments of 1972, commonly known as the Clean Water Act, to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In accordance with this mandate, the CWA prohibits the discharge of any pollutants[11] into navigable waters of the United States unless authorized by a permit. 33 U.S.C. § 1311.

The Army Corps of Engineers oversees the Section 404 permit process and may issue either

---

[10](...continued)
In this case, the Court defers to the agency that its regulations fairly interpret the statutes at issue because this issue is uncontested by Plaintiffs. Further, the Court assumes, without finding, that the Memorandum of Agreement Between the Department of the Army and the EPA and Regulatory Guidance Letter No. 02-2, later discussed in this Memorandum Opinion and Order, do not exceed or conflict with the Corps' own regulations.

[11]The CWA defines pollutants to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discharged equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

general permits or individual permits for a specific disposal site.[12]  33 U.S.C. § 1344.  Section 404

permits must be issued in accordance with guidelines ("404(b)(1) Guidelines") promulgated by the

Environmental Protection Agency ("EPA"), 33 U.S.C. § 1344(b)(1), which the Corps has

incorporated into its own regulations.  *See, e.g.*, 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6).  The

underlying intent behind the 404(b)(1) Guidelines is that dredged or fill material should not be

discharged if it will result in an unacceptable adverse impact on the aquatic ecosystem.  40 C.F.R.

§ 230.1(c).

In considering the potential adverse impact of a proposed discharge, the Corps must

determine in writing the short-term and long-term effects of the discharge on the "physical,

chemical, and biological components of the aquatic environment."  40 C.F.R. § 230.11.  Specifically,

the Corps must consider the nature and degree of effect the proposed discharge will have on (1) the

physical substrate of the proposed disposal site; (2) water circulation, fluctuation, and salinity; (3)

suspended particulate/turbidity in the vicinity of the disposal site; (4) the introduction, relocation

or addition of contaminants in the aquatic environment; and (5) the structure and function of the

aquatic ecosystem and organisms.  40 C.F.R. § 230.11(a)–(e).  The Corps must assess both the

cumulative impact resulting from individual discharges of dredged or fill material as well as any

secondary effects associated with the discharge but not directly resulting from it.  40 C.F.R.

§ 230.11(g)–(h).

---

[12]General permits cover classes of activities determined to be similar in nature and that result in minimal adverse incremental or cumulative impact to waters of the United States.  33 U.S.C. § 1344(e)(1).  General permits are not at issue in this matter, but have been the subject matter of extensive litigation.  *See generally OVEC v. Bulen*, 429 F.3d 493 (4th Cir. 2005).

No permit shall be issued if (1) there is a practicable alternative to the proposed discharge which results in a less adverse impact on the aquatic ecosystem and where the alternative does not itself result in significant adverse consequences; (2) the proposed discharge will cause or contribute to significant degradation to the waters of the United States; or (3) potential adverse impacts to the aquatic ecosystems are not minimized through appropriate and practicable steps.  40 C.F.R. § 230.10.

Alternatives to the proposed discharge include discharge of the dredged or fill material at another location or activities involving no discharge at all.[13]  40 C.F.R. § 230.10(a)(1)-(2).  In determining whether a proposed discharge individually or collectively contributes to the significant degradation of the waters of the United States, the Corps must assess any adverse effect of the discharge on (1) human health or welfare including municipal water supplies, fish, and wildlife; (2) life stages of aquatic life and other wildlife dependent on the aquatic ecosystem; (3) aquatic ecosystem diversity, productivity, and stability; and (4) recreational, aesthetic, and economic values.  40 C.F.R. § 230.10(c)(1)–(4).  Potentially adverse impacts may be minimized by requiring on-site or off-site mitigation as a condition of the permit.  33 C.F.R. §§ 320.4(r)(1), 325.4(a)(3).  Such mitigation must be directly related to the impacts of the proposal and designed to avoid, reduce, or compensate for those resource losses which have been identified and are reasonably likely to occur.  40 C.F.R. § 320.4(r)(1)–(2).

---

[13]An alternative is considered practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

*B. National Environmental Policy Act*

In 1970, Congress enacted NEPA to serve as "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2006). NEPA is designed to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. Specifically, NEPA sets forth "action-forcing" procedural requirements to ensure federal agencies act in furtherance of this goal. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348 (1989).

First, NEPA requires that an agency take "a 'hard look' at environmental consequences" before taking any action that may affect the environment. *Id.* at 350. Second, NEPA provides for broad dissemination of relevant environmental information for public comment so that the general public may be an active participant in the decisionmaking process. *Id.* at 349–50; *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996).

At base, NEPA is a procedural statute intended to prevent uninformed agency action. *Robertson*, 490 U.S. at 351. It does not require substantive, environmentally friendly results, merely that adverse environmental effects of a proposed action are identified and evaluated. *Id.* at 350–51. An agency action resulting in harmful environmental effects will not be overturned where the agency has considered the environmental impact of that action and then determined that other benefits outweigh them. *Id.* at 350.

Pursuant to § 102 of NEPA, a federal agency, to the fullest extent possible, must prepare a detailed EIS for actions which "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). In order to assist federal agencies in this process, Congress established the Council on Environmental Quality ("CEQ") to oversee the implementation of the environmental

impact assessment process and ensure federal agencies fulfill their obligations under NEPA.  The CEQ has promulgated extensive regulations in furtherance of this mandate.  40 C.F.R. § 1500.3.  Under the CEQ regulations, agencies must consider both the "context" and the "intensity" of a proposed action to determine if the action "significantly" affects the environment sufficient to require an EIS.  40 C.F.R. § 1508.27.  "Context" focuses the scope of the analysis to the affected geographic region and interests, 40 C.F.R. § 1508.27(a), whereas "intensity" looks to the severity of the environmental impact upon that region and interests.  40 C.F.R. § 1508.27(b).  Impacts that alone appear insignificant may become significant when cumulatively grouped together.  40 C.F.R. § 1508.27(b)(7).  An agency may not avoid issuing an EIS by separating a significant action into small insignificant component parts.  40 C.F.R. § 1508.27(b)(7).

Not all actions "significantly" affect the environment, however, and where it is unclear, an agency must complete an environmental assessment ("EA") to determine whether an EIS is required.  40 C.F.R. § 1501.4.  The EA serves as "a concise public document" containing the evidence and analysis of the agency and its determination whether an EIS is required.  40 C.F.R. § 1508.9(a).  At the heart of an EIS is the requirement to explore and evaluate reasonable alternatives to the proposed action.  For no matter how thorough, an EA can never serve as a substitute for the preparation of an EIS if the proposed action could significantly affect the environment.  An EA simply determines whether there will be a significant impact on the environment whereas an EIS, in contrast, weighs any significant negative impacts of the action against the positive objectives of the project.  *Anderson v. Evans*, 371 F.3d 475, 494 (9th Cir. 2004).  An EIS serves to balance the negative

-21-

environmental consequences against the project's objectives, so that officials are adequately informed about the environmental effects before deciding whether to approve a project. *Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985).

If the agency concludes that its action will not have a significant effect on the environment, it must issue a finding of no significant impact ("FONSI") containing the basis for its decision. 40 C.F.R. § 1508.13. However, even where the action will result in a significant effect on the environment, the agency may forego issuing an EIS through a mitigated FONSI. *Wetlands Action Network v. U.S. Army Corps of Eng'rs,* 222 F.3d 1105, 1121 (9th Cir. 2000). If the agency or an involved third party "employ certain mitigation measures that will lower the otherwise significant impacts of an activity on the environment to a level of insignificance[,] . . . a FONSI could be issued for an activity that otherwise would require the preparation of a full-blown EIS." *Spiller v. White*, 352 F.3d 235, 241 (5th Cir. 2003); *see also Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 62 (4th Cir. 1991) ("If a mitigation condition eliminates all significant environmental effects, no EIS is required.").

## V.

## DISCUSSION

As to each permit, the applicants submitted dozens of technical, complex reports to the Corps in order to satisfy the detailed review required under the CWA and NEPA. The accumulated administrative record for each permit is extensive, comprised of thousands of pages and filling multiple binders. However, "girth is not a measure of the analytical soundness of an environmental assessment." *Anderson*, 371 F.3d at 494. The Corps' staff clearly devoted substantial time and effort reviewing and considering the applications. At the Corps' insistence, the applicants have

-22-

revised their projects, at least in part to reduce environmental concerns. The process has been a long one, and the task a substantial challenge for the Corps' staff and the applicants. The staff obviously took the Corps' responsibilities seriously and endeavored to produce decisions that tracked the standards set in the statutes and regulations which the Corps is duty-bound to apply. Even so, it is not the amount of the Corps' effort that is at issue here; rather, what matters is whether the results meet the proper standards. For the reasons which follow, the Court finds that the Corps has not met its obligations under the CWA and NEPA. The Court's criticisms arise more from the practices and fundamental assumptions used by the Corps than from the expertise or diligence of the staff.

### A. The Probable Impacts of the Valley Fills will be Significant and Adverse

The initial step in the Corps' review under the CWA and NEPA is to determine the potential environmental impacts of the proposed activity.[14]  The Corps is required under both regulatory schemes to examine how, and to what extent, the proposed project will affect the environment.[15] Unless the effects of the activity are properly identified, the agency has not met its legal obligation and any proposed mitigation measures dependant upon an incomplete environmental impact analysis

---

[14]The regulations use the terms "effects" and "impacts" interchangeably throughout its regulations. 40 C.F.R. §§ 230.10, 1508.8. So, too, will the Court.

[15]NEPA requires a federal agency to "[i]dentify[] at an early stage the significant environmental issues deserving of study and deemphasiz[e] insignificant issues . . . ." 40 C.F.R. § 1501.1(d).  Similarly, the 404(b)(1) Guidelines, in prohibiting discharges that "have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern," necessarily require a factual determination of potential adverse impacts before a permit may be issued. 40 C.F.R. § 230.1(c).

necessarily fail. *Nat'l Audubon Soc.*, 422 F.3d at 185 (citing *Robertson*, 490 U.S. at 350–51 (stating that NEPA requires agencies to adequately identify and evaluate the environmental costs of a proposed action)).

Although the statutes impose overlapping responsibilities on an agency, the scope of the NEPA analysis extends beyond that required by the CWA. For instance, NEPA characterizes environmental impacts more broadly than the CWA, to include not only ecological effects such as impacts to physical, chemical, and biological components of the aquatic ecosystem, but also aesthetic, historic, cultural, economic, and social effects. 40 C.F.R. §§ 230.10–11, 1508.8. In addition, NEPA requires an agency to consider both the direct effects caused by an action and any indirect effects which are reasonably foreseeable. 40 C.F.R. § 1508.8. In this context, analyzing the direct and indirect effects of a proposed discharge potentially includes effects to the environment outside the aquatic ecosystem. By contrast, the CWA only calls for a determination of potential effects to the aquatic ecosystem itself.[16]

### 1. Adverse Impacts Under the Clean Water Act

The 404(b)(1) Guidelines prohibit discharges which result in significant degradation to waters of the United States. 40 C.F.R. § 230.10(c). Waters of the United States include waters used in interstate commerce, lakes, rivers, streams, including intermittent streams, tributaries, and the

---

[16]The 404(b)(1) Guidelines require an accounting of secondary effects on the aquatic ecosystem in addition to direct effects. 40 C.F.R. § 230.11(h)(1). Secondary effects, as defined by the 404(b)(1) Guidelines, still do not extend beyond the aquatic ecosystem like the effects analyzed under NEPA. The 404(b)(1) Guidelines define secondary effects as the "effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." 40 C.F.R. § 230.11(h)(1). Examples of secondary effects include fluctuating water levels, septic tank leaching, and surface runoff. 40 C.F.R. § 230.11(h)(2).

wetlands adjacent to these waters.  40 C.F.R. § 230.3(s).  A discharge is deemed to contribute to significant degradation if it results, either individually or collectively, in significant adverse effects on the human health or welfare; the life stages of aquatic life and other wildlife dependent on aquatic ecosystems; or the diversity, productivity, and stability of the aquatic ecosystem, including, but not limited to, "loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy."  40 C.F.R. § 230.10(c)(1)–(3).  Further, no discharge is permitted unless "appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."  40 C.F.R. § 230.10(d).

The 404(b)(1) Guidelines require the Corps to make certain factual determinations before it may decide whether to issue a permit.  In order to evaluate the proposed discharge of dredged or fill material, the Corps must assess the short-term and long-term effects of the discharge on the (1) physical substrate; (2) water circulation, fluctuation, and salinity; (3) changes in the kinds and concentrations of suspended particulate/turbidity in the vicinity of the disposal site; (4) introduction, relocation, or increase in contaminants; and (5) structure and function of the aquatic ecosystem.  40 C.F.R. § 230.11.  The Corps, in analyzing effects on the aquatic ecosystems and organisms, must consider potential changes in "substrate characteristics and elevation, water or substrate chemistry, nutrients, currents, circulation, fluctuation, and salinity, on the recolonization and existence of indigenous aquatic organisms or communities [and] [p]ossible loss of environmental values."[17]  40

---

[17]In making factual determinations regarding the possible loss of environmental values, the 404(b)(1) Guidelines state:

The discharge of dredged or fill material can variously affect

(continued...)

C.F.R. § 230.11(e).  This determination of individual impacts is then used to ascertain the cumulative impacts to the aquatic ecosystem, or the collective changes in the aquatic ecosystem attributable to the discharge.  40 C.F.R. § 230.11(g)(1).  Individual discharges may be considered minor by themselves, but by determining the cumulative impact of such piecemeal changes, the Corps can discern whether a significant impairment of water resources, productivity, and water quality will result.  *Id.*

### 2. Significant Impacts Under NEPA

NEPA requires every federal agency recommendation or proposal for actions "significantly affecting the quality of the human environment" to include a detailed statement describing the environmental impact of the action, any adverse and unavoidable environmental effects of the action, and any alternatives to the action.  42 U.S.C. § 4332(2)(C).  Therefore, as a threshold issue under NEPA, the agency must determine whether the effects[18] of the activity are significant.

---

[17](...continued)
> populations of fish, crustaceans, mollusks and other food web organisms through the release of contaminants . . . . Discharge of dredged and fill material may result in the debilitation or death of sedentary organisms by smothering, exposure to chemical contaminants in dissolved or suspended form, exposure to high levels of suspended particulates, reduction in food supply, or alteration of the substrate upon which they are dependant . . . . Reduction of detrital feeding species or other representatives of lower trophic levels can impair the flow of energy from primary consumers to higher trophic levels.  The reduction or potential elimination of food chain organism populations decreases the overall productivity and nutrient export capability of the ecosystem.

40 C.F.R. § 230.31(b).

[18]Effects include direct effects caused by the action and occurring at the same time and place and indirect effects caused by the action, but later in time or farther removed in distance, but still
(continued...)

