IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, et al.,

        Plaintiffs,

v.                                                CIVIL  ACTION  NO.  3:05-0784

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

        Defendants.

v.

JUPITER HOLDINGS, LLC, et. al.,

        Intervenor-Defendants

**MEMORANDUM OPINION AND ORDER**

      Pending before this Court is Plaintiffs' Motion For a Temporary Restraining Order and a Preliminary Injunction Against the Callisto Surface Mine (Doc. 358). A hearing on this motion was held by the Court on September 26, 2007. Additionally, parties have submitted memoranda explaining their positions. Having considered all of this, and for the reasons explained below, the Court **GRANTS** the plaintiffs' motion.

**Introduction**

      The focus of this motion is on a surface mining operation conducted by Jupiter Holdings, LLC (Jupiter), at its Callisto Surface Mine in Boone County, West Virginia. Through Defendant United States Army Corps of Engineers (Corps), Jupiter obtained permits to construct five separate valley fills at the Callisto mine. The first of these, Valley Fill 1, is now almost completely full of

the excess spoil (or overburden) produced during the process of surface coal mining.[1]  In order to continue operations Jupiter needs a place to dispose of additional overburden.  Jupiter intends to begin construction of another fill, Valley Fill 4, as soon as possible, so that it may continue mining without interruption.

The plaintiffs assert that the permit upon which Valley Fill 4, and other valley fills at the Callisto mine, are based violates both National Environmental Policy Act (NEPA) and the Clean Water Act (CWA).  This Court has previously considered nearly identical claims by the same plaintiffs in regard to different permits and separate mining operations.  *See Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs*, 429 F.Supp.2d 607 (S.D. W. Va. 2007) [hereinafter *OVEC v. USACE*].  Then, the Court held that the Corps failed to comply with provisions of NEPA and the CWA imposed to ensure adequate protection of the environment and invalidated the permits.  *Id.*  The Court's prior ruling is not dispositive of this matter.  The analysis may be the same, but the individual facts and circumstances of the Callisto mine and the affected environment must be considered.

**Factual Background**

It is undisputed that the construction of additional valley fills at the Callisto mine will impact the environment.  If all four additional fills are constructed, a total of 5,750 feet of stream channel will be lost.  Valley Fill 4 would itself bury 2,095 feet of streams.  With the loss of these streams comes the loss of aquatic habitat and the organisms that depend upon them.  The Corps has

---

[1] Although the Surface Mining Control and Reclamation Act (SMCRA) requires coal mine operators to restore land to its "approximate original contour", excess soil and rock is generated nonetheless due to the swelling of these materials when they are removed.  This excess material is referred to as overburden and commonly disposed of in valley fills. *See Ohio Valley Envtl. Coalition v. Bulen*, 410 F. Supp. 2d 450, 456 (S.D. W. Va. 2004) [hereinafter *OVEC v. Bulen*].

estimated that, combined with other past, pending, and future mines, the Callisto mine would contribute to a cumulative impact on 16.7% of the streams in the Pond Fork watershed. In addition to the effects they will have on the stream channels, the planned valley fills would affect 212 acres of terrestrial forest on the mountainsides beside those waterways (approx 46 acres from Valley Fill 4).

During oral argument on their motion, the plaintiffs presented testimony from Maria Gunnoe, who lives near the Callisto Mine in relative proximity to Valley Fill 1. Ms. Gunnoe testified that she felt affected by Valley Fill 1 and about her fears over Valley Fill 4. Among other things, Ms. Gunnoe explained that she attributed increased floods, mudslides, and dust near her home to the construction of Valley Fill 1. She told the Court that she no longer fished or swam in the Pond Fork River because of concerns over the effects of mining. Ms. Gunnoe further stated that she had visited the area that would be covered by Valley Fill 4 and she thought it to be a beautiful natural place. She feared that Valley Fill 4 might exacerbate some of the negative effects she was suffering from Valley Fill 1, and would have an impact on life-long friends in the nearby town of Bim.

Neither the Corps nor Jupiter contest the fact that the proposed valley fills will bury streams and forest. They do, however, argue that the relevant statutes contemplate a certain amount of environmental degradation, and that regulations assure environmental impacts will be minimized and/or mitigated. The Corps also reminds the Court that it has invested significant resources in ensuring the Callisto valley fills will meet these regulations.

Jupiter takes issue with some of Ms. Gunnoe's claims. It argues that there is no basis for attributing increased flooding and mudslides to its mining activities. Jupiter also points out that Valley Fill 4 is three times farther from Ms. Gunnoe's home than Valley Fill 1, and therefore less

likely to impact her personally. Affidavits submitted by Jupiter from residents of Bim and other communities near the mine site show that not all of the affected citizens share Ms. Gunnoe's concerns.

This Court is aware that coal mining has an effect not only on the environment, but the economy as well. Thirty-two Jupiter employees and seven full time contractors are employed at the Callisto surface mine, earning an average salary of $75,000. An additional 180 employees work at a nearby underground mine. Jupiter also contributes substantially to the local and state economy by paying taxes and making the purchases necessary to run its operation.

## Analysis

### I.     The Plaintiffs Have Met the Requirements for Organizational Standing

For the purposes of standing, injury to the environment is not enough; rather, the injury must be to the plaintiffs themselves. *OVEC v. USACE* 479 F. Supp. 2d at 618 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl Servs. Inc.,* 528 U.S. 167, 181 (2000). General averments and conclusory allegations are not enough, but standing can be established through injury to recreational, aesthetic, and economic interests. *Id.*

In this case, Ms. Gunnoe has established through her testimony that she has suffered a personal injury, not only from the perceived increase of flooding, dust and mudslides, but also from her aesthetic and recreational interests. As described above she no longer swims or fishes in the Pond Fork River, and laments the potential loss of a beautiful landscape. When environmental damage (or even fears of environmental damage) affect a personal recreational interest such as fishing or swimming, this is enough to constitute a personalized injury. *See e.g. Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000). Even the

destruction of an environmentally pleasing locale a person has visited in the past and plans to return to in the future can be sufficient to meet this requirement of standing. *Friends of the Earth, Inc. v. Laidlaw Envtl Servs. Inc.,* 528 U.S. at 181 ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

The organizations named as plaintiffs in this case likewise have standing based on the factors described in *Hunt v. Wash. State Apple Adver. Comm'n*.[2] They are associated with members such as Ms. Gunnoe who have personalized injuries as a result of the mining operations in question. They each have an organizational interest in preventing the type of environmental degradation alleged in this suit. Finally, they are capable of proceeding on behalf of their membership but without the participation of individual members.

## II. The Plaintiffs Have Shown Sufficient Magnitude of Harm and Likelihood of Success on the Merits to Warrant a Preliminary Injunction

In considering a motion for a preliminary injunction, there are a few separate steps the Court must consider. First, it must "balance the likelihood of irreparable harm to the plaintiff, against the likelihood of harm to the defendant." *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg, Co., Inc.,* 550 F.2d 189, 195 (4th Cir. 1977) (internal quotations omitted). If the Court determines that the balance of harm favors the plaintiffs, it must then consider the likelihood of success on the

---

[2] "Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. 333, 343 (1977)

merits. *Id.* This test may be flexible depending upon the degree of harm shown by the plaintiff. "The importance of probability of success increases as the probability of irreparable injury diminishes." *Id.* But, ordinarily, when irreparable harm is demonstrated, it will be sufficient, "that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation."*Id.* Finally, and in addition to these factors, the Court must always consider the effect of the injunction on the public interest. *Id.* at 196.

### A. The Balance of Harm in This Case Favors the Plaintiffs

Damage to the environment is a strong consideration in balancing the harms for an injunction. In fact, because damage to the environment is often irreversible, this harm is frequently justification for a restraining order or an injunction. In an oft quoted passage, the U.S. Supreme Court stated, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co., v. Vill. of Gambell, Ala.*, 480 U.S. 531, 545 (1987); *accord*, *Nat'l Audubon Soc'y v. Dept. of Navy,* 422 F.3d 174, 201 (4th Cir. 2005).

If a restraining order and injunction is not issued by this Court, irreparable harm to the environment is nearly certain. During the hearing on this motion, a Jupiter representative indicated that the company wanted to begin construction on Valley Fill 4 within a scant two weeks in order to ensure that their surface mining operations would not be interrupted. This time period is now expired. If allowed to proceed, Jupiter would begin construction of Valley Fill 4 immediately, permanently burying 2,095 feet of stream and acres of terrestrial forest.

Jupiter argues that the regulations governing the mining permit will ensure that the environmental damage caused by the loss of these streams is minimized and mitigated. Jupiter asserts, therefore, that the environmental harm alleged by the plaintiffs is overstated. Jupiter also argues that because some of Ms. Gunnoe's concerns will be lessened by the movement of operations from Valley Fill 1 to Valley Fill 4, plaintiffs have not established sufficient probability of harm.

Whether or not the applicable regulations are sufficient to adequately minimize and mitigate the loss of streams, forest, and the organisms that depend upon them is precisely the question that the Court will address on the merits. If the Court allows valley fill construction to continue, and then finds that protections were not adequate, the damage cannot be undone. As the *Amoco* Court recognized, money cannot not rectify this type of loss. 480 U.S. at 545.

Further, it was clear from Ms. Gunnoe's testimony in the hearing that her interests in this lawsuit extend beyond issues of dust, flooding, and landslides which may be lessened by the movement of operations from Valley Fill 1 to Valley Fill 4. Ms. Gunnoe expressed other concerns related to her aesthetic and recreational interests that will be certainly and permanently affected by the loss of streams and forest. Importantly, the plaintiff organizations and many of their members, besides Ms. Gunnoe, share these interests and concerns. While increased flooding, landslides, and dust may or may not be attributable to the Callisto mine, and the movement of operations to Valley Fill 4 may exacerbate, alleviate, or have no demonstrable effect on these harms, it is certain that another valley fill will result in the permanent loss of additional streams and forest. If it is necessary to debate the causes of the other problems felt by Ms. Gunnoe, that can be done during a trial on the merits.

Although the Corps has an identifiable interest in defending the validity of permits it has issued and the permitting process itself, the effect of an injunction on these interests seems rather inconsequential.  The statutory and regulatory structure under which the Corps operates is undoubtedly complex, but the grant of this motion is not a ruling on the merits and does has little effect on the probability of a trial.  The Corps' interest in defending its permits and permit process seems to be only slightly affected, if at all, by the issuance or denial of an injunction.

Jupiter's main interest in opposing this motion is it's own economic interest.  While the Court must certainly consider the economic effect of this decision on Jupiter's employees and the surrounding communities, these effects are distinguishable from the harm suffered by Jupiter itself.  Jupiter is a business formed and operated for the purpose of making a profit.  While Jupiter may or may not be a good employer or a beneficent corporate citizen, it is certainly out to make money.  In hearing, Mike Day, a Jupiter representative, testified that a ruling for the plaintiffs in this suit could lead to a three dollar increase in the price of coal per ton from an underground mine.  According to Mr. Day, this was potentially enough to cause Jupiter to lay off 180 workers at its underground mine.  This kind of analysis indicates that the direct reason for the layoff of workers is the same kind of economic calculus that Jupiter must preform on a regular basis.  Whether it is environmental enforcement or other market forces that cut into profits, Jupiter's interest in its own bottom line may cause it to lay off its workers.

The main harm suffered by Jupiter, therefore, is a delay in reaping economic benefits from the Callisto mine.  This temporary economic harm can be outweighed by the permanent harm to the environment that comes from the filling of streams and valleys.  *See OVEC v. Bulen,* 315 F. Supp. 2d at 824; *Bragg v. Robertson*, 54 F. Supp. 2d 635, 645 (S.D. W. Va. 1999).  Mr. Day did testify that

the closing of this mine would lead to some monetary loss, that would not be recouped completely even if the mine were to reopen. He also indicated that there was some possibility that Jupiter would not return to the Callisto mine, if this injunction were issued. These harms are not, however, so irreparable or certain as the potential loss to the plaintiffs. Money can be earned, lost, and earned again; a valley once filled is gone.

The Court **FINDS** that on balance the harms to be suffered by the plaintiffs by the denial of this motion outweigh the harms to be suffered by the defendants by the grant of this motion.

### B.  The Plaintiffs Have Established a Sufficient Likelihood of Success on the Merits

This Court has not yet had an opportunity to conduct a thorough review of the particular permits or mine operations at issue in this motion. It has reviewed, however, similar permits in the past while considering issues nearly identical to those in the present claim. In a March 23, 2007 ruling, the Court invalidated four such permits, issued by the Corps, because they did not comport with the CWA and NEPA. *See generally, OVEC v. USACE*, 479 F. Supp. 2d 607. Critical to the Court's decision were the findings that mitigation plans were inadequate to compensate for the loss of headwater streams and that the Corps did not adequately assess the cumulative impacts of its actions. *Id.*

In the Callisto permit, the Corps relies on the same mitigation techniques previously found to be inadequate in order to justify its finding that there is no significant effect on the environment from these permits. Likewise, the Corps evaluated the cumulative impacts of the Callisto mine in the same way that it evaluated the cumulative impacts of the mines discussed in the March 23rd order. Both the Corps and Jupiter rely on many arguments to justify this permit that failed to convince the Court of the adequacy of the prior permits. While the Court is not bound by its prior

order, and must consider the individual merits of the Callisto permit, it is hard to imagine that it will not be influenced by its own prior reasoning. There is, therefore, a high likelihood that the plaintiffs will succeed on the merits.

Jupiter does point to a few factual differences between the Callisto permit and those previously invalidated. These differences are not, however, enough to convince the Court that the plaintiffs will not be able to make out a strong case on the merits. Certainly, they do not cast so much doubt on the plaintiffs' claims as to make them unfair for litigation or unworthy of more deliberate investigation. The Court will indeed consider these differences, but **FINDS** that the plaintiffs have established a sufficient probability of success to warrant the grant of an injunction.

### C. The Public has a Strong Interest in Maintaining a Balance Between Economic Gain and Environmental Harm

Finally, the Court must consider the effect of an injunction upon the public interest. There is frequently a tension between environmental protection and immediate economic gain. It could be said fairly that all environmental protection statutes were written in an attempt to find a proper balance between these worthy pursuits. Surely, this is true of the CWA and NEPA. The first stated Congressional goal of NEPA is to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. The intent underlying the applicable CWA provisions, 404(b)(1), was to ensure that dredged or fill material would not be discharged if doing so would result in an unacceptable environmental impact. *See OVEC v. USACE*, 479 F. Supp. 2d at 624 (citing 40 C.F.R. § 230.1(c)). Each contains numerous provisions that serve as checks on development, industry, and other economic activities in order to ensure that environmental consequences are considered and valuable environmental resources are protected.

The public has a strong interest in maintaining the balance Congress sought to establish between economic gain and environmental protection. While it is true that these statutes contemplate a certain amount of environmental degradation, they also mandate a certain amount of economic loss. Economic gain is not be pursued at all costs, and certainly not when it is contrary to the law. The Court must ensure that it does not itself upset the balance struck by Congress. While considering the other impacts an injunction will have on the public interest, the Court must be conscious of its proper role – to interpret the law as handed down by Congress, not to rewrite it.

In addition to seeing the policies of federal law enforced and upheld, the public citizens have an interest in maintaining environmental quality in the places they choose to live. The public has an interest in ensuring the safety and health of all its members. The public has an interest in ensuring the integrity of the biological and ecological systems. And, the public has an interest in seeing beautiful landscapes preserved for posterity. A denial of this injunction may have a negative effect on all of these interests.

Regrettably, the grant of this injunction is likely to cause some Jupiter employees to lose their jobs. The Court is well aware of the value of these jobs to employees, their families, and the communities in which they live. While ultimately the decision to lay off or fire an employee is an economic one, borne by the company, the Court is under no illusion that this decision will have no bearing on that process. The plaintiffs have, however, made a strong showing that the permits issued by the Corps are arbitrary and capricious, contrary to law, and contrary to the economic and environmental balance struck by Congress in the passage of the relevant environmental statutes. The plaintiffs have also demonstrated that if an injunction is not granted, valuable environmental

resources will be lost forever. It is for these reasons the Court **FINDS** the balance of public interest must weigh towards the plaintiffs.

## CONCLUSION

As explained above, the Court **FINDS** that the balance of harm, likelihood of success on the merits, and public interest all weigh in favor of the plaintiffs. Consequently, Court **GRANTS** Plaintiffs' motion for temporary restraining order and preliminary injunction (Doc. 358). The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: October 11, 2007

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE