IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, COAL RIVER MOUNTAIN
WATCH, and WEST VIRGINIA
HIGHLANDS CONSERVANCY,

      Plaintiffs,

v.                                         Civil Action No. 3:05-cv-0784

UNITED STATES ARMY CORPS OF
ENGINEERS; LIEUTENANT GENERAL
CARL A. STROCK, Commander and Chief
of Engineers, U.S. Army Corps of Engineers;
COLONEL WILLIAM E. BULEN, District
Engineer, U.S. Army Corps of Engineers,
Huntington District,

      Defendants,

ARACOMA COAL COMPANY, ELK RUN COAL
COMPANY; INDEPENDENCE COAL COMPANY;
ALEX ENERGY, INC.; MINGO LOGAN COAL
COMPANY, INC.; WEST VIRGINIA COAL
ASSOCIATION; FRASURE CREEK MINING, LLC;
JUPITER HOLDINGS, LLC; LOADOUT, LLC;
TYLER MORGAN, L.L.C.; COAL RIVER MINING, LLC,

      Intervenor-Defendants.

MEMORANDUM OF LAW IN SUPPORT OF
MINGO LOGAN COAL COMPANY'S
MOTION FOR SUMMARY JUDGMENT

Permittee Intervenor-Defendant, Mingo Logan Coal Company, Inc. ("Mingo

Logan"), submits this brief in support of its motion for summary judgment.

## I.     INTRODUCTION

Plaintiffs Ohio Valley Environmental Coalition ("OVEC"), Coal River Mountain

Watch ("CRMW"), and West Virginia Highlands Conservancy ("WVHC"), (collectively,

"Plaintiffs"), have filed a series of complaints challenging the United States Army Corps of

{C1563591.1}

Engineers' (the "Corps") issuance of Clean Water Act ("CWA"), 33 U.S.C. § 1344, "fill" permits to certain coal mines. Those challenges have alleged generally that the Corps violated the CWA by authorizing fills that will cause or contribute to significant degradation of the waters of the United States and violated National Environmental Policy Act ("NEPA") by issuing a "finding of no significant impact" (or "FONSI") rather than requiring a more detailed "environmental impact statement" ("EIS").

In the current iteration of their Complaint for Declaratory and Injunctive Relief (the "Complaint"),[1] Plaintiffs challenge Permit No. 199800463-3 issued to Mingo Logan for the discharge of fill material in connection with its Spruce No. 1 Mine located in Logan County. The permit authorizes the construction of both excess spoil "valley fills" in the headwaters of small streams and small dams constructed downstream of these valley fills to create ponds for the collection and control of sediment discharged from the valley fills. These fills and ponds are necessary for virtually all mining in central Appalachia.[2]

Unlike all of the other permits challenged in this and a parallel action, the Corps conducted an EIS for the Spruce No. 1 Mine. Accordingly, the Corps here need not demonstrate under NEPA that the likely impacts of the fills are not significant. *See Ohio Valley Environmental Coalition v. Aracoma Coal Co.,* 556 F.3d 177, 191 (4th Cir. 2009).[3] Rather, under NEPA, the

---

[1] The most recent complaint is styled as the Second Amended Sixth Supplemental Complaint, but Plaintiffs' allegations against the Spruce No. 1 permit appear in their Fourth Supplemental Complaint. *See* Docket 318.

[2] *See Kentuckians for the Commonwealth v. Rivenburgh*, 317 F.3d 425, 431 (4th Cir. 2003) (explaining necessity of valley fills because excavated overburden occupies more space than original overburden); *Bragg v. West Virginia Coal Assoc.*, 248 F.2d 275, 246 (4th Cir. 2001) (explaining valley fills are necessary for excess spoil due to "swell factor" of excavated rocks).

[3] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "[I]t is [] well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* (internal citations omitted). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed rather than un-wise-agency action." *Id.* at 351.

Corps need only have taken a "hard look" at the impacts of filling regardless of their significance. *See* note 3, *infra*.

The construction and use of excess spoil valley fills, their associated ponds, and any stream interval between, have withstood repeated attacks relying on both water and surface mining laws by the WVHC, OVEC, and related groups.  Most recently, the Fourth Circuit issued its opinion in *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009), an appeal involving two previous orders issued in this case.

At issue in the *Aracoma* decision were the viability of "instream" sediment ponds and four permits issued by the Corps allowing the filling of stream waters in conjunction with surface mining operations.  Plaintiffs challenged the Corps' issuance of those four permits, contending that the Corps had violated substantive and procedural provisions of the CWA and NEPA, 42 U.S.C. §§ 4321-4370f, and asserting that the Corps' actions were arbitrary, capricious, and an abuse of discretion under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. Plaintiffs also asserted that the stream segments linking the permitted fills to downstream sediment treatment ponds were "waters of the United States," and that the Corps lacked authority under the CWA to permit discharge from the fills into the stream segments.

The Fourth Circuit concluded that the Corps' actions were entitled to deference. When viewed through the lens of deference, the Fourth Circuit ruled that the Corps' permit decisions were not arbitrary or capricious.  The Court also concluded, with regard to the Corps' authority under the CWA to permit discharge from the fills into stream segments that connect to sediment ponds, that the Corps' interpretation of its authority under § 404 of the CWA was reasonable and was also entitled to deference.

That opinion addressed, and disposed of, the issues raised in Plaintiffs' challenge to the Spruce No. 1 permit.  In fact, Plaintiffs themselves likened the issues resolved by the Fourth Circuit to those in their challenge to the Spruce No. 1 permit when they sought to add the Spruce

No. 1 permit to this case.  *See* Docket 252, p. 3  (Plaintiffs claimed their challenge to the Spruce No. 1 permit  raised "many of the same issues," and that the EIS had "substantially the same defects as those contained in the Corps' Environmental Assessments" on the other permits at issue.)  A review of the Corps' administrative record on the Spruce No. 1 permit reveals that the Fourth Circuit's decision in *Aracoma* effectively mandates that summary judgment be awarded to Mingo Logan on all claims in the current matter.

## II.    RELEVANT FACTS AND PROCEDURAL HISTORY

The Spruce No. 1 application has undergone a longer and more thorough review by the public and the Corps than any other application for mine-related fills in central Appalachia— including those permits affirmed by the Fourth Circuit.  The original application, for more fills and a larger mine, was submitted by Mingo Logan's then sister company, Hobet Mining, Inc. Operations under that permit were enjoined in a separate proceeding in this Court.  *See Bragg v. Robertson*, 72 F. Supp. 2d 642, 645 (S.D. W.Va.) (citing 54 F. Supp. 2d 635 (S.D. W.Va. 1999)) (rev'd *Bragg v. W.Va. Coal Ass'n.,* 248 F.3d 275 (4th Cir. 2001)).  As a consequence of that action, the Corps retracted a previously proffered nationwide permit, and Hobet advised the Corps that it would submit an "individual" permit application and not oppose the preparation of an EIS. Administrative Record ("AR"), Index ¶¶ 21 & 43; Doc. 572, Record of Decision ("ROD"), p. 2.  It was, however, permitted by the West Virginia Department of Environmental Protection ("WVDEP") pursuant to the State's surface mining program approved under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA), 30 U.S.C. §§ 1201-1328.  In connection with the approval, WVDEP issued a cumulative hydrologic impact assessment ("CHIA"), which concluded that cumulative impact of the Spruce No. 1 and other mines in the area would not result in material damage to the hydrologic balance.

The proposed § 404 permit was initially advertised on June 29, 1999.  AR, Doc. 46. The Corps published a notice of intent to prepare an EIS for the proposed project in the Federal

Register on February 4, 2000.[4]  AR, Doc. 106.  The EIS was to be prepared by a contractor paid for by the applicant, but operating under the Corps' sole direction. AR, Doc. 79-82.  As then configured, Hobet proposed to impact 57,755 linear feet of waters of the United States and 3,113 acres of land to recover slightly more than 51 million tons of coal.  AR, Doc. 572, ROD, p. 2.  In response to agency comments and concerns, Hobet revised this proposal and its State-issued surface mining permit to meet the requirements of WVDEP's newly developed Final Approximate Original Contour Guidance Document.  This new proposal reduced the impacts to the waters of the United States by 13,809 linear feet and reduced surface mining disturbance by 835 acres.  *See* AR, Doc. 572, ROD, pp. 1-2.  The revised proposal was advertised along with the Corps' request to WVDEP for a CWA § 401 water quality certification on October 12, 2005.  AR, Doc. 313.  Throughout the process, EPA participated extensively in the review of the permit.  AR, Doc. 322.

The Corps distributed a NEPA Guidebook to facilitate public involvement in the hearing on the Draft EIS by notice published December 14, 2005.  AR, Doc. 324.  On December 31, 2005, the application for the Spruce No. 1 Mine was transferred to Mingo Logan.  On March 30, 2006, the Corps advertised notice of a public hearing on the Draft EIS and issued the draft EIS on March 31, 2006.  AR, Doc. 351 & 355.  The Corps conducted a public hearing on the Draft EIS on May 1, 2006.  AR, Doc. 406.  The Corps issued the Final EIS on September 22, 2006.  AR, Doc. 467.

---

[4] Pursuant to NEPA, a federal agency can avoid an EIS if it concludes that there will be no "significant impact" to the quality of the human environment.  *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. 1508.9(a)(1) (explaining an Environmental Assessment is a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact [FONSI]."); *see also* 40 C.F.R. §§ 230.10-230.11 (explaining Corp's requirements for EA).  The other permits at issue in this litigation were issued by the Corps after it issued FONSIs, making the preparation of an EIS unnecessary.

Mingo Logan's permit for the Spruce No. 1 Mine, however, was originally enjoined by District Judge Haden in *Bragg v. Robertson*, 72 F. Supp. 2d 642 (S.D. W. Va. 1999).  As a consequence, Mingo Logan's predecessor, Hobet Mining, agreed that the permit review for the Spruce No. 1 Mine would include an EIS.  As the Fourth Circuit explained, "[u]nder NEPA, federal agencies must take a 'hard look' at the potential environmental consequences of their actions."  *Aracoma*, 556 F.3d at 191.  But because NEPA is only a procedural statute, if a federal agency prepares an EIS, it need *not* determine that the environmental impacts of the project will not be significant to be NEPA-compliant.  *See id.*  Thus, to comply with NEPA, the Corps was only required to consider the effects of the proposed project and determine that competing policy values outweigh those costs.

On January 22, 2007 the Corps issued a Clean Water Act § 404 Permit to Mingo Logan for its Spruce No. 1 Mine, along with the Corps' Record of Decision.  AR, Doc. 572. Shortly thereafter, on January 30, 2007, the Plaintiffs filed their Complaint against the Corps, challenging its decision to issue the permit.  The Plaintiffs' Complaint alleges that the Corps' issuance of the permit violates the CWA, NEPA, and is arbitrary, capricious, and an abuse of discretion, and not in accordance with the APA.  *See* Complaint, ¶ 2.  In February 2007, Mingo Logan intervened as a defendant.

In early 2007, Mingo Logan commenced operations in certain areas under an agreement to provide Plaintiffs with prior notice of its intention to mine outside those areas.[5] Plaintiffs have not sought to restrict filling or mining operations in those areas.

### III.  STANDARD OF REVIEW

Review of agency action is typically limited to the administrative record that was available to the agency at the time of its decision.  *Aracoma*, 556 F.3d at 201 (citing *Camp v. Pitts,* 411 US 138, 142 (1973).  Because this is a record review case, the Court may direct that summary judgment be granted based on a review of the record.  *Pit River Tribe v. U.S. Forest Service,* 409 F.3d 768, 778 (9th Cir. 2006).  This Court's inquiry on a motion for summary judgment is whether, based on the administrative record, Defendants' actions were arbitrary, capricious or an abuse of discretion.  *Aracoma,* 556 at 189.  Review under this standard is "highly deferential, with a presumption in favor of finding the agency action valid." *Id.* at 192.

---

[5] Mingo Logan represented originally on February 1, 2007 that it would restrict timbering and ground disturbance (including filling activities) to an area in the watershed of the Right Fork of Seng Camp absent further notice to Plaintiffs.  By notice of June 6, 2008, Mingo Logan advised Plaintiffs of its intention to expand the area of land disturbance by 170 acres.

## IV.  DISCUSSION

A.     **The Corps' Issuance of the Spruce No. 1 Mine Permit to Mingo Logan Pursuant to § 404 of the CWA Did Not Violate the CWA, NEPA, or the APA**

In issuing § 404 permits, the Corps follows the § 404(b)(1) Guidelines ("CWA Guidelines") promulgated by the EPA pursuant to 33 U.S.C. § 1344(b)(1), and incorporated by the Corps into its own regulations.  *See* 40 C.F.R. pt. 230; 33 C.F.R. 320.2(f).  The Guidelines prohibit discharges that "will cause or contribute to significant degradation of the waters of the United States."  40 C.F.R. § 230.10(c).  A discharge contributes to significant degradation if it has "significantly adverse effects" on human health or welfare, on aquatic life and other wildlife dependent on aquatic ecosystems, on aquatic ecosystem diversity, productivity, and stability, or on recreational, aesthetic, and economic values.  *Id.*

### 1.     Structure and Function of Streams

In Counts One and Two of their Complaint, Plaintiffs allege that the Corps violated the CWA, NEPA, and the APA in determining that the discharge of fill material in connection with the Spruce No. 1 Mine will not cause significant degradation of waters of the United States because "the Corps has no scientific basis or substantial evidence to assess the functions of streams that are buried by valley fills."  Complaint, ¶¶ 33, 36.  The Fourth Circuit, however, rejected this contention in its *Aracoma* decision.[6]

---

[6] In responding to Fola Coal Company's Motion for Summary Judgment in a companion case, Plaintiffs conceded that identical claims regarding the Corps' failure to properly assess the functions of the streams to be impacted are controlled by *Aracoma* and may be dismissed.  *See* Docket 54, Case No. 3:08-cv-00979.  Specifically, Plaintiffs conceded that the claims in paragraphs 74.a.-f. in Count Two, paragraphs 76.a.-f in Count Three, and all of Count Four of their Fourth Amended and Supplemental Complaint (Case No. 3:08-cv-0979) may be dismissed.

Counts Two and Three are CWA and NEPA claims that the Corps failed to assess stream functions and erred in relying on stream creation to offset mining impacts.  Count Four includes Plaintiffs' claims that the Corps could not authorize the discharges in question because they will cause a violation of the water quality standards, and that the Corps has no authority to designate waters of the U.S. to be used for waste treatment.  The claims against Fola that Plaintiffs agree should be dismissed are identical to their claims against the Spruce No. 1 permit.

The Corps' CWA Guidelines require the Corps to "[d]etermine the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem and organisms." 40 C.F.R. § 230.11(e). The CWA's Guidelines do not define "function of the aquatic ecosystem." However, as the Fourth Circuit and this Court recognized, the Guidelines do provide several factors the Corps must consider. Those factors are "potential changes in substrate characteristics and elevation, water or substrate chemistry, nutrients, currents, circulation, fluctuation, and salinity on the recolonization and existence of indigenous aquatic organisms or communities." 40 C.F.R. § 230.11(e). As the Fourth Circuit stated, these factors are the "only clues" that the regulation offers as to how the Corps is to make its determination. *Id.* at 200 n.19 and 204 n.25. This Court observed that these factors comprise the only analysis plainly required by the rule. *OVEC v. Corps,* 479 F. Supp. 607, 635 n. 36 (S.D. W.Va. 2007). In fact, the Fourth Circuit wrote that to read more into the term "function" would be an "inappropriate judicial intrusion" into the Corps' sphere of authority. *Aracoma,* 556 F.3d at 200-01 & n. 19.

Pursuant to a Memorandum of Agreement developed by the Corps and the EPA in 1990, the common approach for evaluating stream function is to "apply[] aquatic site assessment techniques generally recognized by experts in the field and/or the best professional judgment of Federal and State agency representatives, provided such assessments fully consider ecological functions included in the Guidelines." Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines, 55 Fed. Reg. 9210 (Mar. 12, 1990) [hereinafter, "MOA"].

In 2002, the Corps issued a Regulatory Guidance Letter, requiring the district offices to "use functional assessments by qualified professionals to determine impacts and compensatory mitigation requirements . . . *when possible*." United States Army Corps of

Engineers Regulatory Guidance Letter, No. 02-02 (Dec. 24, 2002) [hereinafter "RGL 02-02"].  It provided that assessment techniques should be "generally accepted by experts or the best professional judgment" of federal and state agency representatives."  *Id.*

As recognized by the Fourth Circuit in *Aracoma*, the Corps does not currently have a functional assessment protocol applicable to West Virginia.  *Ohio Valley Envtl. Coal. v. Aracoma*, 556 F.3d at 198.  As a result, the Corps relies on the best professional judgment of its staff to assess aquatic impacts and potential mitigation measures.  *Id.*  Generally, stream structure is used as a surrogate for function.  *Id.*  In *Aracoma*, Plaintiffs asserted that this was arbitrary and capricious because the use of the "best professional judgment" of federal and state agency representatives lacked objective standards, and that a full functional assessment is required.  *Id.* at 198-99.

The Court, however, rejected this contention.  Recognizing that an agency's interpretation of its own regulations is entitled to significant deference, *see Kentuckians for the Commonwealth*, 317 F.3d at 439, the court concluded that the Corps' approach pursuant to the MOA and RGL 02/02 was not plainly erroneous or inconsistent with the Guidelines.  *Aracoma*, 556 F.3d at 199.  It further concluded that it was appropriate for the Corps, in its best professional judgment, to use stream structure as a surrogate for function.  *Id.*

The Court noted that the Corps provided complete findings under 40 C.F.R. § 230.11(e) for the permits at issue in *Aracoma*, "including a section on 'Physical and Chemical Characteristics of the Aquatic Ecosystem,' which covers substrate characteristics, water quality, current patterns and water circulation, water fluctuations and salinity gradients; and a section on 'Biological Characteristics of the Aquatic Ecosystem,' which covers threatened and endangered species and their habitat, aquatic organisms in the food web, and other wildlife."  *Aracoma*, 556 F.3d at 199-200.  Relying on this information, the court concluded that

> [t]he Corps is entitled to use its best professional judgment for assessing the structure and function of the affected aquatic ecosystem, and its [Combined Decision Documents] address the

required considerations under the Guidelines, 40 C.F.R. § 230.11(e) (2008).  Thus, these findings were not inconsistent with the Corps' regulations and cannot be characterized as arbitrary, capricious, or otherwise not in accordance with the law.

*Id.* at 200-01.

The Corps made similar findings concerning the Spruce No. 1 permit in its EIS.  As outlined in the Corps' ROD, the EIS includes sections on "Physical and Chemical Characteristics of the Aquatic Ecosystem" and "Biological Characteristics of the Aquatic Ecosystem."  AR, Doc. 572, ROD, p. 26.  The section on Physical and Chemical Characteristics of the Aquatic Ecosystem included evaluations of substrate characteristics, water quality, current patterns and water circulation, water fluctuations, and salinity gradients.  *See* AR, Doc. 355, Draft EIS §§ 3.2.4 through 3.2.5 & Appendix ("App.") B.  The section on Biological Characteristics of the Aquatic Ecosystem included evaluations of threatened and endangered species and their habitat, aquatic organisms in the food web, and other wildlife.  *See id.* at §§ 3.2.4 to 3.2.5, 3.5 & App. B.  The Corps also utilized hydrologic and topographic data to perform an energy flow analysis, which concluded that the selected alternative would result in no cumulative impact to carbon conversion or downstream energy contribution.  AR, Doc. 355, Draft EIS, App. L., p. 15.  The Corps collected extensive benthic data (*id.,* App. K) and used EPA's Rapid Bioassessment Protocol ("RPB") to assess the structure and substrate of the streams to be affected.  *Id.,* Compensatory Mitigation Plan ("CMP"), App. I.

As the Fourth Circuit concluded in Aracoma, the Corps is entitled to deference in choosing to use stream structure as a surrogate for stream function.  *Aracoma,* 556 F.3d at 198-202.  Like the decision documents at issue in *Aracoma,* the Corps' EIS for the Spruce permit "included substantial analysis and explanation about the Corps' impact findings.  These determinations are within the agency's special expertise and were based on the Corps' staff's 'best

professional judgment.'"   As such, the Corps cannot be said to have acted arbitrarily or capriciously.  *Aracoma*, 556 F. 3d at 201.

Just as in *Aracoma*, the Corps has provided complete findings under 40 C.F.R. § 230.11(e) in its EIS.  As a result, the Corps complied with the procedural standards of NEPA, which require it to take a "hard look" at the proposed projects' environmental impacts.  *See* note 3, *supra*.  Furthermore, the Corps' substantive findings were consistent with the CWA Guidelines and, thus, cannot be characterized as arbitrary, capricious, or otherwise not in accordance with the law.

### 2.      Mitigation

In Counts One and Two, Plaintiffs also claim that the Corps' issuance of the § 404 permit violates the CWA, NEPA, and the APA because "the Corps has no scientific basis or substantial evidence to conclude that the structures or functions of the buried streams will be offset by attempted stream re-creation, restoration or enhancement pursuant to Mingo Logan's compensatory mitigation plan."  Complaint, ¶¶ 33 & 36.  Again, Plaintiffs raised the same claim in *Aracoma*.

Under the Corps' CWA Guidelines, a § 404 permit cannot be issued "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge [of fill material] on the aquatic ecosystem."  40 C.F.R. § 230.10(d).  In their MOA of 1990, the EPA and the Corps made "no overall net loss" the goal of the § 404 regulatory program.  55 Fed. Reg 9210 (Mar. 12, 1990).  Mitigation has three components:  avoidance, minimization, and compensatory.  *Id.*  Compensatory mitigation, which is the only type at issue in this case, is used to compensate for unavoidable adverse impacts after avoidance and minimization measures have been taken.  *Id.*

### a.      On-site, In-Kind Compensatory Mitigation Measures Not Required

In *Aracoma*, the mitigation measures specified for the challenged fill projects included stream enhancement, stream restoration, and stream creation.  The mitigation plans for

each permit required one or more of these forms of mitigation at a ratio greater than one-to-one as measured in linear feet.  The Corps determined that these plans would lead to "no net loss of habitat."  *Aracoma,* 556 F.3d at 202.  A central part of the Plaintiff's claim in *Aracoma* was that the mitigation plans and the Corps had failed to account for the special character of headwater streams in evaluating net impact of the fills.  The Court rejected that argument, stating that after "review[ing] the Guidelines, . . . whatever the role of headwater streams in overall watershed ecology, the Corps is not required to differentiate between headwater and other stream types in determination of mitigation measures."  *Aracoma*, 556 F.3d at 203.

> The Court explained that:
>
> RGL 02-02 advises that, where a full functional assessment is not feasible, the only compensatory mitigation measure the Corps must require in a permitting decision is stream replacement on a one-to-one basis.  Nothing in the Corps' CWA guidance requires that only in-kind, on-site mitigation measures be used.  By this standard, the Corps' permitting decisions have exceeded the mitigation requirements by creating mitigation plans involving greater than one-to-one replacement schemes.

*Id.* at 203-04.  The Court further explained that "where on-site or in-kind functional mitigation is not practicable or even ecologically preferable, the Corps' guidance allows compensation plans that employ off-site or out-of-kind mitigation based on improvements to the overall aquatic health of the watershed."  *Id.* at 204.

Mingo Logan's CMP calls for the creation of 43,565 linear feet of on-site streams, 7,132 linear feet of on-site restored and enhanced stream channels, creation of 26,625 linear feet of off-site stream channels, and 11,272 linear feet of off-site enhanced stream channels.  *See* AR, Doc. 572, ROD, pp. 31-33; *see also* AR, Doc. 355, CMP, App. I to Draft EIS p. 26.  This is a total of 88,594 linear feet of mitigation stream channels.  AR, Doc., 572, ROD, p. 32.  After considering these compensatory mitigation measures, the Corps concluded that:

> the mitigation measures proposed in the CMP for the Spruce No. 1 Mine [are] reasonable and acceptable. . . .  [T]he Applicant's CMP will provide greater linear footage of headwater streams on-site, such that overall stream mitigation proposed would provide more than twice the linear footage of stream impacted within the same watersheds.  By providing mitigation for impacts at a more than 2:1 ratio (based on linear footage), cumulative impacts within the Spruce Fork watershed as a result of the proposed project would be minimized.

*Id*. at 33.  Thus, as in *Aracoma*, "the Corps' permitting decisions have exceeded the mitigation requirements by creating plans involving greater than one-to-one replacement schemes." *Aracoma*, 556 F.3d at 204.[7]

The court in *Aracoma* also noted that the mitigation plans for the challenged permits included requirements for continued monitoring of the efficacy of the mitigation measures. *Aracoma*, 556 F.3d 177, 205.  Just as with those permits, the Spruce No. 1 Mine permit requires that "[a]ll mitigation sites must be monitored for a minimum of 10 years."  AR, Doc. 572, ROD, p. 34.  This monitoring can be extended if the District Engineer determines that performance standards have not been met or the compensatory mitigation projects are not on track to meet the performance standards.  *Id.*

### b.   Stream Creation

Plaintiffs also claim that the Corps has no scientific evidence to support rating the likelihood of successful stream creation as 'high,' or to show that either the structures or the functions of permanently destroyed streams can be re-created or replaced in other locations. Complaint, ¶ 24.  This contention was rejected by the *Aracoma* Court, which explained:

---

[7]  Just as in *Aracoma*, Plaintiffs also take issue with the Corps' use of a Stream Habitat Unit ("SHU") assessment method in the EIS to assess how much mitigation was needed.  (*See* Complaint, ¶ 23.)  As the Fourth Circuit explained in *Aracoma*, however, "the Corps did not rely on the SHU to determine required mitigation.  The Corps' baseline standard for mitigation is the one-to-one linear feet replacement called for by the Corps' guidance documents."  *Aracoma*, 556 F.3d at 205 n.27.  For the Spruce No. 1 Mine, the Corps also relied on the one-to-one linear feet replacement as their mitigation standard.  In fact, the SHU was not relied upon at all in the ROD.  Thus, as in *Aracoma*, the Corps' use of the SHU model for supplemental information is not problematic.

> the novelty of a mitigation measure alone cannot be the basis of our decision to discredit it.  When an agency is called upon to make complex predictions within its area of special expertise, a reviewing court must be at its most deferential.  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983); *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").  The Corps admits that "[t]ime is required with any new, scientifically based development as well as monitoring and evaluation to show the success and/or failures of the project."  []  And, the monitoring plans in place . . . allow the Corps to reevaluate their efficacy determinations as the stream creation project progresses.

*Aracoma*, 556 F.3d 177, 205.  The Court went on to hold that the Corps' conclusion that the compensatory mitigation plan would offset the adverse effects of the fill activity was not arbitrary, capricious, or otherwise not in accordance with the requirements of the CWA.  *Id.*

In accordance with the Fourth Circuit's conclusion in *Aracoma*, the Corps is entitled to deference regarding its approval of stream creation as an effective means of compensatory mitigation.  In response to a comment from the EPA on October 23, 2006, the Corps explained that Mingo Logan will:

> construct the intermittent and ephemeral stream channels in a manner which mimics the appropriate Rosgen stream type channel based upon the post-mining topographical setting and hydrologic configuration.  To the extent consistent with [SMCRA], a total 43,565 linear feet of intermittent and ephemeral streams would be constructed to incorporate stream bed material similar in size and variety as the pre-existing stream channels being replaced and capable of carrying surface flows.  In order to ensure the likeliness of sustained flow, intermittent channels would be constructed to intercept flow from runoff, as well as that infiltrating the backfill and then flowing along the pavement of the basal seam mined down-dip; thus, intermittent channels would be located on the pavement along the down-dip side of the project area.  To ensure continuity, flow from these created streams would by hydrologically connected to a surface tributary system via outfalls constructed to discharge into natural, currently non-jurisdictional, drainages, thus forming more defined channels (i.e. high gradient tributaries) transporting flow and energy to downstream reaches.

AR, Doc. 572, ROD, App. A. The Corps also addressed Plaintiffs' comments that stream creation is scientifically unproven. The Corps rebutted Plaintiffs' comment that "no one has ever successfully recreated a stream" by noting that Plaintiffs' statement concerned sediment ditches where no attempt had been made to re-create a stream environment. The Corps explained that stream creation is expected to work once a more natural channel is created, increasing channel complexity through the introduction of boulders, logs, and snags, and the restoration of native plant species. AR, Doc. 467, FEIS, p. 2-243.

Though the Corps admits that the success of these streams may require some time for evaluation, the Spruce No. 1 Mine permit requires that "[a]ll mitigation sites must be monitored for a minimum of 10 years." AR, Doc. 572, ROD, p. 34. This monitoring will allow the Corps to reevaluate their efficacy as the stream creation project progresses. In fact, the Corps stated that the monitoring will continue until it has verified that areas within the mitigation area qualify as "waters of the U.S.," and that if any mitigation stream does not meet the definition of "waters of the U.S.," it will not be accepted as mitigation for stream loss and will require additional compensatory mitigation. *Id.,* App. A, pp. 11-18. Thus, the Corps complied with NEPA, and its conclusion that the CMP would offset any adverse effects of the fill activity was not arbitrary, capricious, or otherwise not in accordance with the law.

### 3.    Cumulative Impacts

In Counts One and Two of their Complaint, Plaintiffs further contend that "the Corps has no scientific basis or substantial evidence to conclude that the cumulative environmental effects of the Spruce No. 1 Mine will be insignificant either individually or collectively with other mining projects." Complaint, ¶¶ 33, 36. The Corps is required to consider the cumulative impacts of a proposed project under the CWA and NEPA. NEPA requires the Corps to evaluate "[w]hether the action is related to other actions with individually insignificant

but cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(7).  Under the CWA Guidelines, a project cannot receive a § 404 permit "unless it can be demonstrated that [the project] will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."  40 C.F.R. § 230.1(c).

Plaintiffs also asserted this contention in *Aracoma*.   In that matter, Plaintiffs claimed that the Corps' cumulative impact analysis was faulty in two respects:  (1) the Corps improperly limited the scope of its NEPA analysis to the streams alone, and failed to assess the cumulative impacts of the fills on the valleys themselves; and (2) the Corps' conclusions about cumulative impacts with regard to the streams and watersheds was insufficient.  *See Aracoma*, 556 F.3d at 207.  The Fourth Circuit rejected the first argument, concluding that "the Corps was entitled to deference in its decision to limit the scope of its NEPA analysis to the impacts from the filling of jurisdictional waters."  *Id.*

The Court then considered the sufficiency of the Corps' conclusions regarding the cumulative impacts of the proposed fill projects on the streams and watersheds.  The Court agreed with the district court that a "'mitigated to insignificance' analysis does not alone suffice to demonstrate an absence of cumulatively significant impacts."  *Aracoma*, 556 F.3d at 207-08 (relying on *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225 (5th Cir. 2007)).[8]  The Fourth Circuit concluded, however, that the situation in *Aracoma* was different from the situation in *O'Reilly* because "[w]hile the Corps' finding of no cumulative adverse impacts does lean, to some extent, on mitigation, it is not in the same perfunctory, conclusory way. . . ."  *Aracoma*, 556 F.3d at 208.  The Court noted that the Corps relied in part on both the WVDEP's CWA § 401

---

[8] In *O'Reilly*, the Corps issued a CWA § 404 permit to a developer after issuing a mitigated FONSI.  Regarding the cumulative effects of the project, the Corps stated that "mitigation for impacts caused by the proposed project, possible future project phases, and all Corps permitted projects will remove or reduce e[x]pected impacts."  *O'Reilly*, 477 F.3d 235 (alteration in original) (internal quotation marks omitted).  The court in *O'Reilly* concluded that it could not accept this conclusion from the Corps without further explanation.  *Id.*

certification as to water quality impacts and the SMCRA permitting process. *Id.* As the court recognized, a § 401 certification is considered conclusive, and no independent analysis is required. *See* 33 C.F.R. § 320.4(d). The SMCRA permitting process requires WVDEP to prepare a CHIA of the probable cumulative impact of all anticipated (past, present, and future) mining on the hydrologic balance in the area of the mine, and make a finding that the proposed operation has been designed to prevent material damage to the hydrologic balance outside the permit area. *See* W. Va. Code § 22-3-18(b)(3).

The Court concluded that the permits at issue in Aracoma directly addressed the cumulative impact issue. There, the Corps had explained that:

> while there would be short-term impacts to the aquatic and terrestrial environment as a result of the proposal, it is anticipated the proposed mining activities would have no adverse cumulative environmental impacts within the subwatershed or the overall Cabin Creek watershed. The proposal, if implemented as described, should improve the overall ecological balance of the area. Further, the proposal and resultant mitigation and reclamation requirements are expected to improve the overall health of the Cabin Creek watershed.

*Aracoma*, 556 F.3d at 209. Thus, the Court held that the Corps did not act arbitrarily or capriciously "[b]ecause the Corps has analyzed cumulative impacts in each of the challenged permits and has articulated a satisfactory explanation for its conclusion that cumulative impacts would not be significantly adverse." *Id.*

Here, the Corps concluded that no cumulatively significant impacts would occur to water resources as a result of the Spruce No. 1 Mine permit. *See* AR, Doc. 355, Draft EIS xxi, Chap. 3. In reaching this conclusion, the Corps included an evaluation in each area of: 1) present conditions and probable future conditions if fill activity is not allowed ("No Action Alternative"); 2) the direct and indirect effects that fill activity would have on those conditions ("Applicant's Preferred Alternative" or "Applicant's PA"); and 3) how fill activity would interact with past or future impacts from other activity in the area. *Id.* at 3-1.

Contrary to Plaintiffs' assertion, the Corps' findings are the result of extensive study and analysis of the affected areas. *See* AR, Doc. 355, Draft EIS 3-43 to -129. Just as in *Aracoma*, the Corps' finding relies on both WVDEP's CWA § 401 certification and the SMCRA permitting process. AR, Doc. 355, Draft EIS, p. i; AR, Doc. 325 (WVDEP's 401 certification). As explained by the Fourth Circuit, "[u]nder CWA § 401, the WVDEP must certify that proposed mining activity will not cause or contribute to a violation of state water quality standards," and a § 401 certification is considered conclusive, and no independent analysis of the certification is required." 33 C.F.R. § 320.4(d). *Aracoma*, 556 F.3d 177, 208. Relying on the § 401 certification issued to Mingo Logan for the Spruce No. 1 Mine, the Corps concluded that "[t]here would be no anticipated impact on overall water quality in Spruce Fork and/or its tributaries as a result of the Applicant's PA." AR, Doc. 355, Draft EIS 3-96.

As this shows, the Corps complied with NEPA by analyzing the cumulative impacts of the challenged permits and articulated a reasoned explanation for its conclusion that cumulative impacts would not be significantly adverse. Just as in *Aracoma*, it relied on the § 401 certification and the CHIA prepared by the WVDEP. AR, Doc. 355, Draft EIS, 3-41. Thus, the Corps did not act arbitrarily or capriciously in conducting the required cumulative impact analysis.

**B.**   **The Stream Segments Connecting the Toes of the Valley Fills to the Downstream Sediment Control Ponds Are Within the Jurisdiction of the Corps Under § 404 of the CWA**

In Count Three of their Complaint, Plaintiffs contend that the Corps does not have jurisdiction to issue § 404 permits for the water that is discharged from the toes of the valley fills into the stream segments that connect the toes of the fills to the sediment control ponds because these stream segments are waters of the United States, requiring an NPDES permit pursuant to § 402. Complaint, ¶¶ 38-45. The Fourth Circuit, however, expressly rejected this position in *Aracoma*. Specifically, the Court held that the "stream segments, together with the sediment ponds to which they connect, are unitary 'waste treatment systems,' not 'waters of the United

States,' and that the Corps has not exceeded its § 404 authority in permitting them." *Aracoma*, 556 F.3d at 209.  Consequently, Mingo Logan is entitled to summary judgment on this claim.

> **C.** **The Corps' Analysis of Potential Selenium Contamination, Stormwater Runoff, Flooding, Forest Loss, and Social and Land Use Impacts was not Inadequate.**

In Count Two, Plaintiffs allege that the Corps' analysis of potential selenium contamination, stormwater runoff, flooding, forest loss, and social and land use impacts is "seriously inadequate."  Complaint, ¶ 36.  Contrary to the Plaintiffs' claim, the administrative record documents that the Corps did, in fact, adequately address all of these issues.

The Corps dealt with the Plaintiffs' concerns relating to selenium extensively in its response to comments on the Draft EIS.  The Corps explained that Mingo Logan proposed to test areas for high selenium concentrations prior to mining and to isolate selenium-containing materials in order to prevent contamination of the surface waters.  AR, Doc. 467, FEIS, pp. 2-103, -132, 158, -258 to -262.  Indeed, Mingo Logan's CMP explains that selenium enriched strata will be segregated during mining to prevent contamination.  AR, Doc. 534, CMP, p. 8; AR Doc. 355, Draft EIS, Chap. 2.5.2.5, p. 2-51.

As part of its SMCRA permit application, Mingo Logan performed a Surface Water Runoff Analysis ("SWROA"), which analyzed stormwater runoff and its potential to cause increased flooding.  The SWROA concluded that the Spruce No. 1 mine operations should not cause flooding or increase flooding in the area.  AR, Doc. 276, p. 838, 1751; *see also* AR, Doc. 355, Draft EIS, App. J, p. 6.  The Corps relied on the SWROA in responding to comments concerning flooding. *See e.g.* AR, Doc. 467, FEIS, pp. 2-44, -47 to -52.  Although Plaintiffs commented that the SWROA was flawed, this Court has previously rejected an identical challenge to the Corps' reliance upon similar SWROAs.  *See OVEC v. US ACE*, 479 F.Supp.2d 607, 661 (S.D.W.Va. 2007), rev'd. on other ground, 556 F.3d 177 (4th Cir. 2009) ("The Corps is entitled to its judgment that the SWROAs are an adequate basis for its conclusions.").

Similarly, land use impacts were extensively addressed in Sections 3.8 and 3.11 of the Draft EIS (AR, Doc. 355), and the Corps responded to comments regarding deforestation, explaining that the cumulative impacts of mining are not expected to result in net forest loss.  AR, Doc. 467, FEIS, p. 2-172.  The Corps took a hard look at the cumulative impacts of potential selenium contamination, stormwater runoff, flooding, forest loss, and land use impacts.  There is a rational connection between the facts available and the Corps' decision to issue the 404 permit; therefore, its decision must be affirmed.

## VI.   CONCLUSION

For the foregoing reasons, Intervenor-Defendant Mingo Logan Coal Company, Inc., requests this Court to grant its motion for summary judgment as to all costs in the complaint.

Respectfully submitted,

MINGO LOGAN COAL COMPANY, INC.
By Counsel

s/*Robert G. McLusky*
JAMES R. SNYDER (WVBN 3504)
ROBERT G. McLUSKY (WVBN 2489)
CHRISTOPHER M. HUNTER (WVBN 9768)
JACKSON KELLY, PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
*Counsel for Mingo Logan Coal Company, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL COALITION;
COAL RIVER MOUNTAIN WATCH; and WEST
VIRGINIA HIGHLANDS CONSERVANCY,

        Plaintiffs,

v.                                        Civil Action No. 3:05-0784

UNITED STATES ARMY CORPS OF ENGINEERS;
LIEUTENANT GENERAL CARL A. STROCK,
Commander and Chief of Engineers, U.S. Army
Corps of Engineers; COLONEL WILLIAM E.
BULEN, District Engineer, U.S. Army Corps of
Engineers, Huntington District,

        Defendants,

ARACOMA COAL COMPANY, ELK RUN COAL
COMPANY; INDEPENDENCE COAL COMPANY;
ALEX ENERGY, INC.; MINGO LOGAN COAL
COMPANY, INC.; WEST VIRGINIA COAL
ASSOCIATION; FRASURE CREEK MINING, LLC;
JUPITER HOLDINGS, LLC; LOADOUT, LLC;
TYLER MORGAN, L.L.C.; COAL RIVER MINING, LLC,

        Intervenor-Defendants.

CERTIFICATE OF SERVICE

        I, Robert G. McLusky, do hereby certify that on July 16, 2009, I electronically filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF MINGO LOGAN COAL COMPANY'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Allyn G. Turner | Cynthia J. Morris |
| James S. Crockett, Jr. | Steven E. Rusak |
| Andrew B. McCallister | U.S. Department of Justice |
| Kelly Beth Griffith | Environment & Natural Resources Division |
| Spilman Thomas & Battle, PLLC | Environmental Defense Section |
| P.O. Box 273 | P.O. Box 23986 |
| Charleston, West Virginia 25321-0273 | Washington, DC  20026-3986 |

Terry R. Sammons
Sammons Law Offices
P.O. Box 1747
Gilbert , WV 25621

Stephen E. Roady
Jennifer C. Chavez
Elena Saxonhouse
Earthjustice
1625 Massachusetts Ave., NW, Suite 702
Washington, DC  20036

Joseph M. Lovett
Appalachian Center for the Economy
    and the Environment
P.O. Box 507
Lewisburg, WV  24901

Stephen M. Horn
U.S. Attorney's Office
P.O. Box 1713
Charleston, WV  25326-1713

Diana Leigh Johnson
George A. Patterson, III
Joseph M. Dawley
Leonard B. Knee
Bowles Rice McDavid Graff & Love
P.O. Box 1386
Charleston, WV 25325-1386

Nicholas S. Preservati
Preservati Law Offices
P.O. Box 1431
Charleston , WV 25325

Ruth Ann Storey
U.S. Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, DC  20044-0663

Ann D. Navaro
U.S. Army Corps of Engineers
Great Lakes and Ohio River Division
P.O. Box 1159
Cincinnati, OH  452021

James M. Hecker
Public Justice
1825 K Street, NW, Suite 200
Washington, DC 20006

Edward P. Tiffey
P.O. Box 3785
Charleston , WV 25337-3785


_s/Robert G. McLusky_____
ROBERT G. McLUSKY