Significance, as defined by NEPA, requires the agency to consider both the context of the action and the intensity, or severity, of the activity.  40 C.F.R. § 1508.27.  In evaluating the intensity of an activity, the agency must consider (1) impacts that may be both beneficial and adverse; (2) the degree to which the action affects public health or safety; (3) any unique characteristics of the geographic area; (4) whether the effects on the human environment will be highly controversial; (5) whether the effects on the environment are uncertain or involve unknown risks; (6) whether the action, in conjunction with individually insignificant impacts, results in cumulative impacts that are significant; (7) whether the action adversely affects historic sites, structures, or objects or may result in loss or destruction of scientific, cultural, or historical resources; and (8) whether the action will adversely affect an endangered species or its habitat.  *Id.*

### 3. The Corps' Determination of Impacts

The Corps produced a Combined Decision Document ("CDD") for each permit, comprising both its 404(b)(1) Guideline and NEPA analyses.[19]  Each CDD, in granting the CWA permit under the 404 (b)(1) Guideline review and issuing a FONSI under the NEPA review, discusses the impacts

---

[18](...continued)
reasonably foreseeable.  40 C.F.R. § 1508.8.

[19]The CDD represents the decision of the Corps with respect to each permit.  Each CDD is based on the respective analysis of direct, indirect, and cumulative impacts associated with the proposed discharge and summarizes the Corps' review under NEPA, the CWA and the 404(b)(1) Guidelines, the Endangered Species Act, and the National Historic Preservation Act of 1966.  The CDDs identify the key factors considered in the Corps' decision, any alternatives considered, any required monitoring and mitigation measures, and the Corps' final decision regarding issuance of the permit.  The CDD consists of separate parts: the 404(b)(1) Guidelines, the Environmental Assessment, and the Statement of Findings.

and treats them similarly, and so will the Court in addressing Plaintiffs' challenges to the Corps' decisions.  To the extent the analysis includes non-aquatic impacts, that analysis falls largely under the purview of NEPA, not the CWA.[20]

The Corps' decision to issue these permits will allow the applicants to bury miles of streams and fill their valleys with excess spoil material produced by mountaintop removal mining.[21]  The Corps candidly acknowledges in the CDDs that these valley fills will permanently bury the streams along with their riparian areas, permanently alter the normal water flow within the area under the fill, and destroy or disrupt the living organisms and their habitats within the valley.[22]

_____

[20]Whereas NEPA potentially extends beyond the habitat surrounding the water, depending upon the scope of analysis, the 404(b) Guidelines limit the Corps' analysis to the aquatic ecosystem, including the waters and, to an extent, the habitat and other components that interact with the waters. 40 C.F.R. §§ 230.3(c), 230.11(h).

[21]This material consists of rock, soil and other material excavated during mining by using the mountaintop removal method.  The material expands greatly and cannot be placed back in its approximate original contour, so valleys near the mining are filled.  In addition, the overburden material, as a result of being exposed, undergoes chemical changes which also may affect water quality and aquatic life.

[22]The environmental impacts depicted within the CDD for the Republic No. 2 permit are representative of the impacts for each of the four respective mines:

> Long-term, permanent impacts would consist of permanent changes to habitat and elimination of wildlife populations that may depend on that habitat, i.e., permanent loss of ephemeral and intermittent stream channels and their adjacent riparian buffers. . . . Direct impacts would include direct mortalities, physical displacement, and aquatic habitat alternation. . . . [T]he proposal should result in minimal smothering of aquatic organisms.  However, the benthic populations that do exist would be eliminated as a result of the permanent discharge of the fill.  The elimination of these streams would also result in temporary adverse impacts to food sources (organic material) that are input into these areas and transported to lower reaches of the stream channels.  The permanent discharge of fill material would temporarily disrupt

(continued...)

Each decision reports the length of the streams to be filled.[23]  For example, the Laxare East permit allows the permanent filling of 24,860 linear feet of intermittent[24] and ephemeral[25] streams in order to construct the seven valley fills within the Laurel Creek and Drawdy Creek watersheds. *CDD for Laxare East Surface Mine Application* ("*Laxare East CDD*"), 14, 44 (July 18, 2006). These seven fills will hold 73.9 million cubic yards of overburden material, with each fill draining between 108 acres to 229 acres. *Id.* at 14–15, 36.  Construction of these fills will require the permanent filling of 9,367 linear feet of intermittent and 15,493 linear feet of ephemeral streams. The project also calls for the construction of ten sediment ponds,[26] which will temporarily impact 935 linear feet of intermittent streams and 2,164 linear feet of ephemeral streams.  In total, 27,959 linear feet of intermittent and ephemeral streams will be impacted, 24,860 permanently.  Biological

---

[22](...continued)
> aquatic and associated riparian ecosystems during the proposed mining activities. . . . [T]he proposed mining activities would permanently alter the normal water flow within the footprint of the fills.

*CDD for Republic No. 2 Surface Mine Application* ("*Republic No. 2 CDD*"), 17 (July 6, 2006).

[23]The Court relied on the respective CDDs for the linear feet of stream impacts and mitigation measures.  The Court notes that the permits do vary in part from the numbers specified within the respective CDDs and, therefore, the Court used only those numbers in the CDDs which matched those listed in their respective permits.

[24]An intermittent stream is a stream that has flowing water most of the year, though perhaps not during dry periods, from both groundwater and surface runoff.

[25]An ephemeral stream flows only after precipitation.  These streams typically are found near the ridge line at the top of a hollow, above the water table.

[26]Water draining off the valley fill runs into an existing stream at the base of the fill.  This stream is dammed downstream of the fill to form a pond to capture sediment.

samples collected at different stations within the streams revealed a large number and healthy variety of aquatic organisms.[27]  *Id.* at 16.

Similarly, the Black Castle permit calls for nine valley fills and six sediment ponds within the Mudlick Fork, Laurel Creek, and Sandlick Creek watersheds.  *CDD for Black Castle Contour Surface Mine Application* ("*Black Castle CDD*"), 3, 5 (July 18, 2006).  The nine valley fills will contain approximately 2.57 million cubic yards of overburden material, draining watersheds ranging from 41 to 180 acres.  *Id.* at 3, 9, 44.  The Corps authorizes the permanent filling of 12,851 linear feet of intermittent streams and 2,786 linear feet of ephemeral streams in order to construct the nine valley fills.  *Id.* at 3.  Four sediment ponds will be constructed, temporarily impacting 879 linear feet of intermittent streams.  In sum, 16,516 linear feet of intermittent and ephemeral streams will be impacted, 15,637 permanently filled.  Prior mining within these watersheds have left their toll, and Laurel Creek and Sandlick Creek have not met state water quality standards for years.  *Id.* at 28–29, 49.

The Camp Branch permit authorizes the construction of four valley fills and four sediment ponds within the Camp Branch watershed in order to account for the approximately 59.7 million cubic yards of overburden.  *CDD for Camp Branch Surface Mine Application* ("*Camp Branch CDD*"), 1, 3, 9 (July 6, 2006).  The permit allows for the permanent filling of 14,762 linear feet of intermittent streams and 297 linear feet of ephemeral streams, with the fills draining watersheds ranging from 89 to 367 acres.  *Id.* at 3, 25–26.  The four sediment ponds required by the project will temporarily impact 455 linear feet of intermittent streams.  Like the Black Castle area, the land

---

[27]Specifically, these stream segments had been characterized as having "good station abundances and taxa richness" according to the WV-Stream Condition Index.

adjacent to the watersheds has experienced past and current mining, as well as other land disturbance.  In contrast to Black Castle, most of these areas exhibited good physical and chemical water quality and good fish habitat and cover.  *Id.* at 12, 27.

The Republic No. 2 permit allows for the construction of three valley fills and three sediment ponds within the Upper Cabin Creek watershed to account for the 54 million cubic yards of overburden.  *Republic No. 2 CDD*, at 4, 7–8, 21.  Construction of the three valley fills will permanently impact 6,819 linear feet of intermittent streams and 3,099 linear feet of ephemeral streams.  *Id.* at 7.  In turn, the three sediment ponds will temporarily impact 690 linear feet of intermittent streams.  *Id.*  Water quality within the affected streams ranges from poor to good as a result of prior mining, with the better quality water located near the toe[28] of existing fills and becoming poorer farther downstream.  *Id.* at 16, 32.

The Corps does not dispute that these impacts, standing alone, would require a finding that the proposed discharges violate the CWA and mandate a full EIS under NEPA.  *See, e.g.*, *Black Castle CDD*, at 87.  However, the Corps defends its approvals by relying on mitigation to offset these impacts, thereby rendering the effects not significant.  Before the Court may evaluate whether the mitigation plans offset the impacts, the Court first must consider whether the Corps has met its duty to properly assess the impacts.

### i. Structure and Function of Aquatic Resources

The 404(b)(1) Guidelines require the Corps to assess the effects of the discharge on the "structure and function" of the aquatic ecosystem.  40 C.F.R. § 230.11(e).  The regulations do not

---

[28]The toe is the base of the fill at its outermost point.

expressly define "structure and function," but clearly the Corps must consider, at minimum, "potential changes in substrate characteristics and elevation, water or substrate chemistry, nutrients, currents, circulation, fluctuation, and salinity, on the recolonization and existence of indigenous aquatic organisms or communities," as well as possible loss of environmental values.  40 C.F.R. § 230.11(e).

Plaintiffs contend that the phrase "structure and function" has a generally accepted meaning within the scientific community in the context of stream resources.  As a result, Plaintiffs interpret the 404(b)(1) Guidelines to require the Corps to perform a thorough, quantitative evaluation of the projects' impacts on the aquatic resources to be destroyed by the valley fills.  Based on this interpretation, Plaintiffs believe the Corps failed to properly evaluate the functions of the streams being destroyed and, consequently, inadequately identified the impact of their loss and the corresponding mitigation measures.  In support, Plaintiffs offered extensive comments and reports—which are contained within the administrative record—from scientific experts, who also testified before the Court during the six day trial.[29]

In their reports and testimony, Plaintiffs' experts described a number of stream characteristics and processes considered by the scientific community to represent the "structure and function" of aquatic resources.[30]  According to Plaintiffs' experts, one-time measurements of an

_____

[29]The trial was held from October 3, 2006, to October 12, 2006.  All citations to the transcript will reference the volume and specific page number within the volume.  For clarification, Volume I includes the testimony of October 3, 2006; Volume II is for October 4, 2006; Volume III is from October 5, 2006; Volume IV is for October 6, 2006; Volume V is for October 10, 2006, and Volume VI is the testimony from October 12, 2006.

[30]At trial, Plaintiffs offered the testimony of two experts in stream ecology and ecosystems, who previously had submitted comments throughout the administrative review process: Dr. J. Bruce
(continued...)

existing condition, such as benthic macroinvertebrate[31] sampling or habitat assessment, evaluate only the "structure" of an aquatic ecosystem, simply offering snapshots of the stream's condition that day. As a result, taking measurements or observations of stream "structure," though useful information, is incomplete to understanding fully the impacts resulting from the destruction of these streams.  In order to assess fully the environmental impacts, Plaintiffs contend important stream "functions" also must be considered.

"Functions," as defined by Plaintiffs' experts, refer to the processes or services provided by the stream to the ecosystem.  Functions occur over space and time and are measured by a rate, thus providing a more complete understanding of the stream's role and value as an aquatic resource.  At trial, Dr. Palmer explained functions by reference to a chart she prepared listing several, though not all, stream functions scientists agree are typical of streams.  (Tr. vol. II, 138–41; Intervenors' Ex. 7.)  For example, one such function is nutrient processing, in which streams process nutrients (such as nitrogen and phosphorus) and remove contaminants (such as toxic metals or sediment) that otherwise would accumulate and make streams unsuitable for drinking and for sustaining aquatic life.  Another such function involves the decomposition of organic matter, which prevents the buildup of organic waste that affects oxygen levels and energy sources downstream.  In her

---

[30](...continued)
Wallace and Dr. Margaret Palmer.  Dr. Wallace is an expert in stream ecology and has researched and published extensively on aquatic resources, particularly headwater streams in the Appalachian region.  Dr. Palmer is an expert in stream ecosystem structure and function, particularly stream restoration.  Her research has focused on the relationship between biodiversity and ecosystem function.  Dr. Palmer has directed stream restoration projects and organized the National River Restoration Science Synthesis project in order to better inform policy at local, regional, and national levels.

[31]Benthic macroinvertebrates, as described by Dr. Wallace, are insects and crustaceans typically visible to the naked eye.  (Tr. vol. I, 248.)

testimony, Dr. Palmer offered a useful analogy to illustrate the distinction between structures and functions, explaining that structures are similar to the physical attributes of a person, such as height and weight, whereas functions are akin to blood pressure and heart rate.  Although both are important, functions better reflect the overall health and role of the stream as an aquatic resource.

Plaintiffs advocate the actual measurement over time to establish the rate of these functions, arguing that both the 404(b)(1) Guidelines as well as the consensus of the scientific community require such a quantitative assessment.  Plaintiffs believe these measurements can be conducted inexpensively and would not unduly delay the review, particularly in light of the considerable period of time necessarily transpiring during the permit review.  For instance, processes such as nutrient processing or decomposition of detritus[32] may be measured periodically over a matter of weeks or months and do not require significant costs or expertise.

For the most part, Plaintiffs, applicants, and the Corps agree on the list of "functions" supplied by a stream.  That list includes: (1) treatment of pollutants; (2) nutrient cycling; (3) temperature control; (4) maintenance of genetic diversity; (5) dynamic stability; (6) movement of water and sediment; and (7) water and organic matter retention.  *See, e.g.*, *Laxare East CDD*, at 42; *CMP for Laxare East Surface Mine* ("*Laxare East CMP*"), 25–26 (Nov. 23, 2005).  The parties diverge, however, over whether or how these functions should be measured as part of the Corps' review.  Plaintiffs contend that the Corps must measure the functions of the affected waterways,

---

[32]Detritus is non-living particulate organic material, including the bodies of dead organisms, leaves, twigs and woody matter produced by plants.  Organisms feed on this material, breaking it down as it flows downstream.  This decomposition cycle plays a significant role in the water purification process and nutrient transport within streams.

whereas the Corps believes it may rely upon one-time, structural measurements to determine the effects to a stream.

The Corps counters that Plaintiffs' view of a quantitative functional analysis of impacted streams is not required under the 404(b)(1) Guidelines. Instead, the Corps asserts that determining the proper method of evaluating stream functions is a matter best left to the agency's discretion and that the CDDs and supporting documentation within the administrative record adequately assess the functions of the aquatic ecosystems based upon its best professional judgment.

The Corps and Intervenors argue that because "structure and function" is undefined within the 404(b)(1) Guidelines, the Corps may exercise its expertise to determine what "structure and function" means and how to evaluate it. According to the Corps' and Intervenors' experts, the "structure" factors reported by the applicants and discussed by the Corps within the CDDs provide sufficient information to serve as surrogates for functional characteristics and meet regulatory requirements. With no express regulatory definition, the Corps relies upon its 1990 Memorandum of Agreement with the EPA for clarification of what is required when analyzing the structure and function of an ecosystem. *Memorandum of Agreement Between the Department of the Army and the Environmental Protection Agency: The Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines* ("MOA"), 55 Fed. Reg. 9210 (Mar. 12, 1990).

The MOA sets forth the policies and procedures to be used in determining the type of mitigation necessary to comply with the CWA, which depends upon the "values and functions of the aquatic resource that will be impacted." *Id.* at 9211. In particular, the MOA directs the Corps, in evaluating compensatory mitigation, to consider the "functional values lost by the resource to be impacted." *Id.* at 9212. In order to achieve the goals of the CWA

> the Corps will strive to avoid adverse impacts and offset unavoidable adverse impacts to existing aquatic resources. Measures which can accomplish this can be identified only through resource assessments tailored to the site performed by qualified professionals because ecological characteristics of each aquatic site are unique. Functional values should be assessed by applying aquatic site assessment techniques generally recognized by experts in the field and/or the best professional judgment of federal and state agency representatives, provided such assessments fully consider ecological functions included in the Guidelines.

*Id.*

The Corps also relies upon its Regulatory Guidance Letter addressing its compensatory mitigation policies issued on December 24, 2002, for additional clarification regarding aquatic functions. *U.S. Army Corps of Engineers Regulator Guidance Letter* ("RGL"), No. 02-2 (Dec. 24, 2002). In identifying the unique environmental losses[33] resulting from authorized activities, the RGL encourages Corps' district offices to employ a "functional assessment by qualified professionals to determine impacts." *Id.* at 2. The RGL further recommends districts conducting functional assessments determine "functional scores using aquatic site assessment techniques generally accepted by experts . . . or the best professional judgment" of federal and state agency representatives, while "fully considering ecological functions included in the 404(b)(1) Guidelines." *Id.* at 2. For those projects anticipated to adversely impact streams, the RGL directs the Corps "to replace the stream functions where [a] sufficient functional assessment is feasible" or otherwise replace streams by linear foot on a 1:1 basis. *Id.* at 3.

_____

[33]The stated objective of the RGL is to offset environmental losses from authorized activities because the ecological characteristics of aquatic sites are unique. By determining the unique characteristics of an aquatic site to be affected, the Corps can impose appropriate mitigation measures to offset the anticipated losses.

-36-

At trial, the Corps acknowledged that it has no functional assessment standard currently available for use in the Appalachian coalfields, and therefore, it relies upon the best professional judgment of its staff to assess aquatic values—in this case, by the structure measurements submitted by the applicants.  The Corps notes, however, that it is in the early stage of developing a functional assessment methodology for the Huntington District and, once available, plans to use a functional assessment to gage the success of mitigation.  Dr. Mark Sudol, Chief of the Corps' Regulatory Program, pointed to a lack of funding as the primary impediment to developing and implementing a true functional assessment for this district.  In the meantime, the Corps has continued to review and issue permits that will allow mining and valley fills that permanently destroy significant stretches of headwater streams.  However, this unfortunate circumstance by itself does not dictate a finding that the Corps violated its duty to evaluate the structure and function of the resources.

The Corps asserts that it has complied with the MOA and RGL and, therefore, the regulations by requiring mitigation measures of, at minimum, a 1:1 basis.[34]  That is, in the Corps' view, so long as at least an equal length of stream mitigation occurs for the length of streams destroyed, the 1:1 ratio is met and the impact is no longer considered significant or adverse.  The Corps argues that for each of the respective permits it used its best professional judgment to conclude that one foot of

---

[34]The mitigation required for each of the permits exceed the 1:1 ratio, in some instances requiring mitigation two to three times the linear feet of streams impacted.  For example, the Camp Branch permit involves the mitigation of 43,306 linear feet of streams in order to offset the 15,514 linear feet of streams impacted by the discharge, a 2.8:1 ratio.  *Camp Branch CDD*, at 1, 3, 9; Defs.' Ex. 32.  Similarly, the Laxare East permit requires the mitigation of 36,722 linear feet to compensate for 27,959 linear feet of impacts, a 1.3:1 ratio.  *Laxare East CDD*, at 14, 44; Defs.' Ex. 48.  The Court also notes that the precise distances of the stream impacts and mitigation for a particular permit may vary in the record, but not materially, with the distances listed in the CDD differing from those listed in the permit and the distances listed in Defendants' exhibits differing from those in Intervenors' exhibits.

stream mitigation—whether by restoration, creation or enhancement—replaces the adverse impacts of each foot lost.  The Corps urges the Court to defer to its professional judgment, relying upon *Airport Communities Coal. v. Graves* 280 F. Supp.2d 1207 (W.D. Wa. 2003), and *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 12507 (10th Cir. 2004), in support of its argument that it has complete discretion in how to evaluate function and structure.  In *Airport*, the Court deferred to the Corps' choice of a particular methodology to evaluate wetland functional loss from a fill project.  *Id.* at 1226.  There, however, the Corps had a list of specific, acceptable methodologies, with guidance as to specific geographic and habitat factors, and chose the methodology described as technically the most extensive and progressive.  *Id.*  Here, the Corps claims reliance on the unexplained, apparently subjective, professional judgment of functional values lost.  Similarly, the Court in *Greater Yellowstone* noted that the requirements of 40 C.F.R. § 230.11(e) had been met, but gave no indication that the method of the factual determinations was at issue.  *Greater Yellowstone*, 359 F.3d at 1271.  These cases do not stand for the proposition that the Corps may exercise unbridled discretion, disguised as best professional judgment, or ignore its own regulations and guidance statements in fulfilling a critical step of the impacts analysis.

After a thorough examination of the regulations, the MOA, and the RGL, the Court does not adopt Plaintiffs' argument that the scientific community has clearly recognized not only a set of functions that must be assessed,[35] but also that these functions must be measured as Plaintiffs' experts advocate.  No functional assessment methodology has been adopted as yet by the Huntington District, so in making its decisions in this case, the Corps may rely upon the best professional

---

[35]Although the Court previously noted that the parties agreed on a list of functions within a stream, the Court did not find that this list so clearly represented the opinion within the scientific community that the Corps is required to utilize them.

-38-

judgment of its staff to assess the functional values lost.  The Court finds that the Corps is entitled to deference on how to measure the structure and function of a particular stream.  As there is no regulatory definition of the terms, nor any regulatory description of how to measure them, the Corps is entitled to use its best professional judgment in accordance with the MOA and RGL to evaluate the functions which will be lost.[36]

However, that judgment must constitute a full assessment of the streams' ecological functions before the Corps may conclude that the structure and function of the resources buried by the valley fills is offset by the imposed mitigation measures.  Consequently, the Court must determine whether the Corps' reliance on its best professional judgment meets the obligations set forth by the CWA and the 404(b)(1) Guidelines.  In exercising its best professional judgment, the Corps still must take a "hard look" at the evidence and explain its decision on an objective or scientific basis sufficient to provide a reasoned basis for its conclusions.  *See Motor Vehicle Mfrs.*, 463 U.S. at 52 (holding that an "agency must explain the evidence which is available, and must offer a rational connection between the facts found and the choice made") (internal quotation marks and citation omitted).  In this regard, the Corps has failed.

*ii. Role of Headwater Streams*

Even accepting the Corps' position that "structure and function" measures are best left to its discretion, the Corps has not assessed the full impacts of destroying headwater streams within a

---

[36]Although no regulatory definition exists, the 404(b)(1) Guidelines require the Corps to consider, at minimum, "potential changes in substrate characteristics and elevation, water or substrate chemistry, nutrients, currents, circulation, fluctuation, and salinity, on the recolonization and existence of indigenous aquatic organisms or communities," as well as possible loss of environmental values.  40 C.F.R. § 230.11(e); *see also MOA*, 55 Fed. Reg. at 9212; *RGL*, at 2.

watershed.  The Corps has evaluated the physical structure of the streams and partially considered impacts to these streams as habitat, but has given no more than lip service to the other attributes of headwaters that must be considered in assessing the structure and function of a stream.

At trial, Plaintiffs' experts Drs. Wallace and Palmer discussed the interrelationship among streams and the areas they drain.  In particular, Dr. Wallace, Plaintiffs' expert on stream ecology, described headwater streams and their importance in stream ecology.  Headwater streams, also referred to as first and second order streams, are where streams and rivers originate.  Headwater streams may be ephemeral or intermittent, draining a hollow but not having steady, year-round visible flow.  Intermittent headwater streams receive most of their flow from groundwater and, therefore have at least subsurface flow most of the time.  In contrast, ephemeral streams flow only from rain or snow.  In the Appalachian region, these streams generally are surrounded by forests and greatly influenced by the effect of leaf cover and the detritus produced by the trees and plants.  (Tr. vol. I, 245.)

All streams contribute similar ecological benefits, no matter what their size.  Streams transport sediment and organic material downstream and serve as habitat for aquatic and other life.  Yet, headwater streams differ from perennial streams in critical ways.  Headwater streams, such as those at issue here, are typically found in forested hollows.  The forests supply organic material critical to the stream and life within it.  Trees often produce a canopy covering portions of the stream, shading the water in the summer and providing organic matter.  This organic material is collected within the headwater streams, broken down and transported downstream where it supplies much of the energy and material which support life and other ecological functions.  In addition, the process of "nutrient uptake" is greater in headwater streams.  (Tr. vol. II, 24, 174.)  Headwater

streams are shallow and flow slowly despite their location in steeper terrains, and also are obstructed easily by rocks or organic materials, such as leaves or branches.  (Tr. vol. I, 246.)  As a result of this increased interaction with the stream bed, or substrate, and the presence of fungi and microbes on the organic material, headwaters allow for nutrients to be broken down and used by organisms downstream.  (Tr. vol. I, 250–56; Tr. vol. II, 20.)

Moreover, headwaters serve as the habitat for unique fauna and possess greater biodiversity, with 90% of the biodiversity of a watershed found in headwaters.  (Tr. vol. I, 242–43; Tr. vol. II, 175–76.)  The types of benthic organisms found in headwater differ as well.  Benthic organisms, classified as "scrapers," "shredders," and "collectors," predominate within headwater streams, feeding on the microbes and fungi found on the leaves in the stream.[37]  Aquatic organisms in headwaters break down organic material through decomposition into smaller particles so it may be transported downstream to serve as food for other organisms.  The rate of growth of these organisms is called productivity, a critical "function" of a stream resource.  Many species found in headwaters are sensitive to pollutants or other changes such as altered water temperature or flow levels.  A greater portion of their flow comes from groundwater, which tends to be cooler than surface water in the summer and warmer in the winter, thereby regulating the temperature of downstream waters.  This groundwater exchange also contributes to a water purification function.  Groundwater exchange is a complex interaction of water, nutrients, organic material and chemicals, occurring through contact with the stream bed and banks, where water and dissolved material move to and from the

_____

[37]Aquatic organisms that feed on organic matter may be identified and grouped by their mode of feeding in "functional feeding groups."  These organisms break down organic matter in the stream, and their presence determines the ability of the stream to convert coarse organic matter into fine particulate matter, for use by downstream life.

stream.  (Tr. vol. II, 157–59.)  These characteristics make headwater streams disproportionately important in functions related to biodiversity, water quality, and nutrient processing.  (Tr. vol. II, 174–75.)

The destruction of headwater streams and the trees and plants around them eliminates a large amount of organic material from the stream network and deprives downstream resources of the other functions typically served by headwater streams.  The Corps did not address at all the destruction of forested areas beyond the riparian zones, as the Court will discuss in considering the scope of review. The groundwater exchange naturally occurring in intermittent streams is lost, which may decrease the water purification process.  (Tr. vol. VI, 108–11.)  As a result of valley fills, the water chemistry changes, which affects the range of aquatic life.  Valley fills increase the discharge of chemicals which are then carried downstream.[38]  (Tr. vol. II, 33–35.)  While many discharges are regulated by water quality standards, some chemical changes associated with poorer water quality, such as conductivity, are not.[39]  (Tr. vol. V, 16.)  The increased chemical mix produced by valley fills reduces biodiversity, causing a shift toward pollution tolerant organisms.  (Tr. vol. II, 37, 95; Tr. vol. VI, 29–34, 58.)  An EPA-directed aquatic impacts assessment[40] concluded that sites with

[38]The valley fills and mining activity will result in downstream "increases in sulfates, total dissolved solids, total calcium, total magnesium, hardness, total manganese, dissolve manganese, specific conductance, alkalinity, and total potassium."  *See, e.g.*, *Camp Branch CDD*, at 12.

[39]Specific conductivity measures the ability of a stream to carry an electrical charge, which is an indicator of the concentration of suspended and dissolved solids in the waters.  Higher conductivity is associated with poor water quality.  (Tr. vol. II, 35–36.)

[40]U.S. EPA et al., *Ecological Assessment of Streams in the Coal Mining Region of West Virginia Using Data Collected by the U.S. EPA and Environmental Consulting Firms*, (2003).  This study was included in the programmatic EIS prepared the Corps, the EPA, the U.S. Fish and Wildlife Service ("USFWS"), and other federal agencies as part of the settlement agreement entered in *Bragg*
(continued...)

valley fills had "lower biotic integrity"and "reduced taxa richness" with "fewer pollution-sensitive EPT taxa."[41] Drs. Wallace and Palmer opined, with persuasive reasoning, that burying substantial lengths of headwaters constituted a serious danger to the aquatic ecology in several ways, clearly a set of adverse impacts under the CWA and NEPA.  (Tr. vol. II, 33, 134.)  Even Intervenors' experts, Dr. Donald Cherry and Dr. Mindy Armsted,[42] acknowledged that natural headwater streams perform functions in ways and at rates different from perennial streams and that streams below valley fills have lower biodiversity, reflecting a shift toward pollution-tolerant organisms.  (Tr. vol. V, 146–49, 166, 232–36.)

### iii.  "Hard Look" at Impacts from Destruction of Headwater Streams

The CDDs briefly mention the role of headwater streams, but provide no analysis or explanation to reflect the significance of this role.  They provide no evaluation or description of the functional values lost.  They offer no basis on which to discern how the Corps exercised its best professional judgment in forming its conclusions.  The Corps reports measurements and observations taken by the applicants of the streams being impacted, but it does not evaluate the loss

---

[40](...continued)
*v. Robertson*, 72 F. Supp.2d 642 (S.D. W. Va. 1999).  This EIS is considered "programmatic" because it is intended to develop agency policies, guidance, and coordinate agency decisionmaking in order to minimize the adverse environmental effects of mountaintop removal mining within the Appalachian region.  U.S. Dept. of Interior, et al., *Mountaintop Mining/Valley Fills in Appalachia Final Programmatic Environmental Impact Statement* (2005) [hereinafter *FPEIS*].

[41]EPT taxa refers to certain pollution sensitive species, such as mayflies and stoneflies, whose presence is recognized as an indicator of a healthy stream.  (Tr. vol. V, 79.)

[42]Dr. Cherry is an expert in aquatic ecotoxicology, in particular in the recovery/restoration of aquatic ecosystems damaged by acid mine drainage from abandoned mine land.  Dr. Armstead is a senior scientist with Potesta & Associates, Inc., one of the Intervenors' consultants, and has expertise in aquatic ecology and toxicology.

of these resources in terms of their functional values.[43]  For instance, the Laxare East CDD merely notes that headwaters harbor primarily benthic macroinvertebrate communities which specialize in feeding on organic material.  *Laxare East CDD*, at 27.  Describing the physical characteristics of headwaters, the CDD finds these streams "provide unique habitat[s]," but then claims that suitable habitats will be found downstream without an explanation of how the downstream segments will serve as a substitute when this "unique habitat" is buried.  *Id.*  The CDD discusses impacts to the physical and chemical characteristics of water resources, but does not address headwater stream functions.  *Id.* at 15–20.  The CDD briefly acknowledges the functions of streams generally, but offers no discussion of the role of headwaters in the aquatic ecosystem.  *Id.* at 41–42.  Rather, the Corps provides only its conclusion that the mitigation plan will supply habitat that will result in replacement of the functions lost.

Each of the CDDs include a section explicitly addressing the factual determinations required by the 404(b)(1) Guidelines.  *See, e.g.*, *id.* at 39–43.  Within these determinations is a section focusing on the impacts to the aquatic ecosystem and its organisms, which includes the Corps' aforementioned analysis of "structure and function."  *Id.* at 41–42.  Like the discussion of headwater streams, this section offers little analysis, merely concluding that the mitigation measures would replace "the appropriate type and quantity of aquatic functions lost due to project impacts."  *Id.* at

---

[43]The Corps and Intervenors point to the Rapid Bioassessment Protocol ("RBP") scores noted in the CMPs and CDDs.  The EPA developed the RBP to measure a broad range of variables to analyze chemical, physical, and biological conditions of a stream channel.  The Corps acknowledges that the RPB is not a functional assessment and does not offer a detailed analysis as "typically found in scientific research analysis."  *Republic No. 2 CDD*, at 15.  As the Corps noted, the RPB does not cover the range of characteristics typically included in a function analysis, including nutrient cycling, organic matter dynamics, respiration, and measurement of primary/secondary production.  *Id.*  Here, only the habitat component was used, therefore, the Corps' reliance on this methodology to approximate stream structure and function is misplaced.

42. Instead of analyzing the impact from the loss of these functions, the CDD merely provides a list of functions expected to be replaced, without describing the functions in detail or how the functions would be replaced.[44]  *Id.* at 41–42.  Further, the brief discussion focuses on the intermittent and ephemeral streams to be temporarily impacted by the construction of sediment ponds, not the larger issue of the adverse impacts resulting from the permanent burying of thousands of feet of streams from the valley fills.  *Id.*

In addition, the Corps noted in its structure analysis that the streams to be filled had good taxa diversity and good water quality, using the WV-Stream Condition Index scoring.  *Id.* at 25.  The Corps explained that "aquatic ecosystem structure and function would change" as a result of the project, but concluded the mitigation plan would replace the functions lost from the impacts.  *Id.* at 41.  Again, the Corps reached a conclusion of no adverse impacts by relying only on improved habitat through the mitigation plan.  *Id.* at 42.  Within its "structure and function" analysis, the Corps simply does not describe, much less assess, the functional roles these headwaters may play or explain the Corps' judgment that the mitigation plan would replace the lost functions.  The other CDDs offer even less substance in addressing the role of headwaters.[45]

---

[44]The functions listed are the same as those listed in the CMP, which include: (1) treatment of pollutants; (2) nutrient cycling; (3) temperature control; (4) maintenance of genetic diversity; (5) dynamic stability; (6) movement of water and sediment; and (7) water and organic matter retention.  *Laxare East CMP*, at 25–26.

[45]The Corps used similar language in the other CDDs to address "functions" in a superficial manner.  For example, the § 230.11(e) discussion within the Camp Branch CDD is limited to generic statements and conclusions, with little to no project-specific information or analysis.  Further, the limited analysis of the "structure and function" of affected streams focused on habitat, or structural concerns based on biological sampling.  *Camp Branch CDD*, at 24.  This biological sampling revealed some acidity, but otherwise good physical and chemical water quality and diverse biota in the headwaters.  *Id.* at 15.  The biological sampling for the Black Castle mine discovered fairly poor
(continued...)

In sum, the Corps has failed to take a hard look at the destruction of headwater streams and failed to evaluate their destruction as an adverse impact on aquatic resources in conformity with its own regulations and policies.  Its decisions do not provide a reasoned explanation for the conclusion that adverse impacts have been adequately determined.

*iv. Uncertainty of Impacts to Headwater Streams*

Inexplicably, the only portion that could resemble a meaningful discussion of the impacts to headwater functions—albeit an incomplete discussion—came in response to public comments submitted by federal and state agencies and Plaintiffs concerning the impact to headwater streams that would result from the creation of the valley fills and the importance of these streams to the aquatic ecosystem.[46]  In response, the Corps reiterated its finding that mitigation will offset the

---

[45](...continued)
water quality with elevated conductivity and acidity and poor biotic conditions reflected by less diversity of macroinvertebrates. *Black Castle CDD*, at 42.  The Corps described the mitigation plan, listing a number of functions and the techniques intended to improve/offset those generic functions, but provided no explanation as to how the mitigation would offset the specific functions of these affected streams.  *Id.* at 43.

In contrast to the other three CDDs, the CDD for the Republic No. 2 mine does not distinguish clearly the factual determinations required under 40 C.F.R. § 230.11(e), instead referring to prior analysis within the CDD.  *Republic No. 2 CDD*, at 21.  There is no specific discussion of structure or function within the prior sections, with only a statement that the streams had limited flow, which, combined with the poor water quality, inhibits fish and benthic life.  *Id.* at 16.

[46]While the Corps is not required to agree with sister agencies' comments, it must provide a reasoned response to them.  *Nat'l Parks & Conservation Ass'n v. Babbit*, 241 F.3d 722, 736 (9th Cir. 2001) (stating that NEPA requires an agency to provide a "well-reasoned explanation" explaining why comments during the public review do not create a public controversy based on potential environmental consequences) (citations omitted).  Here, agencies with particular expertise in dealing with the aquatic ecosystem, the EPA and the USFWS, expressed their concern with the Corps' significant impacts and mitigation findings.

-46-

ecological functions lost and listed the attributes intended to be replaced.[47]   The only detailed analysis of specific headwater functions involved the science of nutrient cycling and the effect that environmental variables have on it.  *Camp Branch CDD*, at 55.  The Corps acknowledged that "[t]he loss of the nutrient cycling function of the portion of headwater streams from direct filling may represent a substantial loss of energy to the entire aquatic system within and beyond the watershed containing the fill."  *Id.*  The Corps dismissed this concern, despite conceding that no studies have been conducted to determine the impact of mining on nutrient cycling, by noting that the applicants' mitigation plan may improve hydrological flow, which potentially may encourage nutrient cycling. In fact, the Corps offered no scientific basis, but rather mere speculation for its conclusion that the change in flow below valley fills may aid nutrient cycling.  No studies have been conducted yet, by the Corps or otherwise, on the contributions of intermittent or ephemeral streams in Appalachia. As a result, the Corps readily concedes that the actual impacts to intermittent and ephemeral streams "cannot be quantified directly or otherwise . . . and to date remain unknown."  *Id.*

Without a proper understanding of the impacts to headwater streams, the Corps has not fulfilled its legal obligation to take a "hard look" at the environmental impact of the proposed action.

---

[47]For example, the EPA, during the public review period for the Camp Branch permit, noted that the proposed mine would "impact over 19,889 linear feet of streams, many of them headwater streams. . . . These ephemeral and intermittent streams provide high levels of water quality and quantity, sediment control, nutrients, and organic contributions, and as a result, are largely responsible for maintaining the quality of downstream riverine systems for considerable distances." *Camp Branch CDD*, at 44.  In response, the Corps explained that the applicants' mitigation plans were intended to result in "no net loss" of habitat and ecological functions and that the mitigation streams would "provide a food source for downstream area[s] . . . [and] provide storage and retention sites for nutrients and sediments, transform nutrients and organic matter to fine particulate and dissolved organic matter and export water nutrients and woody debris, from the adjacent established riparian zone."  *Id.*  The Corps does not explain how it determines that the ecological functions mitigated will replace the functions of lost headwater streams.

-47-

*Robertson*, 490 U.S. at 350.  If the effects of a proposed action are uncertain, that uncertainty precludes the finding that the impact to the environment is not significant.  *Anderson*, 371 F.3d at 490–93 ("[T]he EA simply does not adequately address the highly uncertain impact of the [proposed action].  This major analytical lapse is . . . a sufficient basis for holding that the [FONSI] cannot survive the scrutiny applicable in this case.  And because the EA simply does not adequately address the local impact . . . an EIS is required."); *see also Ocean Advocates*, 402 F.3d at 870 ("Where the environmental effects of a proposed action are highly uncertain or involve unknown risks, an agency must prepare an EIS."); *Nat'l Parks & Conservation Ass'n v. Babbit*, 241 F.3d 722, 735–36 (9th Cir. 2001) (requiring preparation of an EIS where effect of agency action unknown and conclusory, making mitigation measures to offset such impacts inadequate and speculative); *Sierra Club v. Norton*, 207 F. Supp.2d 1310, 1334–36 (S.D. Ala. 2002) (finding FONSI arbitrary and capricious where agency determination of effects inadequate and uncertain); *Sierra Club v. Babbitt*, 15 F. Supp.2d 1274, 1283–84 (S.D. Ala. 1998) (holding that an agency cannot state its project will not have a significant impact where the decision is based on "assumptions, presumptions or conclusions themselves—not facts based on any evidence, documents, or data in the Administrative Record"); 40 C.F.R. § 1508.27(b)(5).  In failing to properly inform itself of the environmental impacts of its action, the Corps has not met its obligations imposed under NEPA.  *Robertson*, 490 U.S. at 351 ("Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action.").

Despite the uncertainty of the impacts resulting from the destruction of headwater streams, the Corps seemingly justifies its incomplete analysis on cost concerns and the absence of

standardized monitoring and testing procedures.[48]  This reasoning is flawed, however, and fails to justify an inadequate evaluation of foreseeable significant adverse effects.  NEPA sets forth specific procedures for evaluating "reasonably foreseeable significant adverse effects" when there is "incomplete or unavailable information."  *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549–50 (8th Cir. 2003); 40 C.F.R. § 1502.22.  First, the agency must "make clear that such information is lacking."  40 C.F.R. § 1502.  Then, if the information relevant to the "reasonably foreseeable significant adverse effects"[49] cannot be obtained because of exorbitant costs or the means to obtain the information are not known, § 1502.22 requires the agency to include within an EIS:

> (1) [a] statement that such information is incomplete or unavailable;
> (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable adverse impacts on the human environment; a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable

---

[48]In the Black Castle CDD, the Corps noted:

> [T]here were no studies conducted within the draft EIS study area to measure organic carbon because of the significant cost and the absence of widely-accepted, standardized monitoring and testing procedures. . . . In the absence of standardized testing and research, it is not clear to what extent this direct stream loss indirectly affects downstream aquatic life.  It is also not evident to what degree reclamation and mitigation (e.g., drainage control and revegetation) offset this organic nutrient reduction.  The direct impacts of stream loss are permanent, but the downstream effect from organic energy loss may be temporary.

*Camp Branch CDD*, at 55.

[49]"Reasonably foreseeable" impacts includes those "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason."  40 C.F.R. § 1502.22(b).

significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

*Id.*

Clearly, the discharge into headwater streams within the watershed will impact the aquatic ecosystems, but the extent of this impact is undetermined. If, as the Corps asserts, the extent of this impact is speculative and indeterminable due to cost and/or scientific uncertainties, this is precisely the type of scenario envisioned under § 1502.22(b). Accordingly, in failing to prepare an EIS and assess the impacts within the prescribed CEQ regulations, the Corps has failed to take a "hard look" at whether the impacts to the environment are significant.

### B. The Mitigation Plans will not Compensate for the Adverse Impacts

In each of the four permits at issue, the Corps found that compensatory mitigation offsets the adverse environmental effects that will be caused by the valley fills. The Corps concluded that the permanent destruction of headwater streams would be rendered insignificant[50] if the mitigation work

---

[50]The term "significant" has different implications under NEPA and the CWA. NEPA requires the preparation of an EIS for every proposal that significantly affects the quality of the human environment. 42 U.S.C. § 4322. Under the 404(b)(1) Guidelines, no discharge of dredged or fill material is permitted which will cause or contribute to significant degradation of waters of the United States. 40 C.F.R. § 230.10(c). Accordingly, for any particular 404 permit evaluation, a proposed activity may have a significant impact that requires the agency to prepare an EIS, yet the permit still may be issued under NEPA. In contrast, the 404(b)(1) Guidelines would dictate that the permit be denied even though NEPA would allow such a discharge.

This distinction is critical, as the Corps often analyzes the effects of a discharge under both the 404(b)(1) Guideline analysis and NEPA. Under its NEPA analysis, the Corps balances the benefits reasonably expected to accrue from a proposal against its reasonably foreseeable detriments. 33 C.F.R. § 320.4(a)(1). This balancing process involves numerous factors, including economic benefits, and it reasonably may result in permitting an environmental impact to occur. *Id.* Unlike NEPA, however, the 404(b)(1) Guidelines do not involve a consideration of economic benefits, but instead weigh heavily toward preventing impacts to the water. For that reason, a permit must be

(continued...)

covered an equal or greater length of other streams.  This finding was essential for both the CWA permit and the FONSI, for if the Corps found otherwise, it would be required to perform an EIS under NEPA and potentially unable to issue the permit.

Plaintiffs object to the Corps' conclusion for three reasons.  First, Plaintiffs allege that the Corps cannot determine the extent of mitigation necessary to offset impacted resources because the Corps failed to assess the streams' ecological value properly in the first place.  Second, Plaintiffs claim the Corps (1) authorized scientifically unproven mitigation techniques, such as stream creation, without verifying that it is likely to work, and (2) permitted the applicants to enhance streams different in location and type from those destroyed.  Third, Plaintiffs complain that the Corps' monitoring requirements are insufficient to ensure the compensatory mitigation imposed by the permits adequately replaces the impacts to the aquatic ecosystems.

By inadequately identifying and evaluating the impacts associated with the filling of headwater streams with overburden, the Corps' decision that the mitigation measures described within the Compensatory Mitigation and Restoration Plans ("CMPs") alleviate those adverse impacts consequently fails.  The significant and adverse impacts of the burying of streams were not adequately considered for the reasons stated above, and, therefore, the finding that the mitigation measures offset those impacts is arbitrary and capricious.  However, even if the impacts identified

---

[50](...continued)
denied unless it complies with the 404(b)(1) Guidelines.  33 C.F.R. § 320.4(a)(1).
        Therefore, the Court, although sympathetic to the substantial economic benefits stressed by Intervenors, must ensure the Corps complied with the requirements of the CWA.

by the Corps did represent all the potential adverse impacts, the Court still finds the mitigation measures insufficient on other, independent grounds explained below.[51]

### 1. Mitigation Required by the CWA

No discharge of dredged or fill material may be permitted if (1) a practicable alternative exists that is less damaging to the aquatic ecosystem or (2) the waters of the United States would be significantly degraded.  40 C.F.R. §§ 230.10(a), (c).  Degradation is measured by adverse effects, both individually and cumulatively, to human health or welfare, aquatic life, and the aquatic ecosystem.  40 C.F.R. § 230.10(c).  A permit only may be issued if the applicant demonstrates that appropriate and practicable steps have been taken to minimize the potential adverse effects on the aquatic ecosystem.  40 C.F.R. § 230.10(d).  This process requires the Corps and the applicant to identify the potential adverse impacts of the discharge and then offset those impacts through (1) avoidance, (2) minimization; and (3) compensatory mitigation.  *MOA*, 55 Fed. Reg. at 9211.

The Corps, in determining what mitigation is "appropriate," looks to the values and functions of the aquatic resource impacted.  *Id.*  Aquatic functions unavoidably lost or adversely impacted must be replaced through compensatory mitigation.  *Id.* at 9212.  The unique nature of aquatic ecosystems requires an independent determination of the functions to be lost or impacted by either a functional assessment or, alternatively, the best professional judgment of the Corps.  *RGL*, at 2. The Corps' findings then are used to determine the potential impact to the aquatic ecosystem and the level of mitigation required to replace the functions lost.  *Id.*  If a functional assessment is not

---

[51]Mitigation is treated similarly by the CWA and NEPA, with many of the regulations and guidance documents overlapping.  Although the regulations appear to be the same, the context differs and the Court separates the following analysis for clarification.

practical, resource losses may be mitigated through the replacement of linear feet of stream impacted on a 1:1 basis. *Id.* at 3.

The Corps considers the entire watershed and its subcomponents when deciding what compensatory mitigation to require. *RGL*, at 1. The mitigation measures must be proportionate to the scope and degree of the impacts, but also must be practicable in terms of cost and technology.[52] *MOA*, 55 Fed. Reg. at 9212. If practicable, compensatory mitigation should be undertaken on-site, in areas adjacent or continuous to the discharge site. *Id.* Where on-site compensatory mitigation is not practicable, mitigation measures should be within the same geographic region and, to the extent possible, the same watershed. *Id.* In-kind mitigation should be utilized where possible, but out-of-kind mitigation is permitted if necessary.[53] *Id.*; *RGL*, at 5. If the impacted resource is locally important, in-kind mitigation is required. *RGL*, at 5.

The Corps must carefully consider the likelihood of success of potential mitigation measures. Mitigation techniques previously established to be effective in similar circumstances should be used where possible. 40 C.F.R. § 230.75(d). Where the effectiveness of particular mitigation techniques is unproven, the Corps must limit their use to a small scale to allow for corrective action in the event unanticipated adverse impacts result. *Id.* Permits utilizing scientifically uncertain mitigation techniques should require long-term monitoring, reporting, and actions necessary to remedy any noncompliance with mitigation requirements. *MOA*, 55 Fed. Reg. at 9213.

---

[52]The 404(b)(1) Guidelines define practicable as "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.3(q).

[53]In-kind mitigation refers to replacing the same physical and functional type of aquatic ecosystem affected. Conversely, out-of-kind mitigation refers to offsetting the impacted waterway with a different physical and functional type. *RGL*, at 5.

In sum, the 404(b)(1) Guidelines, the MOA, and the RGL make clear the standard and goal for mitigation where an aquatic resource is lost or impacted. The Corps is required to consider the impacts and determine the type and degree of mitigation needed to replace those functions to sufficiently offset the adverse impact.

### i. Mitigation Techniques Authorized by the Corps

The Corps approved the use of three different types of mitigation techniques in the respective permits: stream enhancement, stream restoration, and stream creation. The CMPs estimate that enhanced streams and created streams will reach their full potential ten years after the completion of the work.[54] The applicants propose utilizing the Stream Habitat Unit model[55] ("SHU") to assess the pre-fill conditions of the impacted streams and to measure the effectiveness of the stream enhancement, restoration and creation during the monitoring period.

Stream enhancement involves the implementation of stream rehabilitation practices designed to improve water quality or habitat. The stream enhancement required by the CDDs primarily entail improvements to existing perennial streams located downstream of the valley fills or in streams adjacent to the permit areas. Specifically, the enhancement techniques include stabilizing stream

---

[54]*See Laxare East CMP*, at 18.

[55]The applicants created the SHU model with the intent of quantitatively assessing the impacts to more appropriately mitigate the losses. The SHU involves a habitat assessment, rating ten parameters by means of the EPA Rapid Bioassessment Protocol. The SHU then factors in the size of the channel, the quantitative habitat score, and the stream's classification as ephemeral, intermittent, or perennial. The SHU is calculated for the proposed impact areas to determine the anticipated losses and then at the proposed mitigation areas, both pre- and post-enhancement, to ensure the mitigation offsets those losses. *See, e.g.*, *Laxare East CMP*, at 18.

banks, placing rocks or logs in streams to improve habitat or alter flow patterns, and planting vegetation along the riparian areas.[56]

Stream restoration, in the context of the four permits at issue, addresses the stream segments "temporarily" impacted by the construction of the sediment ponds below the valley fills. The stream segment below the fill is dammed to form a pond, which captures any sediment coming from the fill. When the sediment control is no longer needed, the dam will be removed and the stream channels will be reconstructed to replicate the original, unimpacted ecosystem. The goal of stream restoration is the re-establishment of the general structure and function of the aquatic ecosystem that existed prior to an impact. The restoration of these streams will not begin for at least two years after the mining has been completed and the area reseeded.

The third form of mitigation required by the permits is stream creation by converting sediment ditches in the mining area into intermittent streams. Sediment ditches are used during the mining phase to collect the runoff produced by mountaintop removal mining. These sediment ditches also help control drainage and collect sediment. After the mining is completed, the ditches will be converted to "mimic intermittent stream channels"[57] by removing the existing sediment, digging a new channel within each ditch, and connecting the ditches. The CMPs contain detailed

---

[56]The enhancements contained in the Black Castle CMP also include placing new fill material on top of an existing valley fill, which may actually improve water quality. The existing fill produces water which has high conductivity and other chemicals which the new fill material potentially could neutralize. (Tr. vol. V, 15–16.)

[57]*Laxare East CMP*, at 83.

descriptions of the size and locations of the different channels, but offer no explanation for how converted ditches will replicate the functions associated with intermittent streams.[58]

### ii. Mitigation Required for Permits

As noted earlier, the Laxare East permit allows the permanent filling of 24,860 linear feet of intermittent and ephemeral streams to construct the seven valley fills and the temporary filling of 3,099 linear feet of intermittent and ephemeral streams to construct the ten sediment ponds. To offset these impacts, the permit requires compensatory mitigation of all three mitigation techniques, through the restoration of 4,937 linear feet of intermittent streams and 2,164 linear feet of ephemeral streams, enhancement of 16,000 linear feet of perennial streams, and the creation of 13,621 linear feet of intermittent streams.[59]  (Defs.' Ex. 48.)

The Black Castle permit calls for the filling of 15,637 linear feet of intermittent and ephemeral streams to construct nine valley filles. In addition, four sediment ponds will be used, temporarily impacting 879 linear feet of intermittent streams. The compensatory mitigation required by this permit includes restoration of 7,590 linear feet of intermittent and ephemeral streams,

---

[58]*See id.*, 83–84, App. B, Stream Creation Designs. At most, the CMP explains that "[o]nce the excavated material has been added and proper riparian, including a combination of short and tall grasses and tree species, has been planted; the channel will naturally meander and create sinuosity on its own." *Id.* at 84.

[59]Independence Coal Company will receive 4,335.65 mitigation credits for these activities as calculated under the SHU formula. These credits include 291.61 credits for the creation of 13,621 feet of intermittent streams, 82.94 credits for restoration of 4,937 feet of intermittent streams, 6.3 credits for restoration of 2,164 feet of ephemeral streams, and 3,954.80 credits for enhancement to 16,000 feet of perennial streams. (Defs.' Ex. 48.)

enhancement of 18,000 linear feet of perennial streams, and improvement of 5,420 linear feet of streams as compensatory mitigation for these impacts.  (Defs.' Ex. 41.)[60]

The Camp Branch permit authorizes the fill of 14,762 linear feet of intermittent streams and 297 linear feet of ephemeral streams in order to build four valley fills.  Four sediment ponds are required, which will temporarily impact 455 linear feet of intermittent streams.  The mitigation intended to offset these impacts involves the restoration of 2,035 linear feet of intermittent streams and the creation of 4,459 linear feet of ephemeral streams and 36,812 linear feet of intermittent streams.  (Defs.' Ex. 32.)[61]

The Republic No. 2 permit allows for the permanent fill of 6,819 linear feet of intermittent streams and 3,099 linear feet of ephemeral streams for the construction of three valley fills.  Three sediment ponds will be used, temporarily impacting 690 linear feet of intermittent streams.  (Intervenors' Ex. 5.)  This permit requires only mitigation in the form of restoration and enhancement, not stream creation, with 10,777 feet of streams restored and enhanced to offset the permanent impact and 2,276 feet of streams restored to compensate for the temporary impact.[62]

---

[60]The required mitigation measures will generate 3,148.8 SHU credits for Elk Run Coal Company, with 2,969.93 SHU credits for the enhancement of 18,000 feet of perennial streams, 132.51 SHU credits for the restoration 7,590 feet of intermittent and ephemeral streams, and 57.95 SHU credits for the improvement of 5,420 linear feet of streams.  (Defs.' Ex. 41.)

[61]Under this mitigation plan, Aracoma Coal Company will receive 717.1 SHU credits, with 643.3 credits resulting from creation of intermittent streams, 33.3 credits for creation of ephemeral streams, and 40.5 credits for restoration of intermittent streams.  (Defs.' Ex. 41.)

[62]Alex Energy, Inc. will receive 663.06 SHU credits for its mitigation efforts of which 446.27 come from restoration and enhancement of the 1.468 acres of perennial streams and 216.79 from restoration and enhancement of the 1.516 acres of intermittent streams.  *CMP for Republic No. 2 Surface Mine*, 19–21 (March 28, 2005).

### 2. Deficiencies in Mitigation Approved by the Corps

### i. Compensating for Aquatic Resources Lost

As the Court previously addressed, the Corps failed to evaluate fully the "structure and function of the aquatic resources."  Therefore, the Corps could not reasonably conclude that mitigation will offset the loss because it does not know what to replace.  However, even if the Corps' assessment of headwater stream values had been sufficient, its finding that mitigation will replace those lost resources is arbitrary and capricious because it lacks a reasoned basis.

In its post-trial brief, the Corps claims the CDDs explain how the mitigation plans would result in replacement of the appropriate type and quantity of aquatic functions lost due to project impacts. (Defs.' Post-Trial Br., 37 (citing *Laxare East CDD*, at 41–42; *Black Castle CDD*, at 42–43; *Camp Branch CDD*, at 24; *Republic No. 2 CDD*, at 40)).)  Yet these sections of the CDDs merely repeat this conclusion with little explanation for how or why the Corps came to this decision.  The CDDs explain that stream functions were "identified and quantified as part of the conducted benthic surveys, water sampling, habitat assessments and WV Stream Condition Index" and then used to design the CMPs.  *Black Castle CDD*, at 42; *see also Laxare East CDD*, at 41–42; *Camp Branch CDD*, at 24.  However, these variables do not account for critical headwater stream functions and values.  The Corps' explanation is too simplistic to meet the standards imposed by the regulations and its own guidance documents.  The Corps merely finds that the structure and functions in the mitigated streams will increase, without explaining how it equates these increases with what is lost by destroying headwaters.  As a result, the Court concludes that the Corps acted in an arbitrary and capricious manner in issuing the permits without explaining how the mitigation required by each of the permits would offset the resulting adverse impacts.  *Ohio River Valley Envt'l Coal., Inc. v.*

*Kempthorne*, 473 F.3d 94, 102–03 (4th Cir. 2006) (stating the agency must "explain the evidence which is available, and must offer a rational connection between the facts found and the choice made") (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43)).

*ii. Stream Enhancement and Creation*

The Court finds other flaws in the Corps' mitigation analysis and conclusion.  First, the Corps allows the applicants to compensate for the destruction of intermittent and ephemeral streams by enhancing nearby perennial streams.  As the Court previously concluded, headwater streams contribute to the aquatic ecosystem in important ways that make them different from perennial streams.  In particular, intermittent and some ephemeral streams provide unique habitat for a diverse population of insects and other animals, from macroinvertebrates to salamanders.  The interaction of groundwater and surface water that takes place in these stream segments helps purify the stream and regulate the downstream water temperature, affecting both aquatic life and water quality below.  As these intermittent and ephemeral streams characteristically are found in forested hollows, with considerable riparian vegetation, they play an elevated role in nutrient processing and the decomposition of organic matter.  In turn, these processes directly affect the downstream water quality, aquatic life, and other values.  *See* 40 C.F.R. §§ 230.20–230.32 (listing characteristics and values of streams affected by these processes).

The experts agree that while these "functions" take place in perennial streams, they do so at different rates and in different ways.  Headwater streams are more than just habitat and their destruction is not offset by merely improving the habitat of a perennial stream.  Even though the particular functions of headwater streams were not measured, and even if not required to be measured precisely, the Corps certainly is aware of these attributes and the role of headwater

-59-

streams.  Yet, it offers no reasoned explanation for equating the enhancement of existing habitat in a perennial stream with the complete destruction of headwater streams.  In addition, the buried streams are lost forever while the enhancements may be effective for only a limited time. Intervenors' expert, Edwin Kirk, estimated that these in-stream improvements could be expected to last 20 to 25 years, depending on changes such as flooding, but would be monitored for only ten years according to the conditions set forth in the permit.[63]  (Tr. vol. V, 90.)  The Corps offers no explanation for concluding the gains expected from enhancements with a limited life-span in perennial streams will make up for the permanent loss of headwaters.

The second error is the Corps' reliance upon stream creation as a suitable compensatory mitigation method.  Here, the applicants' mitigation plans involve turning sediment ditches into streams.  During the mining activities, sediment ditches would be constructed at different locations on the mine site.  These ditches are designed to capture and hold surface runoff, which increases considerably during mining and carries large amounts of sediment resulting from the mining disturbance.  At the conclusion of mining activities, the applicant would remove grout from the bottom of the ditches, dig channels to connect them, and try to establish the physical appearance of a stream.  The Corps believes that once the ditches are connected and channels reshaped, they will transform into streams and supply the same structure and functions as the destroyed streams. However, the Corps offers little experience or scientific support for this belief.

---

[63]Mr. Kirk, Director of the Biological Division of Research, Environmental, & Industrial Consultants, testified about the CMPs and mitigation generally.  He participated in the development of the SHU and offered expertise concerning mitigation techniques.

The Corps' witnesses, Dr. Mark Sudol and Ginger Mullins,[64] conceded that the Corps does not know of any successful stream creation projects in the Appalachian region.  The best example to which the Corps and Intervenors could point was the creation of a stream segment, where a stream bed was relocated in Martin County, Kentucky.  There, the new segment was connected at both ends to an existing stream, unlike the plans here.  Apart from designing the physical appearance of the sediment ditches to mimic a stream channel, there is no design criteria in the record discussing ground water exchange, organic matter retention or other non-habitat characteristics.  The design discussions in the CDDs and CMPs also do not explain how the creation of habitat will result in the functions expected of a natural intermittent stream.  The Corps asserts that the new stream will eventually provide the same structure and functions as a real stream, but the record contains no scientific basis for this assumption.

Plaintiffs' experts characterized the Corps position as a "Field of Dreams" approach[65] and explained that many obstacles make this theory of stream creation doubtful.  The scientific community is skeptical of the likelihood that important headwater stream functions will actually be achieved in manmade streams.  In addition, the USFWS, a sister federal agency with expertise in aquatic ecosystems, advised the Corps that there was no scientific support for the concept that these ditches could be considered "even rough approximations" biologically of a stream.[66]

---

[64]Ms. Mullins is the Regulatory Branch Chief of the Corps' Huntington District Office.  She reviewed and gave final regulatory approval for the permits at issue.

[65]As in, "[i]f you build it, [the streams] will come."  Field of Dreams (Universal 1989).

[66]In conclusion, the USFWS stated that drainage and sediment ditches are "inadequate and unacceptable compensatory mitigation."  *Black Castle CDD*, at 67; *Laxare East CDD*, at 70.  The Corps noted these criticisms in the Black Castle and the Laxare East CDDs.  Its response in the
(continued...)

At trial, Plaintiffs offered Dr. Palmer as an expert in stream restoration. In her extensive participation in restoration projects and review of such projects across the United States, she explained that stream creation has not succeeded and is not scientifically credible.[67] (Tr. vol. II, 155, 159–60.) Dr. Palmer raised a number of doubts about the validity of the Corps' theory. First, she questioned whether aquatic life would recolonize the post-mined streams. Valley fills involve an enormous amount of clearing and earthmoving. Trees and plants are "grubbed out," meaning the roots and all are removed. The area then may be surface-mined if recoverable reserves are located there. In any event, the valley is then filled with the rock and other overburden produced by mountaintop removal mining. When a new stream channel is created there, it is being located in a catchment area that has been cleared, excavated and then filled with overburden. In these conditions, the benthic organisms associated with headwater streams may be less likely to reestablish a population. In most stream restoration projects that are successful, the stream corridor still exists upstream and below the restored area, so aquatic life still may be nearby.[68] (Tr. vol. II,

---

[66](...continued)
Laxare East CDD claims, without reference to any authority, that the "potential for this innovative natural stream design" is high. *Laxare East CDD*, at 70.

[67]Dr. Palmer served as the lead of the National River Restoration Science Synthesis project, and in that capacity, stated that she had yet to learn of a single case of successful stream creation despite the compilation of over 30,000 stream and river restoration projects throughout the United States on behalf of the project. (Tr. vol. II, 159–60.)

[68]Dr. Palmer explained that in order for organisms to recolonize a site, they must come from another location. Typically, stream insects disperse up and down stream corridors. If insects do move between streams, it almost always occurs close by within the same watershed. As a result of the immense clearing and land change occurring during the construction of the valley fills, the sediment ponds are particularly isolated from these source populations. Dr. Palmer questioned whether these source insects could fly in to the newly created streams to reestablish a population. (Tr. vol. II, 135–36.)

135–36.)  Here, the created stream beds lie isolated from functioning aquatic ecosystems, reducing the likelihood that source populations would recolonize the streams.

Dr. Palmer also was critical of the CMPs and the Corps for failing to include sufficient design criteria to account for the many variables involved with a stream's structure and functions. Neither the Corps' CDDs or the applicants' CMPs discuss whether or how groundwater exchange will take place in the fill.  *Id*. at 156–59.  Merely reestablishing a stream channel with habitat features has not been demonstrated to result in a stream which supplies the structure and functions of a natural stream.[69]  *Id*. at 169.  The record contains no evidence to support the Corps' assumption that streams can be created by sediment ditches.[70]  *Id*. at 160.  These conclusions are reinforced by the findings  of the FPEIS, which reported that past attempts at stream creation were met with "limitations in each of the parameters needed" for success; that it was "very difficult" generally to capture groundwater flows; and that "a range of natural variables must be integrated into the design."  *FPEIS*, at III.D-18.

The Court finds these criticisms persuasive.  The Court finds the Corps has too little experience to support its faith in stream creation as an acceptable means of compensatory mitigation. Mitigation by stream creation as approved by the Corps is not supported by evidence in the record

---

[69]The FPEIS stated that no drainage structures to date had successfully developed into functional headwater streams.  *FPEIS*, at III.D-19.  At trial, Dr. Sudol testified that he had no personal knowledge of any successful stream creation projects involving headwater streams, only anecdotal knowledge of a stream in southern California.  (Tr. vol. III, 48–50.)  Dr. Sudol also indicated, however, that the California stream creation design had been based upon a full functional assessment, unlike the designs here.  (Tr. vol. III, 50.)

[70]In fact, the Laxare East CDD states that the drainage ditches are compacted to keep water from seeping through the substrate.  This contradicts the notion that groundwater exchange would take place in the "created" streams.  *Laxare East CDD*, at 132.

or the Corps' post-decision arguments to justify its use. Accordingly, the Court find the Corps acted in an arbitrary and capricious manner in approving such widespread use of stream creation mitigation given this scientific uncertainty. 40 C.F.R. § 230.75(d) (requiring the Corps to use mitigation techniques demonstrated to be effective in similar circumstances whenever possible and, if such techniques are not available, implement new techniques on a small scale to allow for corrective action).

### iii. Inadequate Monitoring and Performance Standards

The Corps fallback response to these concerns is to highlight the performance standards in the permits. These standards require that as part of the monitoring, the applicant will have to demonstrate that the created stream meets the definition of "waters of the United States" and fulfills "the level of ecological performances prescribed in the mitigation plan." *Permit for Laxare East Surface Mine ("Laxare East Permit")*, 6 (Special Condition 5). The permits also set forth the monitoring for enhanced or restored streams in the special conditions, requiring the applicant to "implement and abide" by its CMP and provide annual performance reports to the Corps.

As part of their CMPs, the applicants utilize the SHU model, which they, not the Corps, created. The applicants designed the SHU model in order to standardize a method to quantify a stream's value as a habitat. First, the tool uses a point system to estimate the characteristics of the physical habitat, using a modified EPA Rapid Bioassessment Protocol to quantify habitat features of streams.[71] The SHU then takes the product of that score and the length of the stream, and

---

[71]The RPB and the WV Stream Condition Index gage benthic life, but only to the family, not genus, level so it does not provide a complete picture of the type of aquatic insects found, such as whether they are sensitive or pollution-tolerant species.

multiples the result by a constant: for ephemeral streams 0.05; for intermittent streams 1.0; and for perennial streams 2.0. This multiplier places a much greater value on perennial streams than ephemeral or intermittent streams. Intervenors' expert, Mr. Kirk, explained that these constants were not determined on a scientific basis, but represented the judgment of consultants like himself. They believe that because perennial streams necessarily consist of greater water flows (being year round) and more uses (such as water supplies, recreation, habitat), these streams are more valuable as resources and therefore warrant the larger multiplier.

The CMPs use the SHU model to quantify the permanent impacts, calculating SHU values for the streams being buried. The SHU analysis also is used to determine the total credits for the mitigation plan, by using the same formula to estimate values for the streams being created, restored, and enhanced under the mitigation plan. For enhancements, the applicant measures the SHU value of the selected stream, estimates the SHU value increases expected from the enhancements, factors in the 2.0 multiplier for perennial streams, and then reduces that product to adjust for the expected delay in mitigation sites reaching their maximum potential. For stream creation, the CMPs estimate a SHU score for the new stream channel and consider that amount a net gain (because the sediment ditches have a SHU score of zero) with an adjustment for the delay in reaching completion.

Plaintiffs complain that the SHU lacks a scientific basis and that it distorts the evaluation of streams, by inadequately considering factors other than habitat and treating headwaters as intrinsically less important than perennial streams. When used to value the headwaters being destroyed, the SHU scores necessarily will be lower because the streams are ephemeral or intermittent and, therefore receive the smaller multiplier. However, when perennial streams are

enhanced through mitigation, the SHU disproportionately values the enhancement due to the larger multiplier.

The CMPs propose the SHU analysis as a performance standard to determine the success of the mitigation. SHU scores for the enhanced, created, or restored streams will be measured at the conclusion of the monitoring period, set at ten years by the permits' special conditions. If the SHU values predicted for each stream segment are not met, monitoring may be extended and additional mitigation required. However, the SHU performance standards focus only on habitat measures and physical appearance, not measures of stream functions or other values. Even the habitat performance standard is illusory, or at least confusing, in that the CMP states that annual benthic and water quality studies will be done but "not used to determine the success" of the mitigation. *See, e.g.*, *Laxare East CMP*, at 85. Thus, even if the habitat appears satisfactory, the stream may not be populated by aquatic life similar to that found in natural headwaters, yet still satisfy the permit conditions.

Despite explicit adoption of the SHU tool in three of the permits, the Corps maintains that it does not rely on the SHU tool to determine the degree of mitigation.[72] Rather, it insists that the 1:1 ratio, which each project exceeds, is the only mitigation measurement required. In its argument to the Court, the Corps attempts to minimize its use of the SHU approach, but the permits' special conditions make it clear that the SHU model is integral to the Corps' compensatory mitigation determinations. The special conditions for three of the permits require the applicant to meet the

---

[72]Special condition 20 in the Laxare East permit requires the applicant to achieve the RBP, Riparian Score, and SHU credits as detailed in the CMP. *Laxare East Permit*, at 9–11. The permits for the Camp Branch and Black Castle mines also measure the success of mitigation by SHU values. *Permit for Black Castle Contour Surface Mine*, 8–9 (Special Condition 19); *Permit for Camp Branch Surface Mine*, 7 (Special Condition 21).

SHU-calculated estimates for the created, enhanced and restored streams after ten years of monitoring.[73]  If the applicant meets those estimates, the Corps may terminate monitoring.

Though the buried streams are permanently lost to the ecosystem, under the performance standards their "replacements" could be deemed successful and monitoring would cease after just ten years.  At best, the Corps' position on the SHU is ambiguous; on the one hand it adopts the SHU approach to measure mitigation success, but then attempts to disavow its use.  It provides no substantive discussion of the SHU model in the CDDs.  The Corps has failed to explain why it found the SHU model acceptable as a measure of mitigation success as part of the monitoring plan.

### 3. Mitigation and Finding of No Significant Impact Under NEPA

NEPA defines mitigation in a similar manner as the CWA.  Under NEPA, mitigation includes (1) avoiding impacts; (2) minimizing impacts; (3) rectifying impacts by repair, rehabilitation, or restoration; (4) reducing or eliminating the impact over time; and (5) compensation for the impact through replacement or substitute resources.  40 C.F.R. § 1508.20.  An agency may rely upon the adoption of mitigating measures as the basis for a finding of no significant impact. *Wetlands Action Network*, 222 F.3d at 1121; *Roanoke River Basin Association*, 940 F.2d at 62. Although the measures need not completely compensate for the adverse environmental impacts of the project, they must meet minimal standards.  *Wetlands Action Network*, 222 F.3d at 1121.  First, the mitigation measures must be specific and detailed to a reasonable degree, not hypothetical or

---

[73]The Corps does reserve the right to use some future "functional assessment protocol" being developed by an interagency team.  There is no expected date of completion for this effort, and how this protocol could be used to measure success is left unstated.  No such protocol was available to assess the streams to be filled, so there would be nothing with which to compare a future functional assessment of mitigated streams.

speculative. "A perfunctory description or mere listing of mitigation measures, without supporting analytical data is insufficient" to justify a finding of no significant impact. *Nat'l Parks & Conserv. Ass'n*, 241 F.3d at 734 (internal quotation marks and citations omitted). Additionally, mitigation measures relied upon as the basis of a FONSI must have been either "imposed by statute or regulation or have been so integrated in the initial proposal that it is impossible to define the proposal without the mitigation." *Wyoming Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp.2d 1232, 1250 (D. Wy. 2005) (citation omitted); *see also* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations # 40 ("Forty Questions"), 46 Fed. Reg. 18,026, 18,038 (Council on Envtl. Quality 1981).[74]

Here, this first requirement is met. The proposed mitigation measures are a mandatory condition of the permit, and may be relied upon for a FONSI. The permits contain performance standards, ranging from specific measurements to monitoring periods, that are mandatory conditions. If the permittee fails to meet the performance standards, the Corps may impose new conditions or require additional mitigation.[75]

Second, the mitigation measures relied upon must constitute an adequate buffer against the adverse impacts resulting from the authorized activity so as "to render such impacts so minor as to not warrant an EIS." *Wetlands Action Network*, 222 F.3d at 1121 (citation omitted). The proposed mitigation measures must directly address the identified adverse impacts, supported by substantial

---

[74]As interpretive guidance by the CEQ, the "Forty Questions" are not entitled to substantial deference by the Court as administrative rules promulgated through notice and comment procedures. The Court looks to the "Forty Questions" only as persuasive authority.

[75]The Corps may require the applicant to mitigate other streams or pay a fee in lieu of any actual mitigation. The Court does not address these options.

evidence that such measures will reduce the impacts below the level of significance that would require an EIS. *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997) (citations omitted). Mitigation measures have been found sufficient "when based on studies conducted by the agency or when they are likely to be adequately policed . . . ." *Id.* (internal citations omitted).

For the reasons stated above, mitigation fails to meet this latter requirement. First, there is only the conclusion that mitigation will offset the losses and simply no explanation for how the mitigation proposed will replace what will be lost. Second, while the performance standards purport to ensure success, for the reasons stated above in application of the CWA mitigation requirements, the plans are flawed. The mitigation plans violate NEPA standards and do not support the FONSI determination.

### C. The Corps Improperly Limited its Scope of Review

The Court finds that the Corps acted arbitrarily and contrary to it own regulations by limiting its scope of analysis to only the jurisdictional waters and aquatic impacts. NEPA requires the Corps to include in its analysis "actions . . . which are potentially subject to federal control and responsibility." 40 C.F.R. § 1508.18. As part of guidelines implementing NEPA, the Corps is required to comply with 33 C.F.R. § 325, App. B § 7(b), which outlines the procedures the Corps must follow and guides the review of the proposed activity.

Section 7(b) addresses situations when the specific activity requiring a Corps permit is "merely one component of a larger project." 33 C.F.R. § 325, App. B § 7(b)(1). In that situation, the Corps must establish the scope of the NEPA document (the EA or the EIS) to address the impacts not only of the activity requiring the permit but also those portions of the "entire project" over which the Corps has "sufficient control and responsibility to warrant Federal review." 33

C.F.R. § 325, App. B § 7(b)(1).  Control and responsibility extends beyond the specific permitted activity "where the environmental consequences of the larger project are essentially products of the Corps permit action."  33 C.F.R. § 325, App. B § 7(b)(2).  The regulation then lists "typical factors" that should be considered and provides examples.  Those factors[76] include:

> (I) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).

> (ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.

> (iii) The extent to which the entire project will be within Corps jurisdiction.

> (iv) The extent of cumulative Federal control and responsibility.

33 C.F.R. § 325, App. B § 7(b)(2).

The regulation instructs that federal control and responsibility includes the portion of a project beyond the limits of Corps' jurisdiction "where the environmental consequences of the additional portions of the projects are essentially products of Federal . . . approval."  33 C.F.R. § 325, App. B § 7(b)(2)(A).  The examples set forth in § 7(b) provide additional guidelines describing limits on review of such extra-jurisdictional projects, such as when an

> oil refinery, electric generating plant, or industrial facility . . . [is] to be built on an upland site and the only DA [Department of Army] permit requirement relates to a connecting pipeline, supply loading . . . in and of itself, normally would not constitute sufficient overall Federal involvement with the project to justify expanding the scope of a Corps NEPA document to cover upland portions of the facility beyond the structures in the immediate vicinity of the regulated

---

[76]The Corps did not address the first three factors in the CDDs.

-70-

> activity that would effect the location and configuration of the
> regulated activity.

33 C.F.R. § 325, App. B § 7(b)(3), in part.

In fact, the Corps found these examples analogous and, therefore, limited its review under the scope of analysis for these projects. The CDDs characterize the permit activity of valley fills, as "a necessary but minor portion of the overall upland project" without considering the effects on the upland. *See, e.g.*, *Laxare East CDD*, at 7; *Republic No. 2 CDD*, at 5–6. Consequently, the Corps restricts the scope of analysis to the jurisdictional waters only and excludes all upland impacts. The Corps concludes that NEPA's scope of analysis must be narrow, finding the permit activity (valley fills burying streams) "a small but necessary component of the overall project" of mountaintop removal mining of hundreds of acres. *Id.* The Corps, however, ignores the rest of the explanation in the regulation it relies upon.

By issuing the permits, the Corps is authorizing the specific activity of filling streams in valleys to facilitate mountaintop removal mining techniques. The overburden placed in the streams does not fill just the streams, it buries everything within the valleys. The uplands of those valleys are being destroyed by the same fill structure as the streams. The language from § 7(b)(3), which follows the "examples" language noted above, seems clearly applicable in this situation: "Similarly, if an applicant seeks a DA permit to fill waters or wetlands on which other construction or work is proposed, *the control and responsibility of the Corps, as well as its overall Federal involvement would extend to the portions of the project to be located on the permitted fill.*" 33 C.F.R. § 325, App. B § 7(b)(3) (emphasis added). This language does not provide the extremely narrow scope suggested by the Corps.

-71-

The Corps argues that its determination of the scope of analysis is entitled to deference and points to several cases to support its position. In *Sylvester v. U.S. Corps of Engineers*, 884 F.2d 394 (9th Cir. 1989), the Ninth Circuit upheld the Corps' limited scope of analysis. There, a developer sought to fill wetlands to construct a golf course as part of a larger resort development. *Sylvester*, 884 F.2d at 396. The plaintiff challenged the Corps for not including the entire project in its scope of analysis. *Id.* The Court upheld the Corps' finding that only the meadow where the golf course was to be located, not the entire project, came within the scope analysis. *Id.* While this decision supports the Corps' contention that the entire mining project need not be included in the scope of analysis, it does not support its position that only the jurisdictional waters and riparian zones must be. Rather, in *Sylvester*, the Corps was required to consider the impacts of the proposed golf course, which would include impacts in addition to placing fill material into the wetlands, for the NEPA review. *Id.* at 823.

The Corps also cites *Wetlands Action Network v. U.S. Corps of Engineers*, 222 F.3d 1105 (9th Cir 2000), which upheld the Corps' decision to limit its scope of analysis only to the 16 acres of wetlands being filled and thereby exclude the rest of the project from consideration. As noted in *Wetlands*, the permitted activity may be interdependent with the larger development project, but more is required to justify finding federal control and responsibility over the entire project. *Id.* at 1116–17. This case and *Sylvester* are examples of logical limitations on the scope of analysis. This reasoning certainly supports the Corps' conclusion that the entire mining operation is not properly within the scope of analysis. Yet, this reasoning does not support the Corps' limited scope here. In this case, the Corps failed to adhere to its own regulation when it excluded the impacts to the

valleys.  These impacts and environmental consequences are the products of the Corps' permit action and are inextricably connected to the filling of the streams themselves.

Finally, the Corps relies on *Sierra Club v. Army Corps of Engineers*, 450 F. Supp.2d 503 (D.N.J. 2006).  There, the district court sustained the Corps' determination to restrict its scope of analysis by excluding even the project to be constructed in the fill.  This Court finds *Sierra Club* distinguishable and, in any event, unpersuasive.

In *Sierra Club*, the project would fill 7.69 acres of wetlands comprised of ten distinct parcels as part of a large commercial project with a shopping, entertainment, hotel and office complex.  450 F. Supp.2d at 512.  The Corps applied the four factors set forth in § 7(b)(2) and concluded that only the impacts on jurisdictional waters would be considered.  *Id*. at 516–17.  The district court upheld the Corps' scope of analysis, finding that the Corps was entitled to deference and that the plaintiffs' position was contrary to the regulations.  *Id*. at 518.  The Corps was permitted to exclude from its scope of analysis even the impacts from the portions of the project to be located in the fill area.  *Id*. By that court's reasoning, the Corps would never have to consider any impacts other than to the waters.  However, if that part of the project which is located on the fill may be excluded, these regulations are rendered meaningless.  The Corps would never have to consider more than the filled portion of the stream.  This result would be contrary to the clear statement in the second paragraph of § 7(b)(3), that control and responsibility extend to the portion of a project to be located on the permitted fill.

Unfortunately, the court in *Sierra Club* did not describe the precise nature of that portion of the larger project to be located on the fill.  Clearly, the project entailed a large commercial development of which only a small percentage would be located on the fill.  Equally clear, the larger

project was not within the Corps' jurisdiction or only minimally within the Corps' control and responsibility. Here, the applicant is filling a valley as it places fill material into each stream. While that fill is a component of the larger mining operation which, as a whole, is beyond the Corps' authority, the fill and its direct effects are not.[77]

Thus, while the "entire project" is not within the Corps' scope of analysis, the streams and valleys to be buried by the fill are. The Corps must include in its scope of analysis consideration of the destruction of the upland valleys where these fills are to be located. The riparian areas next to the stream and the upland areas being buried are portions of the project located at the fill and must be evaluated. The Corps must ascertain the size of the fill and the area to be buried and its environmental characteristics. The entire project—all of the mountaintop removal mining and its impacts—would not be included in this scope of analysis. The Corps does not have "control and responsibility" over all the mining or its impacts on all the upland areas affected by the mining. These impacts are subject to extensive regulation by other agencies responsible generally for surface-mining operations. However, the Corps did not assess the environmental consequences of filling the valleys.[78] The terrestrial and other upland effects of the valley fills are important environmental consequences of the Corps' permit action which the Corps has failed to consider.

---

[77]Plaintiffs also argue a coextensive scope of analysis for the CWA 404(b) permit. However, the 404(b)(1) Guidelines do not require the Corps to examine impacts other than to the aquatic resources. The Court does not agree with Plaintiffs that the regulations concerning cumulative impacts should be applied to produce the same result as the NEPA scope of analysis.

[78]The CDDs do discuss some impacts to the riparian and upland areas in the context of its analysis under the Endangered Species Act. However, these impacts were considered only to the extent that they affected the Indiana bat population.

-74-

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005), stated the principle succinctly:

> Although the Corps' permitting authority is limited to those aspects of a development that directly affect jurisdictional waters, it has responsibility under NEPA to analyze all of the environmental consequences of a project.  Put another way, while it is the development's impact on jurisdictional waters that determines the scope of the Corps' permitting authority, it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility.

408 F.3d at 1122.  Here, the fill extends beyond the stream and its banks.  The Corps must gather information and assess all environmental impacts caused by the fill.  The Corps abused its discretion by limiting its scope of analysis to just the stream and immediately adjacent riparian areas.

### D. The Corps Inadequately Evaluated the Cumulative Impacts

The Corps is required to assess the cumulative impacts of the proposed valley fills for both its CWA permit decision and its NEPA review.  The 404(b)(1) Guidelines begin by stating:

> Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern.[79]

40 C.F.R. § 230.1(c).  The Corps, by limiting the scope of analysis, did not consider the full effects of the discharge.  Further, even when the Corps considered the cumulative effects in the narrow scope, it simply recited facts and did not provide an adequate analysis of whether the effects of this

---

[79]The 404(b)(1) Guidelines define aquatic ecosystems to include waters that serve as habitat for interrelated or interacting communities of plants and animals.  40 C.F.R. § 230.3(c).

-75-

proposed activity, in conjunction with past present and future activity, would produce significant impacts.

Under the CWA, in considering an application to discharge, the Corps must consider, in writing, the short-term and long-term effects of the proposed discharge on the physical, chemical, and biological components of the aquatic environment. 40 C.F.R. § 230.11.[80] This information is then used to determine whether the discharge will comply with the restrictions on discharge, including the restriction that no discharge is permitted which will cause or contribute to significant degradation of the waters of the United States. 40 C.F.R. § 230.10.

In analyzing the effects of the discharge, the Corps must assess both the singular and cumulative effects resulting from the discharge. 40 C.F.R. § 230.11. Cumulative effects are those changes to the aquatic ecosystem attributable to the collective impact of individual discharges. 40 C.F.R. § 230.11(g)(1). By looking at the collective effect of individual discharges, the Corps is better able to determine if discharges, which by themselves would result in only minor impacts, will collectively result in major degradation of the productivity and water quality in the aquatic ecosystem.

Similarly, NEPA requires federal agencies to consider cumulative impacts. The regulations explain that "cumulative impact" to the environment may result from the incremental impact of the project when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R.

---

[80]This section requires a number of fact determinations as to the nature and degree of effect that the proposed discharge will have "individually and cumulatively" on a number of stream characteristics, such as water circulation, contaminants, and the aquatic ecosystem. 40 C.F.R. § 230.11(a)–(e).

§ 1508.7.  The Corps is obligated to determine if impacts are significant by considering both context and intensity, as those terms are defined in 40 C.F.R. § 1508.27.[81]

### 1. Cumulative Impact to Hollows Not Considered

Plaintiffs believe the Corps unreasonably restricted the scope of analysis, as addressed in the scope of analysis section.  By so restricting the scope, the Corps failed to consider significant impacts and their cumulative effect.  Although the Court has held that the Corps did not need to consider the entire mine site, the forested hollows where these valley fills are to be located must fall within the scope of analysis.  The Corps first must analyze the impacts to these resources and then consider any cumulative impacts.  As the Corps failed to complete the first step, the Corps could not reach the second step of assessing the cumulative impact of the forest loss.  Consequently, only the cumulative impacts to the streams buried by the valley fills, and not the hollows, were considered, violating the Corps' duties under the CWA and NEPA.

### 2. The Corps Inadequately Considered the Cumulative Impacts to Watersheds

The Corps did address the cumulative impacts within the narrow scope of analysis determined by the Corps.  The record contains much information about cumulative impacts which the Corps merely recites without analysis, before concluding that no adverse impacts will result.  The Corps decided that none of the projects resulted in a cumulative impact deemed significant by the Corps.  Within the Corps' cumulative impact determinations, each CDD lists a number of important facts.

---

[81]Under § 1508.27(b)(7), "[s]ignificance exists if it is reasonable to anticipate a cumulatively significant impact on the environment," even if such actions are individually insignificant.  40 C.F.R. § 1508.27(b)(7).

In the Black Castle CDD, the Corps discusses the cumulative effects on the aquatic ecosystem under 40 C.F.R. § 230.11(g).  *Black Castle CDD*, at 43.  The Corps limits its consideration to the Laurel Creek and Sandlick Creek watersheds.  For its description of past and future impacts, the Corps cited the figures collected by Plaintiffs' expert, Douglas Pflugh.  In considering the past projects, the Corps describes the Laurel Creek watershed as having extensive mining and other development which have disturbed the land and streams.  Using the Laurel Creek watershed (which includes Sandlick Creek as one of its tributaries), the Corps reports these facts:

1.   Valley fill permits cover 11.2% (13.9 miles) of the length of all streams and 18% (13.2 miles) of the first order streams;[82]

2.   Surface mine and valley fill permits together cover 27.9% of total stream length and 37.3% of first order stream length.

*Id.* at 44.

Future impacts include a number of other mining projects expected within the next ten years, including the Laxare East permit.  The Corps estimates "future valley fill construction associated with the reasonably foreseeable future activities would be located in . . . 13% of the stream length" of the watershed.  *Id.* at 51.  With its projection of over 25,600 feet of permanent stream loss, the Black Castle permit alone would destroy nearly 4% of the total stream length of the watershed.  *Id.* at 52.  As a result of present and anticipated mining permits, 30% of the total acreage of the watershed would be disturbed by mining.  Despite these facts, and without a discussion of how it came to the conclusion, the Corps declared that "[b]ased on the expectation of continued

_____

[82]Mr. Pflugh defined first order streams as those having no tributaries according to the hydrologic maps upon which he relied.  He characterized them as headwaters, the origin of the stream network.  (Tr. vol. I, page 54.)

sustainability of all resources, it has been determined cumulative effects on the aquatic environment would not be considered significant." *Id.* at 52.

The Laxare East cumulative impact section tracks that in the Black Castle CDD and describes similar conditions as both projects affect the Laurel Creek watershed. *Laxare East CDD*, at 53.  The Laxare East project will extend into Drawdy Creek, another tributary of Laurel Creek, for which the Corps adds separate estimates of present and future impacts.  The Laxare East project will result in the permanent loss of 3.8% of the total stream length in the watershed. *Id.* at 55.  The Corps' conclusion is identical to its Black Castle conclusion.

Neither permit discusses the impact of these projects on Laurel Creek's receiving stream, the Little Coal River.  Mr. Pflugh found that valley fills cover 5% of the total stream length and 6.9% of the headwaters of the entire Coal River watershed. *Expert Report of Douglas C. Pflugh*, 9 (May 16, 2006).  Other than concluding that the total amount of water flowing into the receiving stream will not be significantly affected, there is no discussion of any impact from the elimination of headwater streams.[83]  The Corps does not discuss how the destruction of headwater streams, in the amount and at the rate it would increase with these projects, will affect the downstream perennial streams other than in base flow.

For the Camp Branch permit, the Corps identified the Dingess Run watershed and relied on Mr. Pflugh's findings. *Camp Branch CDD*, at 28.  The Corps describes past and present activities include mining, gas wells, and logging in the watershed. *Id.* at 27.  Mr. Pflugh estimated that valley fill permits cover 8.7% of total stream length and 6.9% of first order streams in the watershed.

---

[83]The Corps does find that valley fills are expected to even out the base flow rate from a site. Valley fills tend to soak up rain or snow and discharge the water more slowly and over a longer period than an undisturbed hollow.

*Expert Report of Douglas C. Pflugh*, at 8.  Surface mine and valley fill permits total 19.9% of total stream length and 19.5% of first order streams.  *Id.*  The project would permanently cover 4.2% of the streams in the Dingess Run watershed.  *Camp Branch CDD*, at 26.

The Republic No. 2 permit will impact the upper Cabin Creek Watershed.  Valley fills currently cover 7.6% of streams in the watershed and this permit will cover an additional 2.9%.  *Republic No. 2 CDD*, at 22–23.  Past and present activities consist of extensive mining, including pre-Surface Mining Control and Reclamation Act ("SMCRA")[84] mining, which continues to seriously degrade water quality.  *Id.* at 23.  Future anticipated activities include an additional valley fill permit (Republic No. 1, which is the subject of supplemental claims not yet ripe) which will cover an additional 3.5% of the streams.  *Id.*  Together with past activities, valley fills would cover 14% of the total stream length of the watershed.  *Id.* at 24.

The Corps does not explain how the cumulative destruction of headwater streams already affected by mining in these watersheds will not contribute to an adverse impact on aquatic resources.  The Corps fails to "articulate a satisfactory explanation," including a "rational connection," between the facts found and the conclusion reached.  *Motor Vehicle Mfgs.*, 463 U.S. at 43.  Instead, the Corps recites the data and declares that the cumulative impacts are not significant.  *Republic No. 2 CDD*, at 27.  The CWA and NEPA require more.  The Corps was obligated to determine the short-term and long-term effects of the discharge under the CWA and if the impacts were significant under NEPA**.**

The Court presumes that the Corps reached this conclusion by assuming that mitigation entirely eliminates the adverse impacts of destroying many additional miles of headwater streams, despite the alarming cumulative stream loss caused by valley fills in these watersheds.  This

---

[84]30 U.S.C. § 1201 *et seq.*

assumption is a fallacy, which could allow the destruction of most of the headwaters in a watershed without the Corps ever considering any adverse impact it may cause. The Corps' approach suggests no limits on the number or length of headwater streams that can be buried before the cumulative impact analysis identifies an adverse impact.

Recently, the Fifth Circuit decided a similar case rejecting this reliance on cumulative impacts, and the Court finds this case persuasive and that its reasoning applies here as well. In *O'Reilly v. U.S. Corps of Engineers*, 477 F.3d 225 (5th Cir. 2007), the lower court had criticized the Corps' finding of no cumulative impact because the environmental assessment contained "no real analysis" and "merely recites the potential cumulative effects" of the proposed project. *Id.* at 234–35 (internal quotation marks and citation omitted). There, many earlier projects had been permitted with compensatory mitigation requirements, and the subject permit issued by the Corps also included compensatory mitigation. *Id.* On appeal, the court rejected the argument that compensatory mitigation would presumably eliminate cumulative impacts:

> We cannot accept that presumption as legally and empirically valid, however, because the Corps's EA provides no rational basis for concluding that when the individually "mitigated-to-insignificant" effects of this permit are added to the actual post-dredge and fill effects of 72 other permits issued to third parties by the Corps in the area, that the result will not be *cumulatively* significant.

*Id.* at 235 (emphasis in original). The Corps determination of cumulative effects cannot rest entirely on the proposed mitigation plans. The Corps needs to address the effects as required under the law.

The Corps argues that the context of this project, being in previously mined areas, weighs heavily in support if its conclusion. Clearly, mining activities already have disturbed a sizeable area

of the watershed and caused unfortunate degradation of the streams.[85]  However, this fact does not provide a license to destroy more streams without assessing the cumulative impact of this additional destruction.  At a minimum, the Corps must examine and then explain how this added destruction of headwater streams, in view of the significant loss of streams in the watershed, will not result in a significant impact on the environment.

The Corps failed to properly assess the cumulative effects as required under the CWA and NEPA.  The Corps' decision to narrow the scope of review prevented it from addressing the cumulative effects of the proposed activity to the areas affected by the proposed activity.  The Corps only considered the impact to streams and not to the surrounding hollows that would be directly affected by the activity.  Narrowing of the scope prevented the Corps from analyzing the cumulative effects under the CWA.  Further, under NEPA the Corps failed to consider significant impact from the proposed activity in relation to past, present and future activity.  Although the proposed activity is in a heavily mined area and the Corps is requiring mitigation, the Corps is not relieved of its duty to provide an analysis of cumulative impacts when making its conclusion.

*E. Corps Adequately Assessed Surface Water Runoff and Riffle and Pool Complexes*

*1. Surface Water Runoff Impacts Were Adequately Considered*

Plaintiffs raise two further objections to the Corps' CDDs.  Plaintiffs maintain that the Corps failed to adequately consider the effects of valley fills on surface runoff and the potential for

---

[85]At Black Castle existing water quality is poor due to acid mine drainage, and the proposed valley fills would supply alkaline material to help neutralize it.  While this is a laudable effect, the purpose of the valley fill is not to remedy harm caused by unregulated or poorly controlled past mining.  It is unclear whether the applicant or anyone else is responsible for treating the current problem.

flooding and that the Corps erroneously concluded that the affected streams did not possess special aquatic sites, known as "riffle and pool complexes." The Court finds that the Corps adequately considered these issues and came to sustainable determinations and, therefore, rejects Plaintiffs' objections.

Plaintiffs complain that the Corps failed to consider the effects of surface water runoff and the possible contribution of valley fills to flooding. The 404(b)(1) Guidelines require the Corps to consider the effects of the proposed activity on normal water fluctuations and flooding potential. 40 C.F.R. §§ 230.11, 230.24. The Corps concluded that the activity approved in the permits is not likely to increase flooding in the valley fills. The Corps relied upon the Surface Water Runoff Analysis ("SWROA") prepared by the applicants and submitted to the West Virginia Department of Environmental Protection ("WV DEP"). *See, e.g.*, *Laxare East CDD*, at 20, 60; *Republic No. 2 CDD*, at 19, 31. The WV DEP, which regulates surface mining under the federal and state surface mining laws, requires the SWROA as part of its permit application review. The applicants prepare the SWROA using information from United States Soil Conservation Service and submit it to the agency for review. The Corps relied on WV DEP's approval of the SWROA submitted in this case.

Plaintiffs first criticize the Corps for adopting the SWROAs without critical analysis and then argue defects in the SWROAs themselves. Plaintiffs contend valley fills will increase the risks of flooding. Their expert, Dr. Eshelman,[86] opined that valley fills are highly compacted and therefore less permeable, so rain and snowmelt drain off more quickly than they would from natural soil with vegetation. He questioned the validity of the assumptions used as the basis for the SWROAs,

_____

[86]Dr. Keith Eshelman has expertise in ecology and hydrology and has conducted research on the hydrological effects of land disturbances in the Appalachian region.

-83-

particularly the "curve number" used by the applicants and the Corps.[87]  This number is used to predict the likely amount of runoff based on characteristics such the type of soil and vegetation at a given location.  The determination of which curve number to use is somewhat subjective, as observers may reasonably differ in their characterizations of the actual conditions and choose different curve numbers for a particular site.  The curve number methodology has been recognized generally as an appropriate tool specifically for surface water runoff predictions.  Plaintiffs did not demonstrate that its use here was contrary to generally recognized scientific principles.

The Court is persuaded that the Corps had an adequate basis upon which to rely in adopting the state-mandated SWROAs.  Intervenors' expert, Dr. Barfield[88], explained the rationale for use of the curve numbers and otherwise provided justification for relying on the SWROAs.  While Plaintiffs' expert, who was qualified and credible, disagreed, the testimony of the competing witnesses amounts to a battle of experts.  The Corps is entitled to its judgment that the SWROAs are an adequate basis for its conclusions.  The Court cannot simply substitute its judgment or prefer one expert over another where the Corps has a reasonable basis and did not act arbitrarily.

Next, Plaintiffs contend that the Corps simply accepted the WV DEP findings that the SWROAs were reliable without an appropriate review.  Plaintiffs cite *North Carolina v. F.A.A,* 957 F.2d 1125 (4th Cir. 1992), for their claim that an agency may not meet its duties by simply relying on another agency's conclusions.  The *F.A.A.* case is of limited relevance here.  The FAA initially failed to do any assessment, deferring completely to the Navy despite its own obligations under

---

[87]The curve number comes from United States Soil Conservation Service, which assigns a number based on site characteristics, such as soil type, vegetation, and other factors.  A higher curve number reflects greater runoff potential.

[88]Dr. Billy Joe Barfield is an expert on hydrology and surface water runoff.

-84-

NEPA. *Id.* at 1129–30.  However, the FAA corrected its failure by reviewing the Navy's procedural compliance with NEPA and by conducting its own substantive analysis.  The Court noted that the FAA "issued its own FONSI, taking responsibility for the scope and content of the Navy's assessment." *Id.* at 1130.  The Corps has done as much here.

The Corps relied upon a narrow and singular state agency finding that the SWROAs adequately demonstrate the permits are not likely to significantly increase flooding potential.  While *F.A.A.* makes clear that NEPA's requirements must be fulfilled by the agency issuing the FONSI or an EA, the case does not preclude reliance on another agency's findings.  Rather, the Corps must explain its basis for reliance to demonstrate its own independent decision-making.  *See F.A.A.,* 957 F.2d at 1130.  Here, the Corps explained in the CDDs that peak discharge from mine sites would not increase and that drainage control requirements would be imposed over the entire mine site by the state.

The decision of the Corps was not clearly arbitrary when it relied on WV DEP's review and approval of the SWROAs and found that the projects would not significantly increase the potential for flooding as a result of the valley fills.

### 2. Corp's Determination of Riffle and Pool Complexes Entitled to Deference

The 404(b)(1) Guidelines require greater protection for certain "special aquatic sites."  40 C.F.R. § 230.3 (q-1).  The regulations consider these sites to possess special ecological characteristics in productivity, habitat, and other important values.  These sites include "riffle and pool complexes."  40 C.F.R. § 230.45.  This regulation describes riffle and pool complexes only in

general language.[89]  Plaintiffs argue that each of the impacted streams must have riffle and pool complexes.  They point to descriptions of the streams in the sampling reports and other actual observations of the streams found in the CMPs and other documents.  Indeed, there are many references to "riffles" and "pools" being observed at various locations in the streams, and these streams are all found in steep, narrow hollows.  The Corps found that none of the affected streams contain riffle and pool complexes.

The regulation offers something less than a definition or working model for determining whether an area of "riffles" and "pools" constitute the "riffle and pool complex" intended by 40 C.F.R. § 230.45.  In the absence of a more specific definition, the Corps has utilized the classification systems developed by Montgomery and Buffington, from their publication of *Channel-Reach Morphology in Mountain Drainage Basins* (1997),[90] and by Rosgen from his *Classification of Natural Rivers* (1994).  Intervenors' offered the testimony of Mr. Kirk, one of their consultants,

---

[89]The regulations describe riffle and pool complexes as:

> Steep gradient sections of streams are sometimes characterized by riffle and pool complexes. Such stream sections are recognizable by their hydraulic characteristics. The rapid movement of water over a coarse substrate in riffles results in a rough flow, a turbulent surface, and high dissolved oxygen levels in the water. Pools are deeper areas associated with riffles. Pools are characterized by a slower stream velocity, a streaming flow, a smooth surface, and a finer substrate. Riffle and pool complexes are particularly valuable habitat for fish and wildlife.

40 C.F.R.§ 230.45(a).

[90]The Corps attached this study as an exhibit to the CDDs.

to explain how the applicants interpreted the regulation and applied these stream classification systems to the streams at issue.

On this issue, Plaintiffs' evidence falls short.  The Corps' CDDs contain a description of the valley fill sites and discuss the types of riffle and pool areas observed.  *See, e.g.*, *Laxare East CDD*, at 28–29.  The Corps adopts the use of the Montgomery-Buffington classification system in combination with the Rosgen system to ascertain whether the sites qualify as riffle and pool complexes.  In the absence of a definition of "riffle and pool complexes" or more guidance from the regulations, the Corps relied on these classification models.  The applicants report on-site observations concluding that the sites are either "step pools" or "plane bed" type streams, not riffle and pool complexes.  Plaintiffs offered no evidence to the contrary.  All of these streams, and most streams throughout West Virginia's mountains, have riffles and pools.  They are a common feature of streams in the area, but the regulation does not cover every riffle and every pool as a special aquatic site.  The Corps had a substantial basis for its findings and the Court will defer to its expertise in this area.

## VI.
## CONCLUSION

The Court **FINDS** that the Corps failed to comply with the CWA and NEPA when it issued the permits and the FONSIs.  The CWA permit cannot be issued unless the Corps complies with the 404(b)(1) Guidelines and with NEPA in making a FONSI or performing an EIS.  The Corps did not adequately address certain issues as to the impacts of the mining activity on the environment.  Failing to conduct its review as required under the CWA and NEPA, the Corps decided to issue FONSIs where EISs may have been required.  There are two potential remedies—directing the

Corps to prepare full EISs for each application or, alternatively, remanding the permits to the Corps for reconsideration in light of this Memorandum Order and Opinion. The Court is persuaded that the latter course is appropriate in this situation.

Other than in "rare circumstances," the reviewing court should remand the matter to the agency for reconsideration. *O'Reilly*, 477 F.3d at 238–39; *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1226 (10th Cir. 2002). If the evidence is clear that the project will have a significant impact, the Court may not only set aside the FONSI, it may also direct an EIS be performed. *Middle Rio Grande*, 294 F.3d at 1226. However, when the agency's EA is inadequate as to whether impacts will be significant because the review was flawed, the agency should reexamine its action. *Fritiofson v. Alexander*, 772 F.2d 1225, 1238 (5th Cir. 1985), *overruled on other grounds by Sabine River Auth. v. U.S. Dept. of Interior*, 951 F.2d 669 (5th Cir. 1992). Remand is the preferred remedy in such circumstance.

The Court finds fundamental deficiencies in the Corps' approach, resulting in EAs which are inadequate and unsupported. The Corps has gone to great lengths to issue a FONSI and avoid conducting an EIS with respect to each of these permits. Some of the deficiencies, such as the cumulative impact findings or the use of stream creation as mitigation, may be difficult to correct and still result in a FONSI being issued by the Corps. However, each permit is different in scale and setting, which may affect the viability of a mitigated FONSI as well as a CWA permit for a particular project. Further, the agency has committed substantial resources to its efforts and deserves the opportunity to reevaluate its FONSI conclusions. The Corps may decide of its own initiative that an EIS is required, as it apparently did with the Spruce No. 1 Mine, or it may reexamine its findings to determine if it can issue a FONSI which conforms with the Court's

Memorandum Opinion and Order.  Moreover, while surface mining is heavily regulated by federal and state agencies, Congress mandated the Corps "maintain the chemical, physical, and biological integrity of the Nation's waters," which may require the Corps ultimately to deny the permits if the adverse impacts to the waters are significant.  That, however, is a determination for the Corps to make.

Accordingly, for the foregoing reasons, the Court **ENTERS** judgment in favor of Plaintiffs and **REMANDS** the decisions and permits to the Corps for further consideration consistent with this Memorandum Opinion and Order.  The Court **DIRECTS** the Clerk to send a copy of this written Memorandum Opinion and Order to counsel of record and any unrepresented parties and to post this published Memorandum Opinion and Order on the Court's website.

ENTER:          March 23, 2007

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE